# In the
# United States Court of Appeals
# For the Eighth Circuit

LSP Transmission Holdings, LLC,

*Plaintiff-Appellant*,

v.

Nancy Lange, Commissioner and Chair, Minnesota Public Utilities Commission;
Dan Lipschultz, Commissioner, Minnesota Public Utilities Commission;
Matt Schuerger, Commissioner, Minnesota Public Utilities Commission;
John Tuma, Commissioner, Minnesota Public Utilities Commission;
Katie Sieben, Commissioner, Minnesota Public Utilities Commission, and
Mike Rothman, Commissioner, Minnesota Department of Commerce,
each in his or her official capacity,

*Defendants-Appellees*,

*and*

Northern States Power Company d/b/a Xcel Energy, and ITC Midwest, LLC,

*Intervenors-Appellees.*

*On Appeal from the United States District Court for the District of Minnesota*
*Civil No. 0:17-cv-04490 (DWF/HB)*

## BRIEF OF PLAINTIFF-APPELLANT

Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Rachel A. Kitze Collins (#0396555)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

Paul D. Clement
Erin E. Murphy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
(202) 879-5000
paul.clement@kirkland.com
erin.murphy@kirkland.com

*Attorneys for Appellant*
*LSP Transmission Holdings, LLC*

Jason Marisam (#0398187)
Assistant Attorney General
OFFICE OF THE
MINNESOTA ATTORNEY GENERAL
445 Minnesota Street, Suite 1100
St. Paul, MN  55101-2128
(651) 757-1275
jason.marisam@ag.state.mn.us

*Attorney for Defendants-Appellees*

Aaron D. Van Oort (#0315539)
Nathaniel J. Zylstra (#0314328)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
Minneapolis, MN 55402-3901
(612) 766-8726
aaron.vanoort@FaegreBD.com
nathaniel.zylstra@FaegreBD.com

*Attorneys for Intervenor-Appellee Northern States*
*Power Company d/b/a Xcel Energy*

Richard D. Snyder (#0191292)
Lisa M. Agrimonti (#0272474)
Leah C. Janus (#0337365)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
rsnyder@fredlaw.com
lagrimonti@fredlaw.com
ljanus@fredlaw.com

*Attorneys for Intervenor-Appellee*
*ITC Midwest LLC*

## SUMMARY OF THE CASE

This case challenges the constitutionality of the Minnesota right of first refusal statute, Minn. Stat. § 216B.246, which grants incumbent electric transmission owners (who by definition have a pre-existing Minnesota presence) the exclusive right to construct and own new electric transmission lines that are approved by a federally-regulated regional transmission operator and located in Minnesota. The statute prohibits entities like Plaintiff-Appellant LSP Transmission Holdings, LLC ("LSP Transmission") and other out-of-state market participants from competing to build these lines. LSP Transmission brought this case alleging that the statute discriminates against interstate commerce in violation of the Commerce Clause of the United States Constitution.

Defendants moved to dismiss and, after briefing and argument, the district court dismissed the case on the grounds that the Supreme Court's decision in *General Motors, Inc. v. Tracy*, 519 U.S. 278 (1997) ("*Tracy*") forecloses LSP Transmission's claim, and that the statute does not discriminate against or unduly burden interstate commerce. LSP Transmission now appeals that Order.

Appellant requests that this Court grant it 20 minutes of oral argument to address the important constitutional questions that this case presents.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ...................................................................I

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF ISSUES ................................................................. 2

STATEMENT OF THE CASE .......................................................... 4

I.   REGULATORY AND FACTUAL BACKGROUND ................................ 6

     A.   The Federal Power Act ...................................................... 6

     B.   FERC's Efforts to Increase Competition, Efficiency, and
          Transparency in the Transmission Market ......................... 8

          1.   FERC Orders Nos. 888 and 2000 ........................... 8

          2.   FERC Order No. 1000 .......................................... 10

          3.   Incumbent Transmission Owners' Unsuccessful
               Challenges to Order No. 1000 .............................. 11

          4.   MISO Incorporates Order No. 1000 ...................... 12

     C.   Minnesota's Right of First Refusal Statute ..................... 12

II.  PROCEEDINGS BELOW ........................................................ 17

SUMMARY OF THE ARGUMENT .................................................. 21

ARGUMENT ................................................................................. 23

I.   STANDARD OF REVIEW ........................................................ 23

II.  THE MINNESOTA RIGHT OF FIRST REFUSAL
     STATUTE UNCONSTITUTIONALLY DISCRIMINATES
     AGAINST INTERSTATE COMMERCE. ...................................... 23

     A.   The Minnesota Statute Discriminates Against Interstate
          Commerce on Its Face. ................................................... 25

1.    The Statute Expressly Grants a Right of Refusal Only to In-State Entities.............................................25

2.    Protection of In-State "Incumbents" Headquartered Elsewhere Is Still Discrimination Against Interstate Commerce. ..............................................28

B.    The Minnesota Statute Discriminates Against Interstate Commerce in Its Effect. ....................................................33

C.    The Minnesota Statute Discriminates Against Interstate Commerce in Its Purpose. .................................................35

III.    *TRACY* DOES NOT EXCUSE MINNESOTA'S DISCRIMINATION AGAINST INTERSTATE COMMERCE. ........................................................39

A.    *Tracy* Does Not Immunize Minnesota's Statute from Dormant Commerce Clause Scrutiny................................40

B.    LSP Transmission Provides the Same Product as the Incumbent Transmission Owners.......................................45

IV.    NEITHER CONGRESS NOR FERC BLESSED STATE RIGHT OF FIRST REFUSAL LAWS.......................................49

V.    THE STATUTE VIOLATES THE COMMERCE CLAUSE BECAUSE IT UNDULY BURDENS INTERSTATE COMMERCE. ........................................................51

A.    The Statute Burdens LSP Transmission Individually and Interstate Commerce in the Aggregate.............................52

B.    The Statute's Purported Benefits are Entirely Speculative. ......................................................54

CONCLUSION ...................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allco Finance Limited v. Klee*,
    861 F.3d 82 (2d Cir. 2017),
    *cert denied* 138 S. Ct. 926 (2018)......................................................46

*Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*,
    461 U.S. 375 (1983)...................................................2, 42, 54, 55

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984).........................................................................27

*Ben Oehrleins & Sons & Daughter, Inc. v. Henn. Cty.*,
    115 F.3d 1372 (8th Cir. 1997) ....................................................*passim*

*Braden v. Wal-Mart Stores, Inc.*,
    588 F.3d 585 (8th Cir. 2009) ...........................................................23

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*,
    511 U.S. 383 (1994).............................................24, 26, 27, 28

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
    520 U.S. 564 (1997)...............................................................33, 34

*City of Philadelphia v. New Jersey*,
    437 U.S. 617 (1978).........................................................................44

*Colon Health Centers of America, LLC v Hazel*,
    813 F.3d 145 (4th Cir. 2016) ....................................................31, 32

*Cotto Waxo Co. v. Williams*,
    46 F.3d 790 (8th Cir. 1995) ...............................................51, 53, 57

*Dean Milk Co. v. City of Madison, Wis.*,
    340 U.S. 349 (1951).......................................................................27, 28

*F.E.R.C. v. Elec. Power Supply Ass'n*,
    136 S. Ct. 760 (2016).........................................................................6

iv

*Florida Transportation Services, Inc. v. Miami-Dade County*,
   703 F.3d 1230 (11th Cir. 2012) ..............................................30, 31, 57

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*,
   504 U.S. 353 (1992)......................................................................25, 26

*General Motors Corp. v. Tracy*,
   519 U.S. 278 (1997)......................................................................*passim*

*Granholm v. Heald*,
   544 U.S. 460 (2005)......................................................................25, 28

*Healy v. Beer Inst., Inc.*,
   491 U.S. 324 (1989)..............................................................................52

*Hughes v. Talen Energy Mktg., LLC*,
   136 S. Ct. 1288 (2016)..........................................................................50

*IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
   433 F.3d 600 (8th Cir. 2006) ...............................................................35

*Lebanon Farms Disposal, Inc. v. Cty. of Lebanon*,
   538 F.3d 241 (3d Cir. 2008) ................................................................51

*Middle South Energy, Inc. v. Ark. Pub. Serv. Comm'n*,
   772 F.2d 404 (8th Cir. 1985) ...................................................3, 49, 55

*MISO Transmission Owners v. F.E.R.C.*,
   819 F.3d 329 (7th Cir. 2016),
   *cert. denied* 127 S. Ct. 1223 (2017).................................................16

*New Eng. Power Co. v. New Hampshire*,
   455 U.S. 331 (1982)..........................................................................8, 50

*New York v. F.E.R.C.*,
   535 U.S. 1 (2002).............................................................................7, 8

*Noble Sys. Corp. v. Alorica Cent., LLC*,
   543 F.3d 978 (8th Cir. 2008) ...............................................................23

*North Dakota v. Heydinger*,
   825 F.3d 912 (8th Cir. 2016) ...........................................................8, 55

*Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*,
    511 U.S. 93 (1994)................................................................................24

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970).......................................................................*passim*

*Pioneer Military Lending, Inc. v. Manning*,
    2 F.3d 280 (8th Cir. 1993) ..........................................................52, 53

*Pub. Utils. Comm'n of R.I. v. Attelboro Steam & Elec. Co.*,
    273 U.S. 83 (1927)...........................................................................6, 7

*S.C. Pub. Serv. Auth. v. F.E.R.C.*,
    762 F.3d 41 (D.C. Cir. 2014)...............................................7, 8, 10, 11

*S.D. Farm Bureau, Inc. v. Hazeltine*,
    340 F.3d 583 (8th Cir. 2003) ...........................................2, 36, 39, 49

*SDDS, Inc. v. State of S.D.*,
    47 F.3d 263 (8th Cir. 1995) .................................................24, 34, 37

*Smithfield Foods, Inc. v. Miller*,
    367 F.3d 1061 (8th Cir. 2004) .......................................................35

*South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080 (2018)....................................................................24

*Southern Pacific Co. v. Arizona ex rel. Sullivan*,
    325 U. S. 761 (1945)........................................................................30

*Southern Union Co. v. Missouri Public Service Commission*,
    289 F.3d 503 (8th Cir. 2002) .....................................................55, 56

*Town of Southold v. Town of East Hampton*,
    477 F.3d 38 (2d Cir. 2007) .............................................................51

*U & I Sanitation v. City of Columbus*,
    205 F.3d 1063 (8th Cir. 2000) ...................................................*passim*

*United Haulers Ass'n, Inc. v. Oneida-Herkimer*
    *Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007).................................................................30, 49

*Walgreen Co. v. Rullan*,
  405 F.3d 50 (1st Cir. 2005) .................................................................. 31

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ........................................................................... 34

**Statutes**

16 U.S.C. § 824a(a) ............................................................................ *passim*

28 U.S.C. § 1291 .......................................................................................... 1

42 U.S.C. § 1983 .......................................................................................... 1

Art. I, § 8, cl. 3 .................................................................................. *passim*

Minn. Stat. § 216B.01 ................................................................................ 56

Minn. Stat. § 216B.02 ....................................................................... *passim*

Minn. Stat. § 216B.243 .............................................................................. 38

Minn. Stat. § 216B.246 ...................................................................... *passim*

Minn. Stat. § 216B.2425 ............................................................................ 38

Minn. Stat. § 216E.03 ................................................................................ 38

**Other Authorities**

Federal Rule of Appellate Procedure 4(a) ................................................ 1

# JURISDICTIONAL STATEMENT

The United States District Court for the District of Minnesota had jurisdiction over this action under 42 U.S.C. § 1983. This Court has jurisdiction under 28 U.S.C. § 1291 and Federal Rule of Appellate Procedure 4(a). The Order granting Defendants' Motions to Dismiss was entered on June 21, 2018. LSP Transmission timely filed its Notice of Appeal on July 20, 2018.

