# In the
# United States Court of Appeals
# For the Eighth Circuit

LSP Transmission Holdings, LLC,

*Plaintiff-Appellant*,

v.

Nancy Lange, Commissioner and Chair, Minnesota Public Utilities Commission;
Dan Lipschultz, Commissioner, Minnesota Public Utilities Commission;
Matt Schuerger, Commissioner, Minnesota Public Utilities Commission;
John Tuma, Commissioner, Minnesota Public Utilities Commission;
Katie Sieben, Commissioner, Minnesota Public Utilities Commission, and
Mike Rothman, Commissioner, Minnesota Department of Commerce,
each in his or her official capacity,

*Defendants-Appellees,*

*and*

Northern States Power Company d/b/a Xcel Energy, and ITC Midwest, LLC,

*Intervenors-Appellees.*

*On Appeal from the United States District Court for the District of Minnesota*
*Civil No. 0:17-cv-04490 (DWF/HB)*

## ADDENDUM OF PLAINTIFF-APPELLANT

Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Rachel A. Kitze Collins (#0396555)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

Paul D. Clement
Erin E. Murphy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
(202) 879-5000
paul.clement@kirkland.com
erin.murphy@kirkland.com

*Attorneys for Appellant*
*LSP Transmission Holdings, LLC*

Jason Marisam (#0398187)
Assistant Attorney General
OFFICE OF THE
MINNESOTA ATTORNEY GENERAL
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
(651) 757-1275
jason.marisam@ag.state.mn.us

*Attorney for Defendants-Appellees*

Aaron D. Van Oort (#0315539)
Nathaniel J. Zylstra (#0314328)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
Minneapolis, MN 55402-3901
(612) 766-8726
aaron.vanoort@FaegreBD.com
nathaniel.zylstra@FaegreBD.com

*Attorneys for Intervenor-Appellee Northern States*
*Power Company d/b/a Xcel Energy*

Richard D. Snyder (#0191292)
Lisa M. Agrimonti (#0272474)
Leah C. Janus (#0337365)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
rsnyder@fredlaw.com
lagrimonti@fredlaw.com
ljanus@fredlaw.com

*Attorneys for Intervenor-Appellee*
*ITC Midwest LLC*

# **TABLE OF CONTENTS**

Memorandum Opinion and Order,
dated June 21, 2018 (District Court ECF No. 77) ......................................... ADD1

Judgment, dated June 22, 2018
(District Court ECF No. 78).......................................................................... ADD26

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

LSP Transmission Holdings, LLC,

              Plaintiff,

v.

Nancy Lange, Commissioner and Chair,
Minnesota Public Utilities Commission;
Dan Lipschultz, Commissioner,
Minnesota Public Utilities Commission;
Matt Schuerger, Commissioner, Minnesota
Public Utilities Commission; John Tuma,
Commissioner, Minnesota Public Utilities
Commission; Katie Sieben, Commissioner,
Minnesota Public Utilities Commission; and
Mike Rothman, Commissioner, Minnesota
Public Utilities Commission, Minnesota
Department of Commerce, each in his or
her official capacity,

              Defendants,

and

Northern States Power Company d/b/a
Xcel Energy,

and

ITC Midwest, LLC,

              Intervenor-Defendants.

Civil No. 17-4490 (DWF/HB)

**MEMORANDUM**
**OPINION AND ORDER**

_____

Charles N. Nauen, Esq., David J. Zoll, Esq., and Rachel Ann Kitze Collins, Esq.,
Lockridge Grindal Nauen PLLP, counsel for Plaintiff.

Jason Marisam, Solicitor General, Minnesota Attorney General's Office, counsel for State Defendants.

Aaron D. Van Oort, Esq., Lauren W. Linderman, Esq., and Nathaniel J. Zylstra, Esq., Faegre Baker Daniels LLP, counsel for Northern States Power Company d/b/a Xcel Energy.

John Pavelko, Esq., Leah C. Janus, Esq., and Lisa M. Agrimonti, Esq., Fredrikson & Byron, P.A., counsel for ITC Midwest LLC.

B. Andrew Brown, Esq., Dorsey & Whitney LLP; Brian M. Meloy, Esq., and Thomas Carl Burman, Esq., Stinson Leonard Street LLP; David R. Moeller, Esq., Minnesota Power; and Jennifer O. Smestad, Esq., Otter Tail Power Company, counsel for Amicus Utilities.

_____

# INTRODUCTION

This matter involves a Constitutional challenge under the dormant Commerce Clause to Minnesota Statute § 216B.246, which grants incumbent electric utilities a right of first refusal to build and own electric transmission lines that connect to their existing facilities. Plaintiff LSP Transmission Holdings ("LSP") alleges that the statute discriminates against out-of-state transmission developers in favor of in-state utilities. Defendants[1] have filed separate motions to dismiss LSP's lawsuit. (Doc. Nos. 18, 37 & 48.) For the reasons set forth below, the Court grants the motions.