<u>**STATEMENT OF ISSUES**</u>

1.     Did the district court err by granting Appellees' motions to dismiss on the grounds that the Minnesota right of first refusal statute, Minn. Stat. § 216B.246, does not discriminate against interstate commerce on its face, in its purpose, or in its effect?

The most apposite cases and statutory provisions are:

- *Ben Oehrleins & Sons & Daughter, Inc. v. Henn. Cty.*, 115 F.3d 1372 (8th Cir. 1997)

- *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583 (8th Cir. 2003)

2.     Did the district court err by granting Appellees' motions to dismiss on the ground that LSP Transmission's claim is foreclosed by *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)?

The most apposite cases and statutory provisions are:

- *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)

- *Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375 (1983)

3.     Did the district court err by granting Appellees' motions to dismiss on the ground that the Minnesota right of first refusal statute, Minn. Stat. § 216B.246, does not unduly burden interstate commerce?

The most apposite cases and statutory provisions are:

- *U & I Sanitation v. City of Columbus*, 205 F.3d 1063 (8th Cir. 2000)

- *Middle South Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404 (8th Cir. 1985)

530059.1

## STATEMENT OF THE CASE

In 2011, the Federal Energy Regulatory Commission ("FERC") issued an order eliminating a federal practice of allowing incumbent transmission line owners a right of first refusal to construct new transmission lines used on the interstate power grid, concluding that such rights are anti-competitive and harmful to consumers. In 2012, Minnesota responded by enacting a statute that gives incumbent transmission line owners in Minnesota the very right of first refusal that FERC rejected. Minnesota's statute makes this right available *only* to an electric utility or independent transmission company that "owns, operates, and maintains an electric transmission line *in this state*." Minn. Stat. § 216B.246, Subd. 1(c) (emphasis added). By its express terms, the statute discriminates in favor of incumbents (who by definition have a Minnesota presence) and against interstate commerce. It precludes out-of-state companies from competing for the right to build transmission lines in Minnesota.

LSP Transmission is an independent transmission company that would like to compete for federally-approved transmission projects in Minnesota. But Minnesota's right of first refusal ("ROFR") statute precludes LSP Transmission from doing so; because LSP Transmission does not already own transmission lines in Minnesota, it can be—and indeed already has been—precluded from competing if an in-state incumbent invokes its right of first refusal. LSP Transmission

brought this case alleging that the ROFR statute discriminates against and/or unduly burdens interstate commerce in violation of the Commerce Clause.

The district court dismissed LSP Transmission's suit, inexplicably concluding that the statute does not discriminate against interstate commerce either on its face or in its purpose or effects. The court further concluded that, even if the statute did discriminate against interstate commerce, the Supreme Court's decision in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), excuses any discrimination against interstate commerce that is in any way related to public utilities. The district court was wrong on both counts. The ROFR statute plainly discriminates against out-of-state companies on its face, and just as plainly discriminates against them in its effects and its purpose. By design, the statute favors in-state transmission companies at the expense of out-of-state would-be competitors, and that discrimination is in no way excused by *Tracy*. For one thing, unlike the law in *Tracy*, the ROFR statute does not draw a line between public utilities and other companies. The line it draws follows the state border and separates those who operate in-state—whether as public utilities or as independent transmission companies—and those who do not. Moreover, unlike in *Tracy*, the law does not treat two distinct products differently; it instead precludes out-of-state companies from competing to provide the very same product. Nothing in *Tracy* exempts such blatant discrimination against out-of-state competition.

At a minimum, the district court erred by dismissing the case rather than allowing LSP Transmission to proceed to discovery. While Minnesota's express discrimination against out-of-state entities should suffice to render its ROFR statute unconstitutional as a matter of law, LSP Transmission at the very least should have been allowed to develop evidence on the law's discriminatory effects and purpose, and on the substantial burdens it imposes on interstate commerce. Indeed, it is hard to imagine how a statute that codifies a practice that FERC deemed anti-competitive and detrimental to consumers could be summarily upheld without considering any evidence about its effects on interstate commerce. For any or all of those reasons, this Court should reverse.

## I.    REGULATORY AND FACTUAL BACKGROUND

### A.    <u>The Federal Power Act</u>

For nearly a century, courts have grappled with the limits of state power over the interstate transmission market. In the early 20th Century, "state or local utilities controlled their own power plants, transmission lines, and delivery systems, operating as vertically integrated monopolies in confined geographic areas." *F.E.R.C. v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 768 (2016). Although states possessed broad power to regulate these systems, in 1927, the Supreme Court found that Rhode Island's attempt to regulate the rates of electricity sold across state lines violated the Commerce Clause. *Pub. Utils. Comm'n of R.I.*

*v. Attelboro Steam & Elec. Co.*, 273 U.S. 83, 89 (1927). The Court held that the regulation imposed a "direct burden upon interstate commerce" and that only Congress had the power to regulate interstate transactions. *Id.*

In 1935, Congress enacted the Federal Power Act ("FPA") to fill the regulatory gap *Attelboro* created. *See New York v. F.E.R.C.*, 535 U.S. 1, 6 (2002). The FPA charged FERC (formerly the Federal Power Commission) with providing "effective federal regulation of the expanding business of transmitting and selling electric power in interstate commerce." *Id.* (quotation omitted). The Act gave FERC exclusive jurisdiction over the transmission of electricity in interstate commerce and the sale of electric energy at wholesale in interstate commerce. *Id.* at 6-7. The FPA was later amended to direct FERC to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy," and assigned FERC the "duty" to "promote and encourage such interconnection and coordination." 16 U.S.C. § 824a(a); *S.C. Pub. Serv. Auth. v. F.E.R.C.*, 762 F.3d 41, 49 (D.C. Cir. 2014). The FPA also prohibits unreasonable rates and undue discrimination with respect to any transmission or sale subject to the Commission's jurisdiction, and empowers FERC to eliminate such practices. *New York*, 535 U.S. at 7.

The FPA largely left to the states matters they had traditionally regulated, including the siting and permitting of facilities used to generate electricity or

facilities used in local distribution or for wholly *intra*state transmission. *Id.* at 22. But while states may regulate in these areas, courts have repeatedly emphasized that all state regulations of utilities remain subject to the limitations imposed by the Commerce Clause. *See North Dakota v. Heydinger*, 825 F.3d 912, 914 (8th Cir. 2016) (citing *New York*, 535 U.S. at 19-23; *New Eng. Power Co. v. New Hampshire*, 455 U.S. 331, 340-41 (1982)).

**B.     FERC's Efforts to Increase Competition, Efficiency, and Transparency in the Transmission Market**

Over time, new, smaller electricity generators emerged to compete with vertically integrated utilities, and interconnected electric systems and long-distance transmission became increasingly prevalent and economical. *See S.C. Pub. Serv. Auth.*, 762 F.3d at 50. But traditional vertically integrated utilities attempted to use their control over transmission lines to retain their monopolies and market shares by refusing to deliver wholesale energy produced by these emerging generators, or by making their transmission lines available to competitors "only on inferior terms." *Id.* In response, FERC enacted a series of orders to break down barriers, combat these monopolistic and protectionist tendencies, and promote the development of competitive markets.

**1.     FERC Orders Nos. 888 and 2000**

In 1996, FERC promulgated Order No. 888, which required each electric transmission provider subject to FERC's jurisdiction to unbundle its wholesale

generation and transmission services and allow access to transmission on a non-discriminatory basis. *See id.* The goal of this order was to open the electric grid to all sources of electric power, thereby allowing the new, smaller generators access to transmission on an equal basis. *See id.*; APP4 at ¶¶11-12. In 1999, FERC followed up with Order No. 2000, which encouraged owners of transmission facilities operating in interstate commerce to cede operation of their transmission systems to independent system operators or regional transmission organizations (collectively, "ISOs"). APP4 at ¶13. ISOs are nongovernmental agencies vested with authority, through tariffs with their members, to operate and plan the expansion of transmission grids on a regional and interregional basis. APP5 at ¶¶14-15.

The ISO for the Midwest is the Midcontinent Independent System Operator, Inc. ("MISO"). MISO's tariff establishes the terms on which members may participate in planning, building, expanding, and/or operating the electric transmission grids within MISO's region. APP5 at ¶16. MISO's 50-plus transmission-owner members currently own over 49,000 miles of transmission line spanning 15 states, including Minnesota, and parts of Canada. APP5 at ¶16. While states retain their traditional authority over siting, routing, and permitting transmission, within this region, it is MISO, not the states, that decides whether to approve transmission lines that are part of the MISO grid.

## 2. FERC Order No. 1000

In June 2010, FERC recommended additional reforms to encourage competition, improve transmission planning and cost allocation, and "ensure that Commission jurisdictional services are provided at rates, terms and conditions that are just and reasonable and not unduly discriminatory or preferential." *See S.C. Pub. Serv. Auth.*, 762 F.3d at 52. In 2011, FERC issued Order No. 1000, which, among other key reforms, required ISOs to eliminate ROFR provisions for regional transmission facilities from their FERC-approved tariffs and agreements. APP7 at ¶21.