_____

[1] Defendants include the named Commissioners of the Minnesota Public Utilities Commission ("PUC"), who have been sued in their official capacities, and the Commissioner of the Minnesota Department of Commerce (together, the "State Defendants"); Intervenor Defendant Northern States Power Company ("NSP"); and Intervenor Defendant ITC Midwest LLC ("ITC Midwest"). In addition, an amicus brief

(Footnote Continued on Next Page)

## BACKGROUND

This case involves electric generation, transmission, and delivery.  Electricity is provided to consumers in three steps:  (1) electricity is generated at various power plants; (2) electricity is transmitted on an integrated system of large power lines ("transmission lines"); and (3) electricity is then distributed to consumers through a network of smaller power lines ("distribution lines").  Electricity placed on transmission lines becomes part of an integrated, interstate system.  State regulation of industries, such as the electrical industry, has long been recognized as a valid exercise of a state's police powers.  *See Munn v. Illinois*, 94 U.S. 113, 126 (1876) (explaining that state regulation of property that is used in a way that is of public consequence is a valid exercise of the state's powers).

The principal federal statute governing electricity generation and transmission is the Federal Power Act ("FPA"), which was enacted in 1935.  The Federal Energy Regulatory Commission ("FERC") exercises authority over the interstate transmission of electric energy and its sale at wholesale in interstate commerce.  16 U.S.C. § 824(b)(1). States retain jurisdiction over the retail sale of electric energy, as well as the "local distribution" and "transmission of electric energy in intrastate commerce."  *Id*.  Under the FPA, states have traditionally assumed all jurisdiction over the approval or denial of

---

(Footnote Continued From Previous Page)
was filed by Great River Energy, Minnesota Power, Otter Tail Power Company, and Southern Minnesota Municipal Power Agency.  (Doc. No. 25.)

permits for the siting and construction of electric transmission facilities.  *See Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009).

In Minnesota, electric service is provided by monopolies.  Electric utilities are assigned to service areas.  Minn. Stat. § 216B.37.  Within the respective service areas, each utility has "the exclusive right to provide electric service at retail to each and every present and future customer in its assigned area and no [other] electric utility shall render or extend service at retail."  Minn. Stat. § 216B.40.  In Minnesota, the PUC sets "just and reasonable" retail rates for public utilities.  Minn. Stat. §§ 216B.03-.04, and .79.  The PUC also ensures that each utility provides "safe, adequate, efficient, and reasonable service" and "make[s] adequate infrastructure investments."  *Id.*

FERC is empowered to "divide the country into regional districts for the voluntary interconnection and coordination of facilities for the generation, transmission, and sale of electric energy" and has the "duty" to "promote and encourage such interconnection and coordination within each such district and between such districts."  16 U.S.C. § 824a(a). Regionally, FERC-approved nongovernmental agencies, independent system operators ("ISO"s), oversee the operation and expansion of electric transmission grids.  (Doc. No. 1 ("Compl.") ¶ 14.)  Each ISO issues a tariff, which establishes the terms by which its members build and operate grids.  (*Id.* ¶ 15.)  These tariffs are subject to the approval of

FERC.  (*Id.*)  The Midcontinent Independent System Operator ("MISO") is the regional

planning entity that governs Minnesota.[2]  (*Id.* ¶ 16.)

Prior to 2011, FERC gave incumbent utilities a federal right of first refusal

("ROFR").  Under this system, if MISO approved construction of a new electric

transmission line, the MISO member that distributed electricity in the area where the

facility was to be built had a ROFR.  *Miso Transmission Owners v. FERC*, 819 F.3d 329,

332 (7th Cir. 2016).  In 2011, however, FERC issued Order 1000, which eliminated the

federal ROFR.  *See Transmission Planning & Cost Allocation by Transmission Owning*

*& Operating Pub. Utils.*, 136 FERC 61051, 2011 WL 2956837 ("Order 1000") ¶ 7.  *See*

*also MISO Transmission Owners v. FERC*, 819 F.3d at 332.  Order 1000 was consistent

with the effort to manage electric grids on a regional level.  *See Reg'l Transmission*

*Orgs.*, 89 FERC ¶ 61285, ¶ 1, 1999 WL 33505505, at *3 (Dec. 20, 1999); *see also* 18

C.F.R. § 35.34.  At the same time, Order 1000 recognized that states could continue to

regulate electric transmission lines.  (Order 1000 ¶ 107) ("We acknowledge that there is

longstanding state authority of certain matters that are relevant to transmission planning

and expansion, such as matters relevant to siting, permitting, and construction.  However,

nothing in this Final Rule involves an exercise of siting, permitting, and construction

authority.").  FERC further explained:

> In developing the framework below, we have sought to provide flexibility
> for public utility transmission providers in each region to propose, in

---

[2]      MISO also governs other states and the Canadian province of Manitoba.  (Compl.
¶ 16.)

consultation with stakeholders, how best to address participation by nonincumbents as a result of removal of the federal right of first refusal from Commission-jurisdictional tariffs and agreements. *However, we note that nothing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities.* Public utility transmission providers must establish this framework in consultation with stakeholders and we encourage stakeholders to fully participate.