Before Order No. 1000, most ISO formation documents, including MISO's, contained ROFR provisions that gave incumbent transmission owners the exclusive right to construct new transmission facilities in their existing service areas, even if the proposal for new construction came from a third party. APP5 at ¶17, APP7 at ¶21. In Order No. 1000, FERC found that "it is not in the economic self-interest of incumbent transmission providers to permit new entrants to develop transmission facilities, even if proposals submitted by new entrants would result in a more efficient or cost-effective solution to the region's needs." APP82. FERC further found that ROFR provisions discourage non-incumbent transmission developers from investing in transmission, because a non-incumbent would not want to risk the significant investment necessary to develop a transmission project

if it would have to hand the project over to an incumbent once the project is approved.  APP8 at ¶24; APP82.  FERC therefore concluded that ROFRs undermine the identification and evaluation of more efficient and/or cost-effective solutions to regional transmission needs, and deprive customers of the benefits and savings that competition produces.  APP8 at ¶¶25-26.

### 3.   Incumbent Transmission Owners' Unsuccessful Challenges to Order No. 1000

Unsurprisingly, incumbent transmission owners (including Intervenor-Defendant Xcel) vigorously objected to Order No. 1000 and the elimination of ROFR provisions.  *See, e.g.*, APP65-66, 68.  In the lawsuits that followed, the D.C. Circuit affirmed FERC's authority under the FPA to order the removal of ROFRs from ISO tariffs, finding:

> [B]asic economic principles make clear that rights of first refusal are likely to have a direct effect on the costs of transmission facilities because they erect a barrier to entry: namely, non-incumbents are unlikely to participate in the transmission development market because they will rarely be able to enjoy the fruits of their efforts.

*S.C. Pub. Serv. Auth.*, 762 F.3d at 75.  The court further found that substantial evidence supported FERC's findings that "rights of first refusal posed a barrier to entry that made the transmission market inefficient, that transmission facilities would therefore be developed at higher-than-necessary cost, and that those amplified costs would be passed on to transmission customers." *Id.* at 76-77.

## 4.    MISO Incorporates Order No. 1000

Following Order No. 1000, MISO revised its tariff to remove the ROFR. APP14 at ¶40.  MISO also created a competitive solicitation process to select the developer for regionally cost-allocated projects.  APP14 at ¶40.  Two types of projects currently qualify for competitive bidding under MISO's tariff.  The first are Multi Value Projects, which seek to support a range of public policies and/or provide widespread reliability, public policy, and economic benefits across MISO. APP14 at ¶42. The costs of Multi Value Projects are 100 percent allocated system-wide, meaning that all MISO participants (i.e., all 15 states and parts of Canada) share each project's costs.  APP14 at ¶42.  The second are Market Efficiency Projects, which seek to reduce market congestion.  APP15 at ¶43.  Under MISO's tariff, 80 percent of the costs of Market Efficiency Projects are distributed to local resource zones (i.e., the areas benefitted by the project), commensurate with the expected benefit, which may cross multiple states, and the remaining 20 percent are allocated system-wide.  APP15 at ¶43.  Thus, wherever these projects are located, whether interstate or wholly intrastate, at least part of their costs are allocated across the entire MISO region.  APP15 at ¶44.

### C.    Minnesota's Right of First Refusal Statute

In the wake of Order No. 1000, incumbent utilities dissatisfied with the loss of their ROFRs in FERC-approved transmission tariffs began lobbying states to

enact their own ROFR statutes to protect them from competition with out-of-state developers. Minnesota was one of those states. In early 2012, legislation was introduced in the Minnesota House and Senate to "establish[] a right of first refusal for Minnesota utilities and electric transmission owners regarding the construction and ownership of electric transmission lines connecting to their own facilities." APP16-17 at ¶¶50-51.

Senator Brown, who introduced the bill, described it as a direct response to Order No. 1000 and its elimination of "a federally recognized right of first refusal." APP34. A representative from Xcel Energy, the largest transmission line owner in the state, *see* APP22 at ¶67, testified in support of the bill and argued that the ROFR statute is necessary to keep transmission lines in the hands of purportedly more responsive in-state companies, and to keep companies that are not subject to in-state rate regulation from reaping the benefits of federally approved rates. APP34-36. A representative from Missouri River Energy Services, another incumbent transmission owner, described the bill as giving "Minnesota utilities … the first opportunity to invest in federal regionally planned transmission projects," APP37, and urged the Senate Committee not "to encourage third party transmission owners to buy and build transmission service in Minnesota." APP36.

LS Power Development's Vice President Sharon Segner testified against the bill. She explained that ROFRs create barriers to entry by discouraging

independent transmission owners from participating in the transmission planning process. APP40. She further testified that removing ROFRs benefits consumers by promoting competition for transmission projects and, in turn, reducing their costs. APP39-40. She also explained that concerns about out-of-state companies trying to reap higher rates of return are misplaced, and that concerns about local control can be addressed by requiring transmission companies to become state public utilities, a step that other states have taken. APP39-42.

The bill moved out of Committee, was passed by the Senate and House, and was signed into law on April 18, 2012. Codified as Minn. Stat. § 216B.246, the statute states:

> An incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent transmission owner.

Minn. Stat. § 216B.246, Subd. 2. The statute defines "incumbent electric transmission owner" as:

> [A]ny public utility that owns, operates, and maintains an electric transmission line *in this state*; any generation and transmission cooperative electric association; any municipal power agency; any power district; any municipal utility; or any transmission company as defined under section 216B.02, subdivision 10.

Minn. Stat. § 216B.246, Subd. 1(c) (emphasis added). Section 216B.02, in turn, defines a "transmission company" as an entity "engaged in the business of owning, operating, maintaining, or controlling *in this state* equipment or facilities for furnishing electric transmission service in Minnesota." Minn. Stat. § 216B.02, Subd. 10 (emphasis added).

The statute thus, by its terms, singles out "transmission line[s] … approved for construction in a federally registered" ISO—i.e., lines for which costs are allocated among multiple states, not just Minnesota. And the statute identifies as "incumbents" only entities that have in-state transmission facilities—without regard to whether they are vertically integrated public utilities or independent transmission companies. To exercise its ROFR, an incumbent need only give notice within 90 days of MISO's approval of a regional transmission project to the Minnesota Public Utilities Commission ("PUC") of its intent to construct, own, and maintain the new line. Minn. Stat. § 216B.246, Subd. 3(a). If the incumbent does so, then it preempts all would be competitors, be they independent transmission companies or vertically intergrated utilities.

After Minnesota and several other MISO states enacted ROFR statutes, MISO revised its tariff to recognize the existence of these state-created ROFRs. APP15 at ¶45. FERC initially rejected this revision, but upon rehearing, it concluded that it was not prohibited by Order No. 1000 because the new language

"merely acknowledges" state and local laws and "does not create a federal right of first refusal." APP124. FERC further held that it would be inefficient for MISO to consider competitive proposals for a project, if, pursuant to state law, the project would automatically be assigned to the incumbent. APP117-18; APP8 at ¶26.

Notably, however, FERC Chair Norman Bay filed a concurring opinion questioning the constitutionality of state ROFR statutes:

> I write separately to note that the Constitution limits the ability of states to erect barriers to interstate commerce. State laws that discriminate against interstate commerce—that protect or favor in-state enterprise at the expense of out-of-state competition—may run afoul of the dormant commerce clause.

APP131-32. Bay made a point of noting that "[t]he Commission's order today does not determine the constitutionality of any particular state right-of-first-refusal law," and that "[t]hat determination, if it is made, lies with a different forum, whether state or federal court." APP132.

The Seventh Circuit upheld FERC's decision as a reasonable exercise of its discretion, concluding that "it would be a waste of time for MISO to conduct a protracted competitive bidding and evaluation process when the incumbent transmission company has a right of first refusal conferred by state law." *MISO Transmission Owners v. F.E.R.C.*, 819 F.3d 329, 336-37 (7th Cir. 2016), *cert. denied* 127 S. Ct. 1223 (2017). But the Seventh Circuit had no occasion to consider whether state ROFR laws are constitutional.

## II.    PROCEEDINGS BELOW

Plaintiff LSP Transmission is an independent transmission company that owns and operates more than 500 miles of transmission lines in two states and is in the process of developing transmission projects in six additional states across the country.  APP6 at ¶19.  Since Order No. 1000 and the development of competitive processes to build regional transmission lines, LSP Transmission has been a highly successful competitor, due to its ability to offer binding cost caps and multiple other cost-reduction factors beneficial to ratepayers.  APP12-13 at ¶35.

For example, after Order No. 1000, LSP Transmission's subsidiary, Republic Transmission, was selected by MISO to build the Duff-Coleman EHV 345 kV Transmission Project, which will run from southern Indiana to Western Kentucky.    APP13  at  ¶¶36-37.    MISO  found  that  Republic  Transmission's proposal provided the greatest overall value of the eleven competing proposals, including those from major utilities such as affiliates of Intervenor-Defendants ITC Midwest  and  Xcel  Energy.    APP13  at  ¶37.    MISO  noted  that  "Republic Transmission was comparatively advantageous and exhibited the best balance of high-quality design and competitive cost, best-in-class project implementation, and top-tier  plans  for  operations  and  maintenance."    Dkt. 61-1  at  628.    LSP Transmission has thus demonstrated that it is an active and successful competitor in the interstate transmission market, including in the MISO region.  APP14 at ¶39.

LSP Transmission is foreclosed, however, from competing for transmission projects in Minnesota because of the ROFR law. Indeed, LSP Transmission has already experienced the direct effects of the law. In 2016, MISO approved the Huntley-Wilmarth transmission line project, a 40-mile transmission line that will connect Xcel Energy's existing Wilmarth Substation north of Mankato, Minnesota, and a proposed Huntley substation south of Winnebago, Minnesota, which will be owned by ITC Midwest. APP23 at ¶70. The project was designated a Market Efficiency Project, which means that its costs are partially allocated across the MISO region—i.e., to states other than just Minnesota, such as Iowa, Wisconsin, and the Dakotas—and it would normally have been subject to MISO's competitive solicitation process. APP23 at ¶71. If given the opportunity, LSP Transmission, through its affiliate, would have competed for the Huntley-Wilmarth Project. APP24 at ¶73-76. Due to the ROFR statute, however, MISO determined that the project was not eligible for competitive bidding. APP23 at ¶71. On March 3, 2017, Xcel Energy and ITC Midwest submitted a notice to the PUC of their intent to construct, own, and maintain the Huntley-Wilmarth line. APP24 at ¶75.