Order 1000 ¶ 227 (emphasis added).

In accordance with Order 1000, MISO removed the federal ROFR provisions from its tariff. (Compl. ¶ 45.) Minnesota then enacted its own state ROFR law, Minn. Stat. § 216B.246.[3] Therefore, any new MISO-approved transmission project in Minnesota must comply with Minnesota's ROFR law, which provides in part:

An incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent electric transmission owner.

Minn. Stat. § 216B.246, subd. 2. If a proposed line connects to more than one incumbent owner's facilities, both owners will receive the right to build and operate the line "individually and proportionally" with other owner(s). *Id.* In addition, the statute authorizes the PUC to require an incumbent to build the electric transmission line, taking

---

[3]      In response to Order 1000, several states enacted their own ROFR laws. *See, e.g.*, N.D. Cent Code § 49-03-02.2; S.D. Codified Laws § 49-32-20; Neb. Rev. Stat. § 70-1028; 17 Okla. Stat. Ann. § 292.

into consideration various issues, such as cost, efficiency, and reliability.  *Id.*, subd. 3(b).[4]

Further, Minn. Stat. § 216B.246 defines an "incumbent electric transmission owner" as:

"any public utility that owns, operates, and maintains an electric transmission line in this

state; any generation and transmission cooperative electric associations; any municipal

power agency; any power district; any municipal utility; or any transmission company . . .

."  Minn. Stat. § 216B.246, subd. 1.  Currently, "incumbents" in Minnesota include

entities headquartered in Iowa, North Dakota, South Dakota, Wisconsin, and Minnesota.

(Compl. ¶ 64(a)-(p).)  Many of these entities also own and operate facilities in states

other than Minnesota.  *Id.*[5]

　　　FERC approved MISO's tariff, and in particular its decision to honor the state

ROFR laws.  *Midwest Indep. Transmission Sys. Operator, Inc.*, 150 FERC ¶ 61037, 2015

---

[4]　　　Minn. Stat. § 216B.246 provides for a process by which incumbent owners have a window of time in which to notify the PUC whether they intend to exercise their ROFR; if an incumbent indicates that it does not wish to build the proposed line, it must explain the reason for its decision, and the PUC may override that decision and order the incumbent to build the line.  *Id.*, subd. 3(b).

[5]　　　The primary purpose of Minn. Stat. § 216B.246 was to preserve the status quo and avoid the uncertainty of a new process for electric transmission development in Minnesota after the Federal ROFR was eliminated.  (Compl. ¶ 53 (bill was intended to "preserve the status quo").)  This purpose is reflected by the comments of Senator David Brown, one of the bill's authors, at the Senate committee hearing on the ROFR bill:  "Our regulated system has served Minnesota well, and our system is reliable and our rates are fairly competitive. . . .  If we choose not to pass this legislation, we are moving into the world of the unknown versus we have a very known process right now, members.  And I think it's best to stick with that process. . . ."  (Doc. No. 22 ("Peick Aff.") ¶ 2, Ex. A, Statement of Senator Brown at 00:28 & 49:21.)  The Court takes judicial notice of these comments.

7

WL 285969, at ¶ 25.  FERC explained that "even if a transmission project is subject to a state [ROFR], the regional transmission planning process still results in the selection for planning and cost allocation purposes of transmission projects that are more efficient or cost-effective than would have been developed but for such processes." *Id.* ¶ 16.

LSP objected to FERC's ruling, arguing that FERC should preclude states from enacting ROFR laws. *Id. ¶* 24.  FERC held that "it is appropriate for MISO to recognize state or local laws or regulations as a threshold matter in the regional transmission planning process." *Id.* ¶ 25.  FERC explained that Order 1000 "struck an important balance between removing barriers to participation by potential transmission providers in the regional transmission planning process and ensuring the nonincumbent transmission developer reforms do not result in the regulation of matters reserved to the states." *Id.* ¶ 27.  LSP then sought judicial review of FERC's ruling and again argued that FERC should not have allowed MISO to implement state ROFR laws.  *MISO Transmission Owners*, 819 F.3d at 336.  The Seventh Circuit Court of Appeals rejected LSP's argument and held that it was a "proper goal" for FERC "'to avoid intrusion on the traditional role of the States' in regulating the siting and construction of transmission facilities." *Id.*  The Seventh Circuit also explained that Order 1000 terminated the federal, not any state, right of first refusal.  *Id.* ("Order No. 1000 terminated only federal rights of first refusal; it did not 'limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities.'").