Having been barred from competing for MISO-approved transmission projects in Minnesota, LSP Transmission initiated this action to challenge the constitutionality of the Minnesota ROFR statute under the Commerce Clause, arguing it impermissibly discriminates against and unduly burdens interstate

commerce.  On September 29, 2017, LSP Transmission brought suit against the Commissioner and Chair of the Minnesota PUC, the other Commissioners of the PUC, and the Commissioner of the Minnesota Department of Commerce (collectively, "State Defendants").  ITC Midwest, LLC ("ITC Midwest") and Northern States Power Company d/b/a Xcel Energy ("Xcel Energy") intervened as Defendants, and all Defendants moved to dismiss the Complaint.

After briefing and argument, the United States submitted a Statement of Interest supporting LSP Transmission's argument that Minnesota's statute unconstitutionally discriminates against interstate commerce.  As the United States explained, "Minnesota's right of first refusal statute fails both the antidiscrimination test and the undue burden test because it raises entry barriers, segments the interstate market in developing transmission lines, favors in-state incumbents, and causes substantial anticompetitive effects in interstate commerce." Dkt. 70 at 10.

On June 21, 2018, the district court issued an order granting Defendants' motions to dismiss.  The court began by declining to consider the United States' statement of interest because it was untimely, but summarily noting, "consideration of the statement would not alter the Court's decision."  ADD11.  Invoking the Supreme Court's decision in *Tracy*, the court then concluded that "the dormant Commerce Clause does not apply" to Minnesota's statute because "[m]any of the

entities that own existing transmission facilities are regulated public utilities."
ADD18. The court also concluded that the statute does not discriminate against
interstate commerce because it also bars in-state non-incumbents from competing
with incumbents, and because a handful of the protected incumbents are
headquartered out of state. ADD20-21. And the court rejected as a matter of law
LSP Transmission's argument that the statute unduly burdens interstate commerce,
conducting the *Pike* balancing test without the benefit of any discovery,
evidentiary presentation, or discussion of the United States' views on the question.
ADD22-25.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The Minnesota ROFR statute discriminates against interstate commerce three times over. The statute discriminates against interstate commerce *on its face* by explicitly granting a right of first refusal to build new regional transmission lines *only* to entities with an existing physical presence in Minnesota. The statute discriminates against interstate commerce *in its effects* by granting entities with an in-state presence a preference at the direct expense of out-of-state entities that lack such a presence and by predominantly favoring entities that are headquartered in Minnesota. And the statute discriminates against interstate commerce *in its purpose*, as it was enacted to ensure that MISO-approved transmission projects would remain with the favored Minnesota companies. As the United States opined below, the statute is subject to a virtually *per se* rule of invalidity, a demanding standard that it plainly cannot survive.

Rather than subject the statute to the exacting scrutiny required by both Supreme Court and Eighth Circuit precedent, the district court concluded that the statute is not subject to dormant Commerce Clause scrutiny *at all*, reading the Supreme Court's decision in *Tracy* to exempt from the dormant Commerce Clause any law that favors "public utilities." That is not what *Tracy* holds, and in all events, Minnesota's ROFR statute does not grant a preference to public utilities. It instead grants a right of first refusal to *every* entity that has transmission lines in

Minnesota, regardless of whether the company is a vertically integrated public utility (like Intervenor-Defendant Xcel Energy) or an independent, non-utility company that provides only transmission services (like Intervenor-Defendant ITC Midwest). Moreover, unlike the statute in *Tracy*, Minnesota's law does not treat two different products in two different markets differently, but rather treats two *competitors* for the *same* project differently depending on whether they have an in-state presence. Simply put, Minnesota's ROFR statute is nothing like the tax exemption at issue in *Tracy*.

The district court's mistaken view that *Tracy* wholly exempts from Commerce Clause scrutiny any law having anything to do with public utilities infected not just its analysis of whether Minnesota's statute discriminates against interstate commerce, but also its analysis of whether the statute unduly burdens interstate commerce. Indeed, at times, the court even went so far as to describe fundamentally different statutes that survived dormant Commerce Clause challenges as "substantially similar" to Minnesota's law for no other reason than because they involved public utilities.

The district court's decision cannot stand because it is the product of profoundly mistaken views of both the law and the facts. The discrimination against interstate commerce is so open and notorious that the invalidity of the Minnesota statute requires no further factual development. But even if the statute

did not discriminate against interstate commerce on its face, in its effects, and in its purpose, the district court at a minimum should have allowed LSP Transmission to develop a record on what local benefits (if any) beyond eliminating competition from out-of-state companies are served by a ROFR statute that the United States has deemed anticompetitive and an excessive burden on interstate commerce.

## ARGUMENT

## I.  STANDARD OF REVIEW

This Court reviews an order dismissing a case *de novo*, accepting as true the complaint's factual allegations and drawing all reasonable inferences in favor of the non-moving party. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 591 (8th Cir. 2009).  A court reviewing an order of dismissal may also "consider some public records, materials that do not contradict the complaint, or materials that are necessarily embraced by the pleadings." *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008).

## II.  THE MINNESOTA RIGHT OF FIRST REFUSAL STATUTE UNCONSTITUTIONALLY DISCRIMINATES AGAINST INTERSTATE COMMERCE.

The Commerce Clause grants Congress the power "to regulate commerce among the several states." Art. I, § 8, cl. 3.  As the Supreme Court recently affirmed, the Commerce Clause "reflects a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward

economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2089 (2018). To that end, the Supreme Court has long held that this affirmative grant of power to Congress contains a negative restriction on states' power to regulate interstate commerce. *Id.*

Under the Court's Commerce Clause jurisprudence, if a state or local law "discriminates against interstate commerce in favor of local business or investment, it is per se invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Ben Oehrleins & Sons & Daughter, Inc. v. Henn. Cty.*, 115 F.3d 1372, 1383 (8th Cir. 1997) ("*Ben Oehrleins*") (citing *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994)). For purposes of the Commerce Clause, discrimination is not limited to facial discrimination; it simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter. *Id.* (citing *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Or.*, 511 U.S. 93, 99 (1994)). Accordingly, if a law discriminates against interstate commerce on its face, in its effects, or in its purpose, it is virtually *per se* invalid because such a law almost always reflects a protectionist attempt to benefit local businesses at the expense of out-of-state businesses. *Id.* (citing *SDDS, Inc. v. State of S.D.*, 47 F.3d

263, 267 (8th Cir. 1995)); *see also Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Natural Res.*, 504 U.S. 353, 361 (1992).

The Minnesota ROFR statute is subject to a virtually *per se* rule of invalidity as the statute discriminates against interstate commerce on its face, in its effects, and in its purpose. The statute plainly does not fall into the very "narrow class of cases" in which the state has no means other than discrimination against interstate commerce "to advance a legitimate local interest," *Ben Oehrleins*, 115 F.3d at 1383, as it is a bare attempt to insulate in-state business from out-of-state competition.

## A.  The Minnesota Statute Discriminates Against Interstate Commerce on Its Face.

### 1.  The Statute Expressly Grants a Right of Refusal Only to In-State Entities.

The Minnesota ROFR statute discriminates against interstate commerce on its face because it singles out in-state entities for preferential treatment; namely, the opportunity to build new MISO-approved transmission lines in Minnesota. *See Granholm v. Heald*, 544 U.S. 460, 474 (2005) (finding unconstitutional a state statute that "grants in-state wineries access to the State's consumers on preferential terms"). Under the statute, if MISO approves a transmission project that connects to an incumbent transmission owner's facilities, that incumbent has an automatic right of first refusal to build the project. The statute defines an "incumbent electric

transmission owner" as an entity that "owns, operates, and maintains an electric transmission line *in this state*," Minn. Stat. § 216B.246, Subd. 1(b), thereby excluding any out-of-state transmission company.[1] By its plain terms, the statute thus "discriminates against interstate commerce in favor of local business or investment." *Ben Oehrleins*, 115 F.3d at 1383.

That makes the ROFR law virtually indistinguishable from the countless "flow control" laws that the Supreme Court and this Court have struck down for decades. Flow control ordinances generally operate by requiring all solid waste collected in a particular region to be delivered to a designated transfer station or processing facility. *See id.* at 1376. State and local governments have frequently tried to justify such laws on the ground that the economic viability of the facility depends on an adequate supply of waste. *See id.* at 1385. Yet courts nonetheless routinely invalidate such laws under the Commerce Clause because, by "grant[ing] an absolute preference to a particular local interest at the expense of all others," *id.*, they "depriv[e] competitors, including out-of-state firms, of access to a local market," *C & A Carbone, Inc.*, 511 U.S. at 386. *See Fort Gratiot Sanitary Landfill*

---

[1] The other entities included in the definition of "incumbent electric transmission owner" necessarily already own and operate facilities in the state: a "cooperative electric association; any municipal power agency; any power district; any municipal utility," or a "transmission company," Minn. Stat. § 216B.246, Subd. 1(b), which is defined by cross-reference to another statute that covers only entities operating "in this state," *see* Minn. Stat. § 216B.02, Subd. 10.

*Inc.*, 504 U.S. at 361 (flow control statutes "afford[] local waste producers complete protection from competition from out-of-state waste producers").

The ROFR statute operates in the same way. It secures lucrative business opportunities—the construction of MISO-approved transmission lines—for favored local operators, thus preventing out-of-state entities from competing for such projects. That is precisely what the Commerce Clause prohibits states from doing. "It has long been the law that States may not build up [their] domestic commerce by means of unequal and oppressive burdens upon the industry and business of other States." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 272 (1984); *see also Dean Milk Co. v. City of Madison, Wis.*, 340 U.S. 349, 354 (1951) ("In thus erecting an economic barrier protecting a major local industry against competition from without the state, Madison plainly discriminates against interstate commerce.").