This case involves the Huntley-Wilmarth line, a proposed 345 kilovolt electric transmission line that is proposed to run approximately 40 miles, wholly within Minnesota.  The Huntley-Wilmarth line will connect two substations—NSP's existing Wilmarth substation north of Mankato, Minnesota and ITC Midwest's Huntley substation, which is currently under construction, south of Winnebago, Minnesota. (Compl. ¶ 70; Doc. No. 40 ("Zylstra Decl.") ¶ 4, Ex. C (Notice of Intent) at 1.)[6]  On March 3, 2017, after the Huntley-Wilmarth line was approved, NSP and ITC Midwest jointly exercised their rights of first refusal under § 216B.246.  In their Notice of Intent to the Commission, NSP and ITC Midwest gave formal notice that they "intend to construct, own and maintain the Huntley-Wilmarth 345kv transmission line project to be located in south central Minnesota."  (Notice of Intent at 1.)  NSP and ITC Midwest also filed their Notice Plan on June 30, 2017.  (Zylstra Decl. ¶ 4, Ex. D.)  The project is scheduled to be complete by January 1, 2022.  (Compl. ¶ 72.)

On September 29, 2017, LSP filed the present lawsuit challenging the constitutionality of Minn. Stat. § 216B.246.  LSP argues that Minnesota's ROFR law violates the dormant Commerce Clause of the United States Constitution.  (*See generally* Compl.)  Specifically, Plaintiff alleges that Minn. Stat. § 216B.246 facially discriminates, or discriminates in purpose or effect, against interstate commerce in the construction and ownership of large transmission facilities because it (1) gives "incumbent utilities with an existing footprint in Minnesota the exclusive right of first refusal to build transmission

---

[6]    The Court considers the Notice of Intent because it is embraced by the Complaint.

lines," and (2) effectively prohibits LSP and other out-of-state participants from building transmission lines in Minnesota.  (Compl. ¶¶ 85-86.)  LSP also alleges that, even if Minn. Stat. § 216B.246 is not discriminatory, it imposes an undue burden on interstate commerce.  (*Id*. ¶¶ 91-92.)  Defendants move to dismiss LSP's complaint for failure to state a claim.

## DISCUSSION

## I.      Statement of Interest

On April 13, 2018, the U.S. Government filed a Statement of Interest on Behalf of the United States of America.  (Doc. No. 70.)  The Government's statement was filed by the Justice Department's Antitrust Division.  The Court allowed the parties to respond to the Statement of Interest.  (Doc. Nos. 72-76.)  As aptly noted by NSP and ITC Midwest, the Antitrust Division's statement is untimely, as it was filed roughly two and one-half months after briefing was completed.  Moreover, the Antitrust Department offers no explanation, let alone good cause, for its delay.  It is solely within the Court's discretion to permit or deny a statement of interest.  *See Creedle v. Gimenez*, Civ. No. 17-22477, 2017 WL 5159602, at *2 (S.D. Fla. Nov. 7, 2017).  In exercising that discretion, the Court can consider whether the information is timely, useful, or otherwise necessary to the administration of justice.  *Id*.  In light of the Antitrust Division's unjustified delay and the fact that this case has been fully and thoroughly briefed by all other parties, the interests of justice do not require the Court to consider the Statement of Interest.  Accordingly, the Court declines to consider the Statement of Interest.  However, the

Court has reviewed the statement and notes that consideration of the statement would not alter the Court's decision.

## II.   Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

ADD11

at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  *Twombly*, 550 U.S. at 556.

## III.   Commerce Clause

The Commerce Clause expressly authorizes Congress's power to regulate interstate commerce.  U.S. Const. Art. I, § 8, cl. 3.  The Commerce Clause has a negative or dormant implication as well, prohibiting states from enacting laws that discriminate or unduly burden interstate commerce.  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) ("*Tracy*"); *Quill Corp. v. North Dakota*, 504 U.S. 298, 312 (1992).  State laws invite scrutiny under the dormant Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (citation omitted).  The rationale behind the dormant Commerce Clause is to prohibit economic protectionism, or state "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Associated Indus. of Mo. v. Lohman*, 511 U.S. 641, 647 (1994) (citation omitted).  *See also S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 508 (8th Cir. 2002) (citation omitted) (noting the rationale behind the dormant Commerce Clause).