Contrary to the district court's contentions, *see* ADD20-21, it makes no difference that Minnesota's law disadvantages not just out-of-state entities, but in-state non-incumbents as well. The Supreme Court rejected precisely that argument in *C & A Carbone*, finding a flow control ordinance that favored a single processor "no less discriminatory because in-state or in-town processors are also covered by the prohibition." 511 U.S. at 391; *see also Dean Milk*, 340 U.S. at 354 n.4 ("It is immaterial that Wisconsin milk from outside the Madison area is subjected to the

same proscription as that moving in interstate commerce."). As *C & A Carbone* and *Dean Milk* confirm, what matters is that the state has deprived out-of-state entities of access to its markets by diverting business to "favored operator[s]." *C & A Carbone, Inc.*, 511 U.S. at 391. Whether Minnesota has frozen out some in-state would-be-competitors in the process is immaterial. "States may not enact laws that burden out-of-state [entities] simply to give a competitive advantage to in-state businesses." *Granholm*, 544 U.S. at 472. By doing so, Minnesota's statute discriminates against interstate commerce on its face.

2. **Protection of In-State "Incumbents" Headquartered Elsewhere Is Still Discrimination Against Interstate Commerce.**

The district court disregarded the statute's facial discrimination against out-of-state competitors because some of the favored incumbents with in-state operations are headquartered out of state. *See* ADD21. But this Court has already rejected the notion that a company's headquarters dictates whether it should be considered in-state for Commerce Clause purposes. What matters for purposes of determining whether an entity is in-state is not where it is headquartered, but whether it has a meaningful in-state presence. A statute limiting commercial opportunities to companies that already employ Minnesota workers or already pay Minnesota taxes would be an obvious Commerce Clause violation, even if some of the favored "incumbents" were headquartered elsewhere. The result is no different

when incumbent status turns on whether someone already owns transmission facilities in Minnesota.

That conclusion flows directly from this Court's decision in *Ben Oehrleins*, which involved an ordinance that required all designated waste to be delivered to a county-designated transfer station or processing facility. 115 F.3d at 1376. The Court held the ordinance unconstitutional to the extent it prohibited waste from being transported out of the state, but upheld the ordinance as applied to waste transported solely *within* the state, concluding that wholly in-state application did not discriminate against *inter*state commerce. *Id.* at 1384-87. In reaching that conclusion, the Court rejected the argument that "an out-of-state concern that permanently locates an operation within the state is still an 'out-of-state' entity" for Commerce Clause purposes. *Id.* at 1386. For instance, "[a] Delaware corporation doing business in Minnesota could not argue that it is discriminated against by Minnesota laws that apply equally to all businesses operating in the state." *Id.* at 1386-87.

The same rationale holds true here. Just as a company that is headquartered out of state but has permanent in-state operations is an "in-state" entity when it comes to Commerce Clause analysis, a state cannot avoid violating the Commerce Clause by pointing to benefits it provides to a select few corporations with headquarters outside of Minnesota that have pre-existing in-state operations.

Again, what matters for Commerce Clause purposes is not where a company is headquartered, but whether it has meaningful connections with the state. Indeed, one of the animating concerns of the dormant Commerce Clause is that "when 'the burden of state regulation falls on interests outside the state, it is unlikely to be alleviated by the operation of those political restraints normally exerted when interests within the state are affected.'" *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 345 (2007)) (quoting *S. Pacific Co. v. Ariz. ex rel. Sullivan*, 325 U.S. 761, 767-68, n.2 (1945)). Favoring entities that already operate in state but are headquartered "out-of-state" raises all the same concerns.

This is a case in point: Even if an incumbent happens to be headquartered or incorporated out-of-state, it still has an active business operation in Minnesota, has facilities and employees here, and therefore has a firm base from which to wield political influence in Minnesota. Indeed, Minnesota's ROFR statute was enacted at the behest of in-state incumbents and over the objection of out-of-state competitors like LSP Transmission.

This Court is not alone in rejecting the distinction the district court drew. In *Florida Transportation Services, Inc. v. Miami-Dade County*, 703 F.3d 1230 (11th Cir. 2012), the Eleventh Circuit rejected a formalistic distinction to determine whether a company should be considered "in-state" or "out-of-state," concluding

that the Commerce Clause instead demands a "functional approach" that focuses on "where [a] company's business takes place or where its political influence lies." *Id.* at 1259. And in *Walgreen Co. v. Rullan*, 405 F.3d 50, 52 (1st Cir. 2005), the First Circuit rejected the argument that a permitting requirement that operated to exclude all out-of-state companies did not unduly burden interstate commerce because a few of the in-state entities that it favored were owned by out-of-state interests. As the court explained, "[h]olding otherwise would be tantamount to saying that a favored group must be *entirely* in state for a law to have a discriminatory effect on commerce." *Id.* at 58.

The district court did not discuss *Ben Oehrleins*, or the First and Eleventh Circuit decisions applying the same reasoning. Instead, the court cited only a single, out-of-circuit precedent, *Colon Health Centers of America, LLC v Hazel*, 813 F.3d 145 (4th Cir. 2016), in summarily rejecting the proposition that entities headquartered out of state should be considered "in-state." ADD21. But *Colon Health* is readily distinguishable, and in all events not the law of this Circuit.

*Colon Health* involved a concededly facially neutral law that required any health care operation, incumbent or not, to demonstrate a need for its services before it could build a new facility. *Id.* at 149, 152. The plaintiffs argued that the law burdened interstate commerce by requiring new firms to go through a lengthy administrative process before entering the market. *Id.* at 153. The court disagreed,

31

in part based on evidence indicating that the rate of approval for applications was the same for in-state firms and out-of-state firms. *Id.* at 153-54. Plaintiffs challenged that evidence, arguing that the state's expert should have treated firms that already had a presence in the state as in-state firms even if they were headquartered out of state. *Id.* at 154. The court rejected that argument, concluding that "incumbency bias in this context is not a surrogate for" discrimination against interstate commerce. *Id.*

*Colon Health* does not purport to establish a blanket rule about out-of-state companies with in-state interests, but rather found only one expert's methodology "reasonable" in the specific "context" at hand. Indeed, the court made a point of emphasizing the "fact-intensive quality" of its Commerce Clause analysis, which was conducted only after reviewing an entire summary judgment record. *Id.* at 151. Moreover, *Colon Health* involved a challenge to a new-project approval process that gave no special treatment to in-state "incumbents"; even "incumbents" had to undergo the process to build new facilities. In that context, where there was no set-aside for those with a requisite pre-existing connection to the state, it may have been acceptable to look to some other metric of what renders an entity in-state versus "out-of-state." But where new economic opportunities are reserved solely for those with pre-existing in-state operations, the in-state connection that shields an entity from competition is what matters for Commerce Clause purposes.

Whether a law reserves economic opportunities for Minnesota-chartered companies, for Minnesota-headquartered companies, or for companies with pre-existing Minnesota operations, it discriminates against out-of-state companies. Minnesota's statute thus discriminates against interstate commerce on its face.

B. **The Minnesota Statute Discriminates Against Interstate Commerce in Its Effect.**

Even accepting the district court's mistaken view that incumbents with out-of-state headquarters do not qualify as in-state entities, Minnesota's ROFR law would still be virtually *per se* invalid because it is discriminatory "in its effect[s]." *Ben Oehrleins*, 115 F.3d at 1383. Courts have found that statutes have the effect of discriminating against interstate commerce when the majority of the benefits inure to in-state entities and/or the majority of the burdens fall on out-of-state entities. *See, e.g.*, *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564 (1997). That is exactly how Minnesota's statute operates. Of the sixteen incumbents that own high-voltage transmission lines, eleven are headquartered in Minnesota. APP22 at ¶64-66. These eleven entities own 16,229 miles, or 87 percent, of the 18,460 miles of transmission line in Minnesota. *Id.* And the four largest entities, Northern States Power Company, Great River Energy, Otter Tail Power Company, and Minnesota Power are Minnesota companies and own 79 percent of all transmission assets in the state. APP22-23 at ¶67.

Courts readily find such overwhelmingly disproportionate effects discriminatory. In *Camps Newfound*, for example, the Supreme Court struck down a tax scheme that exempted entities doing business primarily with in-state residents, but not similar entities doing business primarily with nonresidents. 520 U.S. at 576. The Court noted that although the case did not involve a "total prohibition," the burden of the tax scheme fell "in a predictably disproportionate way on out-of-staters," making "the pernicious effect on interstate commerce … the same as in our cases involving taxes targeting out-of-staters alone." *Id.* at 579-80. Similarly, this Court concluded in *SDDS, Inc.*, that the fact that less than 100 percent of the statute's burdens fell on out-of-state companies "does not eliminate the discriminatory effect," but rather "merely reduces the scope of the discrimination." 47 F.3d at 271 n.12. And "[t]he extent of the discrimination is not relevant to the prior determination whether the state has discriminated against interstate commerce." *Id.* (citing *Wyoming v. Oklahoma*, 502 U.S. 437, 455-56 (1992) (holding that a law that reserved part of the market for in-state products discriminated on its face and in its effect against interstate commerce)).

Here too, even accepting the (mistaken) proposition that only companies headquartered in-state count as in-state in assessing the law's effects, the benefits of the ROFR statute plainly fall disproportionately on in-state companies, and the burdens plainly fall disproportionately on out-of-state companies. LSP

Transmission and other out-of-state transmission developers are wholly excluded from the market for building new MISO-approved transmission lines in Minnesota. The Minnesota ROFR statute thus has the effect of discriminating against interstate commerce.

### C. The Minnesota Statute Discriminates Against Interstate Commerce in Its Purpose.

The ROFR law's discriminatory effects are no accident. The law also has a discriminatory purpose. The legislative history confirms that the law was enacted to protect the favored in-state entities from competition for MISO-approved projects. In determining whether a regulation has a discriminatory purpose, courts may consider both direct and indirect evidence, including lawmakers' statements, the context in which the law was enacted, and whether it is a "highly ineffective means to promote the legitimate interest asserted by the state." *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006) (citing *Smithfield Foods, Inc. v. Miller*, 367 F.3d 1061, 1065 (8th Cir. 2004)). An examination of these factors, based solely on the Complaint and information available in public documents, shows that Minnesota's statute purposefully discriminates against interstate commerce, or, at the very least, creates a fact question that cannot be resolved on a motion to dismiss.