When determining if a state law violates the dormant Commerce Clause, the Court uses a two-step inquiry.  First, the Court asks whether the law overtly discriminates against interstate commerce.  *R&M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 734 (8th Cir. 2002).  A state law "overtly discriminates" if it is discriminatory on its face, in

12

its purpose, or in its effects.  *Id*.  In such a case, the state law "will be invalidated unless the state can show, under rigorous scrutiny, that it has no other means to advance a legitimate local interest."  *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist*., 433 F.3d 600, 604 (8th Cir. 2006); *see also C&A Carbonne, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994).  If the state law is not overtly discriminatory, the Court moves to the second tier of the analysis.  Under this tier, known as the *Pike*-test, even if a statute regulates evenhandedly to effectuate a legitimate, local public interest, the Court will ask if the law imposes a burden on interstate commerce that "is clearly excessive in relation to its putative local benefits."  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  The burden of demonstrating that a state law discriminates against interstate commerce "rests on the party challenging the validity of the statute."  *Hughes v. Okla.*, 441 U.S. 322, 336 (1979).  The Eighth Circuit has noted (citing Supreme Court precedent) that courts exercise caution in reviewing state utility regulations under the dormant Commerce Clause, and explained that "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States."  *S. Union Co.*, 289 F.3d at 508 (quotation omitted).

Plaintiff argues that Minn. Stat. § 216B.246 both overtly discriminates and fails the *Pike* test.  Defendants, on the other hand, argue that Minn. Stat. § 216B.246 is an evenhanded, non-discriminatory state public-utility regulation that is presumptively valid under the dormant Commerce Clause.  Defendants contend that the Supreme Court's decision in *Tracy* is dispositive and forecloses LSP's discrimination claim.  Defendants

13

also point out the long history of judicial deference to utility regulation and contend that

Minnesota has made a reasonable determination that the entities that own the facilities to

which new lines would connect are best positioned to ensure the reliable delivery of

power to Minnesota consumers.  In addition, Defendants argue that Minnesota's interest

in regulating the provision of electricity to its citizens outweighs any indirect effects on

interstate commerce.

### A.    *General Motors Corp. v. Tracy*

As an initial matter, the parties dispute the proper application of the Supreme

Court's decision in *Tracy*.  Defendants argue that *Tracy* forecloses LSP's claim of

discrimination.  LSP, on the other hand, argues that *Tracy* is inapposite and that

Defendants misconstrue and attempt to overextend the decision in *Tracy*.

In *Tracy*, the Supreme Court reviewed an Ohio statute that granted a tax

exemption on retail sales and use of natural gas to in-state regulated public utilities and

denied the same tax exemption to interstate natural gas transmission companies.  *Id*. at

281-82.  General Motors, a purchaser of natural gas from out-of-state marketers whose

sales were subject to the taxes, challenged the tax exemption under the dormant

Commerce Clause, arguing that the exemption discriminated against interstate commerce.

*Id*. at 297-98.  The Supreme Court considered the threshold issue of whether the Ohio

statute applied to "substantially similar entities."  *Id*. at 298 ("Conceptually, of course,

any notion of discrimination assumes a comparison of substantially similar entities.").

This inquiry is important because, as noted by the Supreme Court, if a statute

14

distinguishes between "different entities" serving "different markets," there would be no discrimination.  *Id*. at 299.  More specifically, if the entities are not "substantially similar," then "eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a natural market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors."  *Id*.

In *Tracy*, the Supreme Court found that in-state gas utilities served residential consumer end-users through monopolies that exist independent of the state statute at issue.  *Id*. at 297-98, 302-03.  In contrast, interstate companies—out-of-state marketers whose sales were subject to the taxes—did not serve those residential consumers.  Thus, with respect to sales to consumers in these monopolies, the local gas utilities and the out-of-state marketers were not similarly situated because they did not compete.  *Id*. at 302-03.  As to the sales to the consumers, the dormant Commerce Clause had "no job to do."  *Id*. at 303.

The Supreme Court, however, also considered the sale of natural gas to industrial consumers.  *Id*.  With respect to these sales, the Supreme Court noted the "possibility of competition" between the local utilities and private businesses, and therefore also a possibility of a dormant Commerce Clause violation.  *Id*.  The Supreme Court asked whether "we should accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utilities alone operate?"  *Id*. at 303-04.  Despite the possibility of competition in the noncaptive market,

the Supreme Court held that the state was justified in treating the utilities differently in both markets.  The Supreme Court held that it would give controlling weight to the captive, monopoly market:

> First and most important, we must recognize an obligation to proceed cautiously lest we imperil the delivery by regulated [utilities] of bundled gas to the noncompetitive captive market.  Second, as a Court we lack the expertness and the institutional resources necessary to predict the effects of judicial intervention invalidating Ohio's tax scheme on the utilities' capacity to serve this captive market.  Finally, should intervention by the National Government be necessary, Congress has both the resources and the power to strike the balance between the needs of the competitive market and captive markets.

*Id.* at 304.  The Court went on to explain that "[w]here a choice is possible . . . the importance of traditional regulated service to the captive market makes a powerful case against any judicial treatment that might jeopardize [the utilities'] continuing capacity to serve the captive market."  *Id.*  The Supreme Court further reasoned that:

> [the state's] regulatory response to the needs of the local natural gas market has resulted in a noncompetitive bundled gas product that distinguishes its regulated sellers from independent marketers to the point that the enterprises should not be considered 'similarly situated' for purposes of facial discrimination under the Commerce Clause.