At the outset, it is important to remember the context in which the ROFR statute was enacted. There is no dispute that the statute was passed in direct

response to Order No. 1000, the goal of which was to increase competition in the market for regional transmission lines. *See* APP34. By re-instating a ROFR, Minnesota lawmakers openly sought to insulate incumbent transmission owners from the competition introduced by Order No. 1000. Indeed, the hearing testimony is replete with statements explaining the supporters' views that a ROFR law would prevent out-of-state interests from competing to build regional transmission lines, paid for by regional ratepayers, so that any profits that flow from building such lines would stay in Minnesota. *See, e.g.*, APP36 ("It's important that we know that this is transmission service that is going to be built already by Minnesota utilities."); APP37 (explaining that statute will ensure that returns on transmission projects "flow back to our members as rate payers, as a benefit to them"); APP47 ("[T]his is fundamentally about who gets the benefit of the FERC rate").

These statements are "brimming with protectionist rhetoric" that confirms that the purpose of the statute was to protect local, entrenched companies and to preclude out-of-state entities from building MISO-approved transmission lines in Minnesota. *S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003) (finding discriminatory purpose from statements such as "desperately needed profits will be skimmed out of local economies and into the pockets of distant corporations" and "[the law] gives South Dakota the opportunity to decide

whether control of our state's agriculture should remain in the hands of family farmers and ranchers or fall into the grasp of a few, large corporations").

The legislature's discriminatory purpose is reinforced by the problem that the purported neutral interests the state has asserted in trying to defend the statute—ensuring reliable delivery of electricity and protecting consumers—are not advanced by a ROFR. *See SDDS, Inc.*, 47 F.3d at 269 ("South Dakota has employed a highly ineffective means to pursue its ostensible purpose of environmental protection."). As discussed further *infra* Part III.B, the regional transmission projects to which the statute applies are developed and approved by MISO, and are unrelated to the retail distribution of electricity provided by utilities and regulated by the Minnesota PUC. The ROFR law thus does nothing to preserve "local control" over the approval of or tariff rate for the transmission projects to which it applies, APP36; MISO determines which projects are built and who pays for them and FERC determines the rates. Instead, the ROFR law serves only to decide *who* builds a project and recovers FERC's rate—in other words, it serves only to insulate in-state entities from competition to build and operate those projects. Making matters worse, the law insulates in-state entities from competition on projects for which costs are allocated *across states*. By reserving to in-state companies economic opportunities that are designed to benefit an entire

multi-state region, Minnesota is not only engaging in protectionism, but effectively shifting the costs of its protectionism to other states.

Minnesota's law is all the more indefensible because nothing in Order No. 1000 deprives Minnesota of its many regulatory mechanisms to hold all transmission owners responsible for the maintenance and upkeep of any transmission lines they build. If LSP Transmission were to build and operate a transmission line in Minnesota, it would of course be subject to (and comply with) all the same regulations that apply to other transmission owners in the state. Like any new entrant to the Minnesota transmission market selected through the MISO competitive process, LSP Transmission would need to apply for a certificate of need and route permit from the PUC pursuant to Minn. Stat. § 216B.243 and § 216E.03, and follow all of the associated statutory and regulatory procedures to obtain the necessary approvals to build and operate the line. Like ITC Midwest and every other transmission owner in Minnesota, LSP Transmission would also have to provide regular reports regarding present and foreseeable inadequacies in the transmission system, and the investments necessary to modernize the system. *See* Minn. Stat. § 216B.2425. Simply put, the ROFR statute has nothing to do with local regulatory control.

Indeed, beyond the self-serving testimony of Xcel Energy, one of the incumbents that stands to benefit from the ROFR statute, there is no evidence in

the public record supporting a claim that the failure to enact a ROFR would harm consumers or impact reliability. To the contrary, the evidence developed by FERC in Order No. 1000 and set forth in the judicial decisions upholding that Order affirmatively refutes any such contention, and shows that ROFRs actually *harm* consumers by discouraging participation in the transmission market and stifling innovation that could drive down costs. This Court has found the lack of evidence to support the legislature's professed concerns, and the lack of any effort to determine whether such evidence exists, indicative of discriminatory intent. *See S.D. Farm Bureau, Inc.*, 340 F.3d at 594-96. Here, it is even worse than that, as the legislature not only had no evidence to support its protectionist rhetoric, but *ignored* all of the evidence to the contrary.

The public record confirms that the ROFR statute was motivated by a discriminatory purpose—to protect entrenched local entities and prevent out-of-state companies from competing in the market. That illicit purpose alone independently triggers a rule of virtually *per se* invalidity. At the very least, LSP Transmission has stated a plausible claim that the statute has a discriminatory purpose and is entitled to proceed with discovery on that question.

## III. *TRACY* DOES NOT EXCUSE MINNESOTA'S DISCRIMINATION AGAINST INTERSTATE COMMERCE.

The district court reached the remarkable conclusion that "the dormant Commerce Clause does not apply" to Minnesota's law *at all*. ADD18. In the

district court's view, the Supreme Court's decision in *Tracy* immunizes from any Commerce Clause scrutiny whatsoever any law that discriminates in favor of public utilities. ADD18. *Tracy* does no such thing, and the Minnesota ROFR statute does not discriminate in favor of "public utilities," but rather favors *all* transmission-owning companies in Minnesota, regardless of their corporate structure or the customers they serve. That is clear from the fact that one of the incumbents that intervened in this case is not a public utility and has no retail ratepayers; it is an independent transmission company, just like LSP Transmission. Moreover, unlike *Tracy*, this case does not involve differential treatment of two distinct products in two distinct markets. It instead involves an effort to preclude out-of-state entities from competing with in-state entities for the opportunity to build the very same transmission projects. Nothing in *Tracy* comes close to shielding such blatant discrimination against out-of-state entities from the exacting scrutiny that the Commerce Clause demands.

A.    *Tracy* **Does Not Immunize Minnesota's Statute from Dormant Commerce Clause Scrutiny.**

*Tracy* involved an Ohio law that exempted certain natural gas sales from a generally-applicable sales and use tax. 519 U.S. at 282. But that exception applied only to sales of natural gas by local distribution companies ("LDCs")—local utilities that had an obligation to supply all members of the public with natural gas and provide them with a bundle of accompanying benefits and protections. The

exception did not apply to producers of gas (i.e., those who sold it at wholesale rather than retail), or to independent marketers who sold gas "unbundled" from all the benefits and protections that LDCs were obligated to provide. *Id.* at 282-83. General Motors, who purchased its natural gas from an independent marketer whose sales were subject to the tax, argued that this differential treatment violated the Commerce Clause. *Id.* at 285-86.

The Supreme Court disagreed. It reasoned that LDCs were not similarly situated to producers or independent marketers for purposes of natural gas sales because they sold a different product to different customers. *Id.* at 297-98. Independent marketers sold gas, in bulk, to large customers, like General Motors, who had the ability to bypass the ordinary natural gas market. *Id.* at 302. LDCs, on the other hand, were heavily regulated public utilities that were under an obligation to sell a bundled gas product to ordinary consumers who had "neither the capacity to buy on the interstate market nor the resilience to forgo the reliability and protection that state regulation provided." *Id.* at 294. Thus, although LDCs also could compete with independent marketers for sales to the large customers, *id.* at 302-03, the Court found their core products and their state regulatory obligations sufficiently distinct to differentiate them from producers or independent marketers for purposes of the tax exemption. *Id.* at 309.

*Tracy* did not purport to immunize all state laws that favor public utilities from dormant Commerce Clause scrutiny; to the contrary, *Tracy* explicitly reiterated that state utility regulation is not "immune from our ordinary Commerce Clause jurisprudence." *Tracy*, 519 U.S. at 291 n.8; *see also Ark. Elec. Co-op. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 391 (1983) ("Our constitutional review of state utility regulation in related contexts has not treated it as a special province insulated from our general Commerce Clause jurisprudence."). Moreover, regardless of what *Tracy* said about laws that favor state-regulated public utilities, it is irrelevant here because that is not what Minnesota's ROFR statute does. Instead, the statute protects *all* transmission-owning entities that have a physical presence in Minnesota, *regardless of* whether they are vertically integrated public utilities that, in addition to providing transmission services, distribute electricity to captive retail customers.

That is clear on its face: The ROFR statute defines "incumbent electric transmission owner" to include not only "any public utility that owns, operates, and maintains an electric transmission line in this state," but also, *inter alia*, "any transmission company as defined under section 216B.02, subdivision 10." Minn. Stat. § 216B.246, Subd. 1(b). Section 216B.02, in turn, defines "transmission company" as any entity "engaged in the business of owning, operating, maintaining, or controlling in this state equipment or facilities for furnishing

electric transmission service in Minnesota." The statute thus preferences all in-state transmission owners alike.

Lest there be any doubt about that, the parties that have intervened in this case to defend the statute confirm the breadth of the preference it provides. Intervenor-Defendant Xcel is a vertically integrated public utility that provides generation, transmission, and retail (distribution) services. But Intervenor-Defendant ITC Midwest is an independent transmission company that provides only transmission services, has no captive retail customers, and is structured much like LSP Transmission, which would be competing to build MISO-approved transmission projects but for the Minnesota ROFR law. The Minnesota statute protects Xcel, ITC Midwest, and other incumbent transmission owners based solely on the fact that they have a physical presence in Minnesota. Indeed, the law even protects incumbent independent transmission companies like ITC Midwest *at the expense of* vertically integrated public utilities who, absent the law, would be eligible to pursue a MISO-approved transmission project.

The district court failed to grasp this distinction. Rather than explain how anything other than physical presence differentiates LSP Transmission from ITC Midwest and the other in-state independent transmission companies that the Minnesota statute favors, the court just reiterated its view that "[r]egulated utilities (the existing transmission line owners with a right of first refusal) are not similarly

situated with unregulated entities such as LSP." ADD19-20. But that misses the point. ITC Midwest is not a "regulated utility" at all, let alone the kind of regulated utility at issue in *Tracy*—*i.e.*, a distributor of electricity required to serve a captive market. ITC Midwest is an independent, transmission-only company, just like LSP Transmission. To the extent it is "regulated" by Minnesota in any way that LSP Transmission is not, that is not because ITC Midwest is a public utility obligated to serve a captive market; it is simply because ITC Midwest is an incumbent, whereas LSP Transmission does not presently operate in Minnesota. If LSP Transmission were to operate in Minnesota, it would be subject to (and would comply with) all the same regulations as ITC Midwest. Thus, there is no basis upon which to argue that LSP Transmission is not similarly situated to the entities that are protected by Minnesota's ROFR statute with respect to MISO-approved transmission projects.