*Id.* at 310.  The Supreme Court in *Tracy* held that the Ohio statute did not discriminate against interstate commerce and did not run afoul of the dormant Commerce Clause.[7]

---

[7]     Other Supreme Court decisions have acknowledged that local utilities with monopolies are not similarly situated to private businesses when analyzing the dormant Commerce Clause.  *See, e.g.*, *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342-43 (2007) (citing *Tracy*); *Levin v. Commerce Energy, Inc.*, 560 U.S. 413, 429 n.9 (2010) (citing *Tracy*); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 607 (1997) (Scalia, J., dissenting) (observing that *Tracy*

(Footnote Continued on Next Page)

In a recent decision, the Second Circuit Court of Appeals applied *Tracy* when considering a dormant Commerce Clause challenge to a Connecticut program that distinguished between in-state and out-of-state entities in the electricity market. The Connecticut program required state electric utilities to either produce renewable energy or to purchase renewable energy credits from "renewable energy producers located in the region." *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 86 (2d Cir. 2017). Despite there being a national market for renewable energy credits, the court found that the state program advanced legitimate interests in the local market. *Id.* (noting that the program promotes increased production of renewable power generation in the region and, by extension, the protection of its citizens' health, safety, and reliable access to power). The court also noted that FERC had established a regional market (and geographic boundaries), and that FERC's involvement weighed strongly against intervention by the court. *Id.* (noting FERC and Congress are better-situated to supervise and determine economic and health and safety effects of geographic boundaries). The Second Circuit held that the "means and ends" that Connecticut selected in its renewable energy credit program were "well within the scope of what Congress and FERC have traditionally allowed the States to do in the realm of energy regulation." *Id.* at 106.

After careful analysis, the Court concludes that the reasoning behind the dismissal of the dormant Commerce Clause challenge in *Tracy* applies to the present case. Minn.

---

(Footnote Continued From Previous Page)
"effectively creates what might be called a 'public utilities' exception to the negative Commerce Clause").

Stat. § 216B.246 is part of the Minnesota's broader regulation of the provision of electricity to the consumer market.  Many of the entities that own existing transmission facilities are regulated public utilities, who serve captive markets and have monopolies with respect to the sale of electricity to consumers.  Thus, for these sales, there is no competition and the dormant Commerce Clause does not apply.  *See, e.g.*, *Tracy*, 519 U.S. at 303.  However, the Court recognizes that local utilities in Minnesota and out-of-state entities may compete for the right to build transmission lines.  In this case, LSP alleges that it wishes to compete against Minnesota electric utilities for the right to build transmission lines, but that it is being discriminated against by Minn. Stat. § 216B.246.  (Compl. ¶¶ 75-78.)  Under *Tracy*, however, the Court grants controlling weight to the monopoly market.  Minnesota is entitled to consider the effect on the public utilities and the consumers that the utilities serve and "to give the greater weight to the captive market and the local utilities' singular role in serving it."  *Tracy*, 519 U.S. at 304.  Moreover, like in *Tracy*, where the Supreme Court determined that the possibility of a negative impact on the ability of utilities to serve consumers in the monopoly market weighed against invalidating the challenged statute, the same holds true here.  *Tracy*, 519 U.S. at 309.  The reasons cited in support of giving greater weight to the monopoly market in *Tracy* apply here; namely, to avoid any jeopardy or disruption to the service of electricity to the state electricity consumers and to allow for the provision of a reliable supply of electricity.

In addition, as was the case in *Tracy*, the economic consequences of any Court intervention to strike down Minn. Stat. § 216B.246 are unclear.  *Id*. at 307.  Under Minn. Stat. § 216B.46, Minnesota not only gives existing owners a right of first refusal to build new transmission lines that will connect to their existing facilities, but in return Minnesota also places extensive regulatory burdens on those owners.  Any intervention by the Court could upset the balance between those burdens and regulation.  Importantly, Congress and FERC have both indicated that Minnesota is entitled to make the policy decision to adopt a right of first refusal to build new transmission lines.  And as it has been noted many times before, Congress, FERC, and the Minnesota legislature are "better-situated than the courts" to "determine the economic wisdom and the health and safety effects" of a decision on the correct balance between competition and a right of first refusal in the area of the building of electric transmission facilities.  *See, e.g.*, *Allco*, 861 F.3d at 107.  The Court, therefore, properly defers to their judgment.