Accordingly, any purported distinction between public utilities and other transmission line operators could not save Minnesota's ROFR statute from invalidation under the Commerce Clause, as the statute does not confine its preference to public utilities. It instead grants a preference based on in-state presence alone, which is exactly the kind of preference that is virtually *per se* invalid under the Commerce Clause. *See City of Philadelphia v. New Jersey*, 437

U.S. 617, 627 (1978) ("[There must be] some reason, apart from their origin, to treat them differently."). Nothing in *Tracy* alters that long-settled rule.

**B.    LSP Transmission Provides the Same Product as the Incumbent Transmission Owners.**

In all events, a statute that granted a right of first refusal only to in-state public utilities could not survive Commerce Clause scrutiny, as neither *Tracy* nor any other decision sanctions a law that precludes out-of-state companies from competing with in-state companies. The question in *Tracy* was whether the state could tax unbundled, bulk gas sales to large consumers by independent marketers differently from natural gas sales by public utilities. The Supreme Court concluded that the state was not required to treat these entities the same way for purposes of taxing their natural gas sales because, for the most part, they were not really supplying the same product. *Tracy*, 519 U.S. at 297-99. Whereas the public utilities were required to provide a captive market with a bundled product that included both natural gas and certain mandated benefits and protections, independent marketers simply sold natural gas alone. A distinction between public utilities and other companies thus made sense in that unique context, as these entities were selling two distinct natural gas products in two distinct markets. *Id.* at 303-09.

Here, Minnesota is not treating two different kinds of sales or services differently. The Minnesota ROFR statute indisputably targets a single product:

electric transmission lines approved by a federally-regulated ISO.  Minn. Stat. § 216B.246, Subd. 2.  LSP Transmission is every bit as qualified as other MISO-qualified transmission developers to build these projects, and it seeks to compete with other developers on an equal playing field.  But it is precluded from doing so for no reason other than because it does not have an existing in-state physical presence in Minnesota.  *Tracy* did not involve anything like that, and it does not purport to allow states to treat in-state public utilities and out-of-state competitors differently in a context where the only thing they are doing is competing for the very same business.[2]

Moreover, transmission projects are unlike the direct retail gas sales at issue in *Tracy*.  Part of the reason the Court upheld Ohio's tax is because, regardless of tax treatment, Ohio's LDCs would be required to continue providing a bundled product to ordinary consumers.  The Court thus deferred to Ohio's concern that if the state taxed an LDC's ordinary retail sales the same way as bulk sales of natural gas alone, it could jeopardize their provision of gas to ordinary consumers.

---

[2] The Second Circuit's decision in *Allco Finance Limited v. Klee*, 861 F.3d 82 (2d Cir. 2017), *cert denied* 138 S. Ct. 926 (2018) ("*Allco*"), is distinguishable for the same reason.  There, the court concluded that Renewable Energy Credits produced by generators within the Northeast ISO region were not interchangeable with those produced in Georgia, and therefore, that Connecticut could permissibly refuse to allow Georgia credits to fulfill a Connecticut utility's renewable portfolio standard requirements.  *Id.* at 105-107.  Like *Tracy* (and unlike this case), *Allco* thus concerned whether two distinct products should be treated as the same, not whether out-of-state entities should be given the same opportunity to compete for one product.

There is no plausible basis for assuming that subjecting MISO-approved transmission projects to competitive bidding would jeopardize the ability of local electricity distributing public utilities to serve their retail customers. Distribution and transmission are distinct components of the three-step, generation-transmission-distribution electricity market. While some entities continue to provide all three components, the business of building and owning transmission lines is separate from the businesses of generating electricity and distributing electricity to customers, and companies can and do provide one without the others. There is no need for a retail electricity distributer to build regional transmission lines to be able to continue serving its retail customers. Those transmission lines will be every bit as available to retail distributors (and available at the FERC-set tariff, moreover) if they are built by an independent transmission company. Indeed, if Minnesota thought otherwise, then its law would not give incumbent independent transmission companies like ITC Midwest a ROFR that allows them to preempt vertically integrated public utilities from pursuing MISO-approved transmission lines.

Moreover, with or without Minnesota's statute, the transmission lines at issue here must be approved by a federally-regulated ISO that bears responsibility for ensuring adequate transmission across the entire region. Any transmission developer that seeks to build one of these projects must be certified by MISO as a

"Qualified Transmission Developer," go through a rigorous process to ensure that it will provide effective and reliable service, and obtain a certificate of need and route permit from the Minnesota PUC. *See* APP13 at ¶37; APP19 at ¶59. Given these robust state and federal regulatory protections, it is illogical to assert that Minnesota's law is necessary to protect Minnesota's retail customers.

Indeed, FERC rejected identical arguments in promulgating Order No. 1000. Incumbent utilities argued that eliminating the ROFR could increase rates and reduce reliability. APP68-69; APP72; APP75-76. FERC disagreed, finding that ROFR provisions could produce unjust and unreasonable rates because they undermine "the identification and evaluation of more efficient or cost-effective alternatives to regional transmission needs." APP54-55. Moreover, the competitive bidding that has occurred since Order No. 1000 has resulted in proposals, such as those from LSP Transmission's affiliates, that contain binding cost caps and other cost-reduction factors that are beneficial to ratepayers. APP13 at ¶35. In practice, elimination of ROFRs increases competition, lowers costs, and benefits consumers.

At a minimum, whether the ROFR statute can be justified by its purported impact on the retail market is a factual question that is inappropriate for resolution on a motion to dismiss. The allegations in the Complaint and the information available in the public record are more than sufficient to demonstrate that LSP

Transmission has stated a plausible claim that the ROFR statute discriminates against interstate commerce. Indeed, the discrimination is clear on the face of the statute. The law thus is subject to "a virtually *per se* rule of invalidity," *United Haulers Ass'n, Inc.*, 550 U.S. at 338, a standard that can only be refuted if the state demonstrates under rigorous scrutiny and through ***empirical evidence*** that is has no other means to advance a legitimate local interest. *See S.D. Farm Bureau, Inc.*, 340 F.3d at 593. Accordingly, at the very least, the Court should reverse and remand for discovery.

## IV. NEITHER CONGRESS NOR FERC BLESSED STATE RIGHT OF FIRST REFUSAL LAWS.

The district court further erred in suggesting that Congress and FERC approved state ROFR laws. First, with respect to Congress' alleged approval, the district court cited no authority—no case, statute, or rule—for this assertion. *See* ADD19, 24. That is unsurprising, as none exists. Indeed, Defendants did not even argue that Congress has blessed state ROFRs, and for good reason. Nothing in the FPA or any other law indicates, expressly or otherwise, that Congress intended to authorize states to enact ROFR statutes. That is fatal to any such argument: "[F]or a state regulation to be removed from the reach of the dormant commerce clause, congressional intent must be unmistakably clear." *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 414 (8th Cir. 1985) (citations omitted).

The district court's suggestion that Congress blessed ROFR statutes is also difficult to reconcile with the United States' filing below. As noted, the United States took the extraordinary step of filing a statement of interest to explain that the ROFR law discriminates against interstate commerce and violates the Commerce Clause. The district court "decline[d] to consider" that statement, ADD10, which would have been remarkable enough if the court had not attributed a fundamentally inconsistent position to the federal government—that it blessed state ROFRs. But it is inexplicable given the United States' thorough explanation as to why nothing in the FPA comes anywhere close to authorizing ROFR laws in the requisite "unmistakably clear" language. Dkt. 70 at 25-26.

As for FERC, the most that can be said is that FERC has not expressly preempted state ROFRs. APP106-07. However, that FERC has not preempted a state law does not mean that FERC approved its enactment or insulated it from a Commerce Clause challenge. *See New Eng. Power Co.*, 455 U.S. at 341 (finding no congressional intent to approve state transgression of the Commerce Clause when "nothing in the legislative history or language of the statute evince a congressional intent to alter the limits of state power otherwise imposed by the Commerce Clause") (quotations omitted); *cf. Hughes v. Talen Energy Mktg., LLC*, 136 S. Ct. 1288 (2016) (finding state law preempted even though FERC declined to affirmatively preempt it). Indeed, Chair Bay made that explicit in his

concurrence, explaining, "[t]he Commission's order today does not determine the constitutionality of any particular state right-of-first-refusal law." APP132. As he explained, *this* Court is the appropriate forum in which to determine the constitutionality of Minnesota's law. The district court erred as a matter of law in concluding that the federal government approved Minnesota's law.

## V.     THE STATUTE VIOLATES THE COMMERCE CLAUSE BECAUSE IT UNDULY BURDENS INTERSTATE COMMERCE.

Even if a statute does not "overtly discriminate against interstate commerce," it "may still violate the dormant Commerce Clause if the local interests that it serves do not justify the burden that it imposes upon interstate commerce." *U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1069 (8th Cir. 2000). The *Pike* test is a fact-intensive inquiry that is generally inappropriate for resolution before discovery. *See Lebanon Farms Disposal, Inc. v. Cty. of Lebanon*, 538 F.3d 241, 252 (3d Cir. 2008) (reversing grant of summary judgment on *Pike* inquiry and remanding for "development of a proper factual record"); *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 52 (2d Cir. 2007) (reversing grant of summary judgment, finding the "fact-intensive" *Pike* analysis required further discovery); *see also Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794-95 (8th Cir. 1995) (reversing grant of summary judgment and remanding for trial on whether a law burdened interstate commerce). The district court misapplied the *Pike* test, ignored the United States' view that the statute unduly burdens interstate

commerce, and prematurely concluded that the purported benefits of the statute outweighed its burdens on interstate commerce. Accordingly, the district court erred in granting Defendants' motions to dismiss.

A. **The Statute Burdens LSP Transmission Individually and Interstate Commerce in the Aggregate.**

In assessing a law's burdens on interstate commerce, a court must both consider the burdens on the parties before it and undertake an "aggregate analysis" of "'what effect would arise if not one, but many or every, State adopted similar legislation.'" *U & I Sanitation*, 205 F.3d at 1069 (quoting *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989)). LSP Transmission has plainly plausibly alleged that the ROFR statute burdens interstate commerce, with regard to both LSP Transmission individually and the interstate market in the aggregate.