The Court has considered, but is not persuaded by, LSP's arguments that *Tracy* is inapposite.  First, LSP argues that Minn. Stat. § 216B.246 does not single out providers that serve retail consumers as the sole beneficiaries of the statute's protection, but instead that it protects all transmission owning entities in Minnesota.  This distinction, however, is not persuasive.  While it is true that Minn. Stat. § 216B.246 relates to transmission lines, the main principle of *Tracy*—that there cannot be discrimination between entities that are not similarly situated—applies here.  Regulated utilities (the existing transmission line owners with a right of first refusal) are not similarly situated with

unregulated entities such as LSP. *See id.* at 298-99. Second, LSP argues that the Court is not required to defer to Minnesota's policy decision, and in particular because this case, unlike in *Tracy*, does not involve a tax law (and its "subtle complexities"). The Supreme Court in *Tracy*, however, explained that the dormant Commerce Clause "prohibits state taxation *or regulation* that discriminates against or unduly burdens interstate commerce." 519 U.S. at 287 (emphasis added). The relevant case law does not demand that tax statutes receive greater deference than regulatory statutes under the Commerce Clause.

For all of the above reasons, the Court concludes that *Tracy* forecloses LSP's allegation that Minn. Stat. § 216B.246 overtly discriminates against out-of-state transmission developers.

## B. Overt Discrimination

Even if LSP's claim of overt discrimination was not foreclosed by *Tracy*, LSP's argument that Minn. Stat. § 216B.246 facially discriminates because it grants incumbents the right to build federally approved transmission line projects in Minnesota fails. There is no dispute that the statute grants a preference to "incumbent electric transmission owners," but that preference does not discriminate against out-of-state entities. Instead, it affords companies whose facilities will connect to new transmission lines the first chance to build the new line. The statute's preference does not apply to all incumbent electric transmission owners, but only to those directly connected to the proposed line, whether those incumbents are in-state or out-of-state. The statute draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line

20

and all other entities, regardless of whether they are in-state or out-of-state. In fact, the Complaint lists the sixteen entities that would qualify as incumbents under Minn. Stat. § 216B.246, and five of those entities are headquartered outside of Minnesota. (Compl. ¶¶ 64-66; Doc. No. 39 at 26-27.)

In response, LSP argues that any owner of a transmission facility in Minnesota, regardless of their actual headquarters, should be considered "in-state." The Court disagrees. Incumbency bias is not the same as discrimination against out-of-state interests. *See Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 154 (4th Cir. 2016) (explaining that an incumbent recipient of a state benefit is not necessarily an "in-state resident"). Here, out-of-state companies can benefit from Minn. Stat. § 216B.246 on the same terms as a Minnesota company.

For the above reasons, the Court concludes that LSP has failed to demonstrate that Minn. Stat. § 216B.246 discriminates against out-of-state entities.[8]

### C. *Pike* Test

LSP argues that even if Minn. Stat. § 216B.246 regulates evenhandedly, it violates the Commerce Clause under the *Pike* balancing test. Specifically, LSP claims that Minn. Stat. § 216B.246 "unduly burdens interstate commerce by restricting entry to the transmission market in Minnesota, thus walling the state from new market participants." (Compl. ¶ 91.) Even where a law does not patently discriminate, it may still be invalid

---

[8] LSP has also failed to meet its burden to demonstrate that Minn. Stat. § 216B.246 has a discriminatory purpose or effect.

under the dormant Commerce Clause if its burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *S. Union*, 289 F.3d at 507 (quoting *Pike*, 397 U.S. at 142). The *Pike* test requires the balancing of a legitimate public interest against any incidental burdens on interstate commerce.

Minnesota has a strong and well-recognized interest in regulating the market for electricity that serves its citizens. *See, e.g.*, *Ark. Elec. Coop Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[t]he regulation of utilities is one of the most important functions traditionally associated with the police powers of the States"). Minnesota also has a long history of regulating both the construction and operation of transmission facilities. *See N. D. v. Heydinger*, 825 F.3d 912, 922 (8th Cir. 2016). The Minnesota legislature decided to create a right of first refusal as part of its broader scheme regulating utilities. Courts have upheld similar statutes in the face of dormant Commerce Clause challenges. *See, e.g.*, *S. Union*, 289 F.3d at 509. Indeed, the benefits of utility regulation have been presumed by courts. *See id.* (noting that "local public utility rate regulation is presumptively valid"). And courts have consistently noted that legislatures are uniquely positioned to make determinations regarding the "health, life, and safety" of their citizens, even if state legislation might indirectly affect commerce. *Tracy*, 519 U.S. at 306. In enacting Minn. Stat. § 216B.246, the Minnesota legislature determined that it is necessary to provide "the retail consumers of natural gas and electric service in this state with adequate and reliable services at reasonable rates," and that the legislation was necessary "to avoid unnecessary duplication of facilities which increase

22

ADD22

the cost of service to the consumer" and "to minimize disputes between public utilities which may result in inconvenience or diminish efficiency in service to the consumers." Minn. Stat. § 216B.01.  The Court concludes that Minnesota has demonstrated a strong interest in enacting Minn. Stat. § 216B.246 and various resulting benefits.