First, the statute burdens LSP Transmission by barring it from competing for MISO-approved projects in Minnesota. A burden on even a single firm's interstate activities can be excessive under *Pike*. *See Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280, 283 (8th Cir. 1993). But for the ROFR statute, LSP Transmission could have bid on the Huntley-Wilmarth project, worth approximately $88 to $108 million. Instead, the project was automatically assigned to existing Minnesota transmission owners, even though the cost of that project will be allocated to ratepayers throughout MISO—including in other states. The inability to compete for such projects is a far heavier burden than the five- and

six-figure costs that led this Court to invalidate a statute in *Pioneer Military*. *Pioneer Military Lending, Inc.*, 2 F.3d at 282; *see also Cotto Waxo Co.*, 46 F.3d at 795 (finding a $38,000 burden on commerce should be tested at trial). Indeed, it is a far heavier burden than the one that the Supreme Court invalidated in *Pike* itself, which involved a state law that made it very expensive for out-of-state companies to compete for in-state business, but did not wholly foreclose them from doing so. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 145 (1970).

Second, if every state were to adopt a ROFR statute, the cumulative effect of such statutes would nullify Order No. 1000's abolition of federal ROFRs and eliminate competition in the market. As both FERC in Order No. 1000 and the United States in its statement of interest explained, eliminating competition would eliminate associated benefits of increased participation and investment in the development of transmission lines and lower costs. *See* APP81-83; Dkt. 70 at 21-22. In addition, eliminating the competitive process raises costs not just for Minnesotans, but for consumers across MISO, whom all share the costs of MISO-approved transmission projects. Dkt. 70 at 22. If every state enacted a ROFR law, costs could rise nationwide. The potential aggregate effects of state ROFR statutes would indisputably significantly burden interstate commerce.

Instead of considering that burden, the district court simply repeated its erroneous views that Minnesota's law "does not provide a preference to in-state

companies" and that "Congress and FERC have endorsed" state ROFR laws. ADD22, 24. Those conclusions are wrong, *see supra* Part IV, but they also miss the point of the *Pike* test, which considers whether a *non*-discriminatory statute still unduly *burdens* interstate commerce. Indeed, there is no need to reach *Pike* balancing unless a statute is non-discriminatory. The district court's (mistaken) view that Minnesota's statute does not favor in-state companies thus should have been the beginning, not the end, of its *Pike* analysis. Even if the statute did not discriminate against out-of-state companies (which it does), there can be no serious dispute that it at least substantially burdens them. Indeed, it is hard to imagine a more draconian burden on out-of-state entities than wholly precluding them from competing for in-state business.

### B. The Statute's Purported Benefits are Entirely Speculative.

The district court also erred in concluding, without considering any evidence on the issue, that the "burden imposed on [interstate] commerce" by the ROFR statute is not "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. To be sure, "the regulation of utilities is one of the most important functions traditionally associated with the police power of the States." *Ark. Elec. Co-op. Corp.*, 461 U.S. at 377. But "the production and transmission of electricity is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled

regulation by the States can patently interfere with broader national interests." *Id.*; *see also Middle S. Energy, Inc.*, 772 F.2d at 412.

This case indisputably involves the latter issue—the construction of transmission lines approved by a multi-state regional planning authority, the costs of which are allocated across state borders.[3] Far from giving states *carte blanche* to regulate in that interstate arena, *Arkansas Electric* underscores the need for careful scrutiny of state laws that burden the interstate transmission of electricity. Yet the district court did not meaningfully scrutinize Defendants' cursory and unsubstantiated contentions that any local benefits Minnesota's law may provide (beyond insulating in-state entities from competition) outweigh the considerable burdens it places on interstate commerce. Instead, the court impermissibly accepted what amounted to "sheer speculation." *U & I Sanitation*, 205 F.3d at 1070-71.

The district court was equally wrong to characterize *Southern Union Co. v. Missouri Public Service Commission*, 289 F.3d 503 (8th Cir. 2002), as upholding a "similar statute[]." ADD22. That case involved a challenge to Missouri's regulation of interstate stock purchases by public utilities. The challengers

---

[3] The district court simply misquoted *North Dakota*, 825 F.3d at 922, when it stated, "Minnesota has a long history of regulating both the construction and operation of transmission facilities." ADD22. In fact, that case discusses Minnesota's history of regulating "electric *generating* facilities," which is a distinct aspect of the electricity market and subject to very different regulatory treatment under both the FPA and state law.

principally argued that the statute was an impermissible "direct," "extraterritorial" regulation of out-of-state transactions, a proposition that this Court rejected. *Id.* at 508. The Court also found that the regulation was not discriminatory because it applied equally to all utilities regardless of whether they were purchasing stock from an in-state or an out-of-state utility, and it found no evidence that the statute imposed distinct burdens on interstate commerce. *Id.* at 508-509.

In short, there are no similarities between the statute in *Southern Union* and Minnesota's ROFR statute, which is simply an effort to shield in-state transmission owners—no matter their regulatory or corporate character—from competition. Once again, the district court's contrary conclusion seems to have been based on its legally and factually mistaken view that anything having to do with public utilities is immune from Commerce Clause scrutiny.

The district court's reliance on the general "legislative findings" in the introductory section of Chapter 216B was also misplaced. ADD22-23. Section 216B.01 was enacted decades ago and last revised in 1989, long before Order No. 1000 and the Minnesota ROFR statute. The legislative findings thus unsurprisingly speak only to the benefits of regulating "public utilities" as a general matter, and say nothing about ROFR laws—let alone about ROFR laws that protect incumbents other than public utilities.

Moreover, there is no evidence that the ROFR statute actually confers any meaningful local benefits (beyond eliminating competition). Neither Defendants nor the district court explained how the ROFR statute protects retail customers or avoids inefficiencies and increased costs. *See U & I Sanitation*, 205 F.3d at 1070 (finding city's stated purpose "not advanced by the enactment of this ordinance, thereby making illusory any benefit to be achieved by it"); *Cotto Waxo Co.*, 46 F.3d at 795 (finding that defendant "failed to submit any evidence" regarding purported benefits of statute). Nor could they, as MISO's qualification and developer selection process contains numerous stringent requirements to ensure that only capable and reliable transmission developers will be chosen to build regional transmission lines, and takes into consideration numerous other factors, such as design, cost, implementation, operation, and maintenance plans. *See* Dkt. 61-1 at 646-60. And the state itself has an extensive permitting and regulatory regime with which those awarded MISO projects must comply.

The ROFR statute, on the other hand, permits incumbents to secure these projects without demonstrating that they can offer top-of-the-line value and reliability in comparison to would-be competitors. *See Fla. Transp. Servs., Inc.*, 703 F.3d at 1260-62 (finding that county's practice of automatically renewing incumbent's permits did nothing to "ensure the incumbent[s] … remained skilled, experienced, reliable, properly equipped, and safe"). Any argument that a ROFR

law is necessary or even marginally helpful in securing reliable electricity services requires credible supporting evidence, which is not part of the record at this stage.

Finally, even if the statute served some legitimate local purpose, the court must consider the availability of a less burdensome alternative. *U & I Sanitation*, 205 F.3d at 1070. LSP Transmission pleaded that the state could allay any concerns regarding cost and reliability by, *inter alia*, imposing additional permitting obligations on non-incumbents. APP27 at ¶89. Indeed, at the legislative hearings on the ROFR statute, LSP Transmission's representative described these types of regulatory options. *See* APP39-40. The record before the district court thus already establishes that less burdensome alternatives were available, but to the extent more information is required, LSP Transmission should be allowed to proceed to discovery.

In short, even on the pleadings, it is clear that the ROFR statute not only openly discriminates against interstate commerce, but places burdens on interstate commerce that are clearly excessive in relation to any of the purely speculative local benefits the law may provide. The law thus is virtually *per se* invalid. But at a minimum, the district court erred by dismissing LSP Transmission's *Pike* claim, rather than allowing LSP to develop the evidence that the fact-intensive *Pike* inquiry requires.

## CONCLUSION

The Minnesota right of first refusal statute discriminates against interstate commerce on its face, in its purpose, and in its effects, and therefore violates the Commerce Clause. At the very least, LSP Transmission has stated a plausible claim that the statute discriminates against and/or unduly burdens interstate commerce. Accordingly, LSP Transmission respectfully requests that this Court reverse the decision below.

Dated: October 12, 2018           LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/Charles N. Nauen
Charles N. Nauen, #121216
David J. Zoll, #0330681
Rachel A. Kitze Collins, #0396555
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

KIRKLAND & ELLIS LLP
Paul D. Clement
Erin E. Murphy
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
Tel:   (202) 879-5000
Fax:   (202) 879-5200
paul.clement@kirkland.com
erin.murphy@kirkland.com

**ATTORNEYS FOR PLAINTIFF-
APPELLANT LSP TRANSMISSION
HOLDINGS, LLC**

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

The undersigned counsel of record hereby certifies, pursuant to Fed. R. App. P. 32(g), that:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i) because this brief contains 12,866 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14.

Dated: October 12, 2018          s/Charles N. Nauen
                                   Charles N. Nauen (#121216)

# CERTIFICATE OF VIRUS FREE

Pursuant to Local Rule 28A(h)(2) of the Eighth Circuit Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief has been scanned for computer viruses and is virus free.

Dated: October 12, 2018      s/Charles N. Nauen
_____
                                         Charles N. Nauen (#121216)

## CERTIFICATE OF SERVICE AND MAILING

I hereby certify that on October 12, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that in connection with the APPENDIX OF PLAINTIFF-APPELLANT an original and three (3) copies were sent for filing via First Class U.S. Mail, postage prepaid on October 12, 2018, to:

Clerk of Court
U.S. Court of Appeals for the Eighth Circuit
Thomas F. Eagleton Courthouse
Room 24.329
111 South 10th Street
St. Louis, MO 63102

and one (1) copy was served via First Class U.S. Mail, postage prepaid on October 12, 2018, to:

| | |
|---|---|
| Jason Marisam | Aaron D. Van Oort |
| Assistant Attorney General | Nathaniel J. Zylstra |
| OFFICE OF THE ATTORNEY | FAEGRE BAKER DANIELS LLP |
| GENERAL | 2200 Wells Fargo Center |
| State of Minnesota | Minneapolis, MN 55402-3901 |
| 445 Minnesota Street, Suite 1100 | |
| St. Paul, MN 55101-2128 | |

Richard D. Snyder
Lisa M. Agrimonti
Leah C. Janus
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425

s/Charles N. Nauen
_____

Charles N. Nauen (#121216)