Turning to the second prong, the Court balances the local benefits of Minn. Stat. § 216B.246 with any incidental burden that the statute places on interstate commerce. LSP argues that the cumulative effect of individual states' right-of-first-refusal laws would nullify Order 1000's abolition of federal right-of-first-refusal laws and undermine its goals by effectively eliminating competition for transmission line projects.  LSP asserts that giving incumbents the right of first refusal would eliminate competitive bidding for these projects and would place a significant burden on interstate commerce. Moreover, LSP contends that Minn. Stat. § 216B.246 burdens LSP individually by effectively barring it from competing via the FERC-approved process for regionally planned projects approved for construction in Minnesota.  Finally, LSP asserts that the nature of the *Pike* balancing test is fact-intensive, making any decision premature.

As explained above, Minn. Stat. § 216B.246 does not provide a preference to in-state companies.  Instead, it gives a right of first refusal to companies (in-state or out-of-state) whose facilities will connect to the proposed transmission line.  Any incidental effects on interstate commerce caused by giving existing facilities a right of first refusal are insufficient to outweigh the significant local interest described above. *See, e.g.*, *Ark. Elec. Coop. Corp.*, 461 U.S. at 395.  In *Tracy*, the Supreme Court explains

23

that "there is no clear line between [the] two strands of analysis"—facial discrimination

and the "so-called *Pike* undue burden test." *Tracy*, 519 U.S. at 298 n.12.  The Supreme

Court also noted the narrow application of the *Pike* test:

> Nonetheless, a small number of our cases have invalidated state laws under
> the dormant Commerce Clause that appear to have been genuinely
> nondiscriminatory, in the sense that they did not impose disparate treatment
> on similarly situated in-state and out-of-state interests, where such laws
> undermined a compelling need for national uniformity in regulation.

*Id*.  Here, LSP has not shown that Minn. Stat. § 216B.246 undermines a compelling need

for national uniformity.  In fact, FERC, the agency charged by Congress with ensuring

national regulation of electric markets, expressly approved the use of state

right-of-first-refusal laws.  *Midwest Indep. Transmission Sys. Operator, Inc.*, 150 FERC

¶ 61037 at 18.  FERC explained that it had "struck an important balance" between

promoting competition and allowing the continued "regulation of matters reserved to the

states."  150 FERC at 61166 ¶ 27.  In its Complaint, LSP acknowledges that FERC's

rules are not intended to override transmission siting decisions by the state and that FERC

approved a provision in the MISO tariff that incorporates Minnesota's right-of-first

refusal.  (Compl. ¶¶ 44-45.)  Where Congress and FERC have endorsed the state's role, a

regulation will pass the *Pike* test if it was enacted in a "legitimate state pursuit."  *Allco*,

861 F.3d at 108.

After balancing under the *Pike* test, the Court concludes that any burden on

interstate commerce is outweighed by the benefits of Minnesota's right-of-first-refusal

statute.  Moreover, the Court notes that economic and free market arguments are better left to legislators.  *See Colon Health Ctrs.*, 813 F.3d at 158.

For all of the above reasons, the Court determines that Minn. Stat. § 216B.246 does not violate the dormant Commerce Clause.  LSP's Complaint is, therefore, dismissed.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motions to Dismiss (Doc. Nos. [18, 37, 48]) are **GRANTED** and Plaintiff's Complaint (Doc. No. [1]) is **DISMISSED WITH PREJUDICE**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  June 21, 2017                    s/Donovan W. Frank
                                         DONOVAN W. FRANK
                                         United States District Judge

# UNITED STATES DISTRICT COURT
## District of Minnesota

LSP Transmission Holdings, LLC,

Plaintiff(s),

v.

Nancy Lange, Commissioner and Chair,
Minnesota Public Utilities Commission;
Dan Lipschultz, Commissioner,
Minnesota Public Utilities Commission;
Matt Schuerger, Commissioner, Minnesota
Public Utilities Commission; John Tuma,
Commissioner, Minnesota Public Utilities
Commission; Katie Sieben, Commissioner,
Minnesota Public Utilities Commission; and
Mike Rothman, Commissioner, Minnesota
Public Utilities Commission, Minnesota
Department of Commerce, each in his or
her official capacity,

Defendant(s).

Northern States Power
Company d/b/a Xcel Energy,

and

ITC Midwest, LLC,

Intervenor -<br>Defendant(s)

**JUDGMENT IN A CIVIL CASE**

Case Number: 17-cv-4490 DWF/HB

☒ **Decision by Court**.  This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED THAT:

Defendants' Motions to Dismiss (Doc. Nos. [18, 37, 48]) are GRANTED and Plaintiff's Complaint (Doc. No. [1]) is DISMISSED WITH PREJUDICE.

Date: 6/22/2018

KATE M. FOGARTY, CLERK

s/M. Price

(By)  M. Price, Deputy Clerk