No. 18-2559

_____

LSP Transmission Holdings, LLC,

Plaintiff-Appellant,

vs.

Nancy Lange, Commissioner and Chair, Minnesota Public Utilities Commission;
Dan Lipschultz, Commissioner, Minnesota Public Utilities Commission; Matt
Schuerger, Commissioner, Minnesota Public Utilities Commission; John Tuma,
Commissioner, Minnesota Public Utilities Commission; Katie Sieben,
Commissioner, Minnesota Public Utilities Commission; and Mike Rothman,
Commissioner, Minnesota Department of Commerce, each in his or her official
capacity,

Defendants-Appellees.

and

Northern States Power Company d/b/a Xcel Energy, and ITC Midwest, LLC,

Intervenors-Appellees.

_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA**

_____

**BRIEF OF DEFENDANTS-APPELLEES**

_____

LOCKRIDGE GRINDAL NAUEN, P.L.L.P.
Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Rachel A. Kitze Collins (#0396555)
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900

OFFICE OF THE MINNESOTA ATTORNEY GENERAL
Jason Marisam (#0398187)
Assistant Attorney General
445 Minnesota Street, Suite 1100
St. Paul, MN 55101-2128
(651) 757-1275

Attorney for Defendants-Appellees

KIRKLAND & ELLIS LLP
Paul D. Clement
Erin E. Murphy
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
(202) 879-5000

Attorneys for Appellant LSP
Transmission Holdings, LLC

FAEGRE BAKER DANIELS LLP
Aaron D. Van Oort (#0315539)
Nathaniel J. Zylstra (#0314328)
2200 Wells Fargo Center
Minneapolis, MN 55402-3901
(612) 766-8726

Attorneys for Intervenor-Appellee
Northern States Power Company d/b/a
Xcel Energy

# SUMMARY OF THE CASE

This case involves a dormant Commerce Clause challenge to a Minnesota statute, Minn. Stat. § 216B.246, that grants local utilities and other incumbent transmission owners a right of first refusal ("ROFR") to build new transmission lines that connect to their existing facilities. Plaintiff-Appellant LSP Transmission Holdings, LLC, an out-of-state transmission company, alleged this statute discriminates against interstate commerce by favoring local utilities over out-of-state transmission companies.

The district court dismissed the lawsuit because *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), forecloses LSP's claim that the utilities statute discriminates against interstate commerce. The district court found that LSP's claim of discrimination also failed because the ROFR law draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state. The district court further found that the ROFR law satisfies the dormant Commerce Clause's *Pike* balancing test.

LSP timely filed an appeal of the district court's order.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ..................................................................................i

TABLE OF AUTHORITIES ............................................................................. iii

LEGAL ISSUE ...................................................................................................1

STATEMENT OF THE CASE .............................................................................2

I.  FEDERAL AND STATE REGULATION OF ELECTRICITY TRANSMISSION. ..............2

II.  FERC ORDER NO. 1000. ...................................................................3

III.  MINNESOTA'S ROFR LAW. ..............................................................5

IV.  FERC ALLOWS MISO TO ASSIGN TRANSMISSION PROJECTS IN ACCORDANCE WITH STATE ROFR LAWS...........................................8

V.  THE DISTRICT COURT DISMISSES LSP'S DORMANT COMMERCE CLAUSE ACTION. ...................................................................................10

SUMMARY OF ARGUMENT ..........................................................................11

ARGUMENT ....................................................................................................12

I.  THE DISTRICT COURT CORRECTLY DETERMINED THAT *TRACY* FORECLOSES LSP'S CLAIM OF OVERT DISCRIMINATION. ................................13

II.  LSP'S ATTEMPTS TO AVOID *TRACY* ARE UNAVAILING..................................21

III.  LSP'S CLAIM ALSO FAILS BECAUSE THE DORMANT COMMERCE CLAUSE DOES NOT PROHIBIT STATES FROM PRESERVING LONGSTANDING LOCAL UTILITY PRACTICES. ..................................................28

IV.  THE DISTRICT COURT CORRECTLY DETERMINED THAT LSP'S CLAIM CANNOT SATISFY THE *PIKE* TEST....................................................33

CONCLUSION ..................................................................................................34

# TABLE OF AUTHORITIES

**Page**

FEDERAL COURT CASES

*Allco Finance Limited v. Klee*,
    861 F.3d 82 (2d Cir. 2017).........................................................1, 18, 31, 33, 34

*Ark. Elec. Coop Corp. v. Ark. Pub. Serv. Comm'n*,
    461 U.S. 375 (1983)...........................................................................................34

*C&A Carbone, Inc. v. Town of Clarkstown*,
    511 U.S. 383 (1994)....................................................................................13, 32

*Colon Health Centers of America, LLC v. Hazel*,
    813 F.3d 145 (4th Cir. 2016) ...........................................................................26

*Department of Revenue of Kentucky v. Davis*,
    553 U.S. 328 (2008)...................................................................................1, 28, 29

*General Motors Corp. v. Tracy*,
    519 U.S. 278 (1997)............................................................................... passim

*Granholm v. Heald*,
    544 U.S. 460 (2005)...........................................................................................12

*MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016) .................................................................. passim

*Paddell v. City of New York*,
    211 U.S. 446 (1908)...........................................................................................29

*Piedmont Envtl. Council v. FERC*,
    558 F.3d 304 (4th Cir. 2009) ..............................................................................2

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970).....................................................................................13, 33

*Public Citizen v. Farm Credit Admin.*,
    938 F.2d 290 (D.C. Cir. 1991).........................................................................31

*R & M Oil & Supply, Inc. v. Saunders*,
307 F.3d 731 (8th Cir. 2002) ................................................................12

*South Dakota Farm Bureau, Inc. v. Hazeltine*,
340 F.3d 583 (8th Cir. 2003) ...............................................................12

*Stahl v. U.S. Dep't of Agric.*,
327 F.3d 697 (8th Cir. 2003) .................................................................8

**FEDERAL STATUTORY AUTHORITIES**

16 U.S.C. § 824(b)(1).............................................................................2

**STATUTORY AUTHORITIES**

Minn. Stat. §§ 216B.03–.04 ...................................................................3

Minn. Stat. § 216B.37. ............................................................................2

Minn. Stat. §§ 216B.38 .........................................................................24

Minn. Stat. § 216B.40. ............................................................... 3, 15, 24

Minn. Stat. § 216B.243 ............................................................... 6, 25, 26

Minn. Stat. § 216B.246 ................................................................. passim

Minn. Stat. § 216B.2425 .........................................................................6

N.D. Cent. Code §49–03–02.2................................................................5

Neb. Rev. Stat. § 70-1028.......................................................................5

17 O.K. Stat. § 292 .................................................................................5

S.D. Codified Laws §49–32–20 ..............................................................5

**STATE RULES AND REGULATIONS**

Minn. Admin. R. 7829.0800 ..........................................................................6

Minn. Admin. R. 7848.1400, subp. 1 .......................................................6

Minn. Admin. R. 7849.0120 ...............................................................7, 25

**FERC ORDERS**

147 FERC ¶61,127 (2014) ........................................................... 9, 19, 20

148 FERC ¶62,112 (2014) .......................................................................24

150 FERC ¶ 61,037 (2015) .......................................................... 9, 19, 20

FERC Order No. 1000, 136 FERC ¶61,051 (2011)........................... 16, 27

**CONSTITUTIONAL PROVISIONS**

U.S. Const.Art. I, § 8, cl. 3.......................................................................12

**LEGAL ISSUE**


Whether a Minnesota statute, Minn. Stat. § 216B.246, granting incumbent electric transmission owners a right of first refusal to build transmission lines that connect to their existing facilities violates the dormant Commerce Clause.

*General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)
*Department of Revenue of Kentucky v. Davis*, 553 U.S. 328 (2008)
*Allco Finance Limited v. Klee*, 861 F.3d 82 (2d Cir. 2017)
*MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016)

# STATEMENT OF THE CASE

## I.  FEDERAL AND STATE REGULATION OF ELECTRICITY TRANSMISSION.

Electricity is provided to consumers in three steps: (1) electricity is generated at power plants; (2) transmitted on an integrated system through large transmission lines; and (3) distributed to consumers through smaller distribution lines. Addendum of Appellant (Add.) at 3. This case involves the regulation of electricity transmission in Minnesota.

The Federal Energy Regulatory Commission (FERC) has jurisdiction over the interstate transmission of electric energy and its sale at wholesale. 16 U.S.C. § 824(b)(1). The states retain jurisdiction over the retail sale of electric energy, as well as the "local distribution" and "transmission of electric energy in intrastate commerce." *Id.* States' jurisdiction includes the approval or denial of permits for the siting and construction of electric transmission facilities. *See Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009).

In Minnesota, electric service is provided by monopolies. Electric utilities are assigned to retail service areas "in order to encourage the development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public." Minn. Stat. § 216B.37. Within their respective service territories, each electric utility has "the exclusive right to

provide electric service at retail to each and every present and future customer in its assigned area and no [other] electric utility shall render or extend electric service at retail." Minn. Stat. § 216B.40. The PUC sets "just and reasonable" retail rates for public utilities, ensuring each provides "safe, adequate, efficient, and reasonable service," and "make[s] adequate infrastructure investments." Minn. Stat. §§ 216B.03–.04, and .79.

Regionally, FERC-approved nongovernmental entities, known as independent system operators (ISOs), oversee the operation and expansion of transmission grids. Appendix of Appellant ("App.") at 5, ¶ 14. Each ISO issues a tariff that establishes the terms by which its members build and operate transmission facilities within the portion of the national grid managed by the ISO. *Id.* ¶ 15. ISO tariffs are subject to FERC approval. *Id.* Minnesota's electric utilities are covered by the Midcontinent Independent System Operator (MISO). *Id.* ¶ 16.

## II. FERC ORDER NO. 1000.

Until 2011, if MISO approved construction of a new transmission line, the MISO member that distributed electricity in the area where the facility would be built had a federal right of first refusal (ROFR) that gave it the "first crack" to build the line. App. at 5–6, ¶ 17; *MISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016). The federal ROFR existed pursuant to the terms of the

organizing MISO members' transmission agreement and MISO's tariff. App. at 5–6, ¶ 17. Such ROFRs were common among ISOs. *Id.*

In 2011, FERC eliminated the federal ROFRs. Specifically, FERC Order No. 1000 required ISOs to "eliminate provisions in Commission-jurisdictional tariffs and agreements that establish a federal right of first refusal for an incumbent transmission provider with respect to transmission facilities selected in a regional transmission plan for purposes of cost allocation." 136 FERC ¶61,051 at PP 284, 313 (2011), 2011 WL 2956837 at *91, *101. FERC supported this decision by citing "the benefits of competition in transmission development, and associated potential savings." *Id.* at P 285, 2011 WL 2956837 at *91. FERC further explained:

> However, we note that nothing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities.

*Id.* at P 227, 2011 WL 2956837 at *72.

Commissioner Philip Moeller filed a partial dissent to FERC Order No. 1000, in which he cited concerns about regional cooperation and reliability. 136 FERC ¶61,051 (2011), 2011 WL 2956837 (Moeller, Comm'r, dissenting in a separate statement attached). He worried that transmission owners would focus on projects where they may still retain ROFRs, such as wholly local projects, to the detriment of regional projects: "For this reason, instead of encouraging more

regional cooperation, the rule could ultimately discourage such cooperation by encouraging more local transmission projects." *Id.*

Commissioner Moeller also expressed concern that removing the federal ROFR would limit a utility's ability to "maintain the reliability of its existing network" and the utility's "authority to address reliability issues in its franchised service territory." *Id.*

## III. MINNESOTA'S ROFR LAW.

After FERC Order No. 1000 eliminated federal ROFRs, several states, including Minnesota, enacted state ROFR laws. *See, e.g.,* N.D. Cent. Code §49–03–02.2; S.D. Codified Laws §49–32–20; Neb. Rev. Stat. § 70-1028; 17 O.K. Stat. § 292. Minnesota's ROFR law provides:

> An incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent electric transmission owner.

Minn. Stat. § 216B.246, subd. 2. If an incumbent chooses not to build planned transmission that connects to its facility, the PUC may order the incumbent to build the transmission, or the PUC may select another entity to build the line. *Id.* § 216B.246, subd. 3.

The statute defines "incumbent electric transmission owner" as "any public utility that owns, operates, and maintains an electric transmission line in this state;

any generation and transmission cooperative electric association; any municipal power agency; any power district; any municipal utility; or any transmission company as defined under section 216B.02, subdivision 10." *Id.* § 216B.246, subd. 1(c).

No high-voltage transmission lines may be sited or built in Minnesota without a "certificate of need" from the PUC. Minn. Stat. § 216B.243, subd. 2. An incumbent under the ROFR law must also receive a "certificate of need" from the PUC before building a transmission facility. *Id.* § 216B.246, subd. 3(a). The ROFR law requires an incumbent electric transmission owner to "file an application for a certificate of need" before beginning construction. Minn. Stat. § 216B.246, subd. 3(a).[1] In determining whether an applicant for a certificate has justified its need, the PUC considers several factors, including "possible alternatives for satisfying the energy demand or transmission needs." *Id.* § 216B.243, subd. 3(6). Third parties may intervene in the proceedings and propose alternatives. Minn. Admin. R. 7829.0800 and 7849.0110. The PUC will only

---

[1] Technically, the statute gives the incumbent the choice of applying for a certificate of need under section 216B.243 or a certification under section 216B.2425. Minn. Stat. § 216B.246, subd. 3(a). However, under either statutory section, the incumbent must meet the same certificate of need standard. *See* Minn. Stat. § 216B.2425, subd. 3 (establishing that the PUC makes a certification determination "applying the criteria" from the certificate of need statute); *see also* Minn. Admin. R. 7848.1400, subp. 1.

grant the certificate of need if "a more reasonable and prudent alternative to the proposed facility has not been demonstrated by a preponderance of the evidence on the record." Minn. Admin. R. 7849.0120, subp. B.

A primary purpose of the ROFR law is to preserve longstanding preferences and practices for electric transmission development. Historically, since the early part of the twentieth century, incumbent utilities have built the electric transmission projects in their service areas. App. at 3, ¶ 9; 5–6, ¶ 17. Under Minnesota's ROFR law, incumbents will continue to build planned and needed transmission lines in their areas, unless the incumbent chooses not to exercise its right of first refusal to build a line and the PUC declines to order the incumbent to build the line anyway.[2] Minn. Stat. § 216B.246, subds. 2, 3. In this way, the ROFR law establishes a preference, in line with the historical preference, for local utilities to build the transmission facilities located and operated within their exclusive service territories. The ROFR law also ensures continuation of Minnesota's existing system under which transmission is built only when it is needed and in a cost-effective manner.

Preserving the status quo for electricity transmission, including the status quo of reliability and reasonable rates in Minnesota, was an express purpose of the

---

[2] An incumbent utility also would not build planned transmission lines in its service area if its proposal could not satisfy the PUC's certificate of need standards, as discussed above.

ROFR law.  At the Senate committee hearing on the ROFR bill, Senator David Brown, one of the bill's authors, stated: "Our regulated system has served Minnesota well, and our system is reliable and our rates are fairly competitive." *Hearing Before the Comm. on Energy, Utilities and Telecommunications*, S.F. 1815, 87th Minn. Leg. (2012) (Statement of Senator David Brown at 00:01:32); App. at 34.[3]  However, he warned:

> If we choose not to pass this legislation, we are moving into the world of the unknown, versus we have a very known process right now, members.  And I think it's best to stick with that process because FERC's process is unknown.

*Id.* (Statement of Senator David Brown at 00:49:46); App. at 48.  The bill passed and was signed into law in 2012.  App. at 18, ¶ 56.

## IV.  FERC ALLOWS MISO TO ASSIGN TRANSMISSION PROJECTS IN ACCORDANCE WITH STATE ROFR LAWS.

MISO removed the federal ROFR provisions from its tariff, in accordance with FERC Order No. 1000.  App. at 15, ¶ 45.  At the same time, MISO added language establishing that transmission projects will be assigned in accordance with state ROFR laws.  *Id.*  Thus, under the terms of the tariff, a new MISO-

---

[3] The audio for this committee hearing is publicly available through the *Minnesota Senate Audio Services*, http://www.senate.mn/media/index.php?ls=&type=audio. A transcript of the committee hearing was also made by the Attorney General's Office and submitted for the Court's convenience.  *See* App. at 31–50.  This legislative history is a public record and thus may be considered on a motion to dismiss.  *See Stahl v. U.S. Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003).

approved transmission project in Minnesota would be subject to Minnesota's ROFR law.

FERC approved MISO's decision to abide by state ROFR laws. 147 FERC ¶61,127 (2014), 2014 WL 1997986. FERC expressly stated:

> We continue to require the elimination of federal rights of first refusal from Commission-jurisdictional tariffs or agreements, but that is not the issue here. Rather, the issue is whether it is appropriate for the Commission to prohibit MISO from recognizing state and local laws and regulations when deciding whether MISO will hold a competitive solicitation for a transmission facility selected in the regional transmission plan for purposes of cost allocation. On balance, we conclude that the Commission should not prohibit MISO from recognizing state and local laws and regulations as a threshold issue.

*Id.* at P 149, 2014 WL 1997986 at *40.

Further, FERC found: "We recognize that, even if a transmission project is subject to a state right of first refusal, the regional transmission planning process still results in the selection for planning and cost allocation purposes of transmission projects that are more efficient or cost-effective than would have been developed but for such processes." *Id.* at P 157, 2014 WL 1997986 at *43.

FERC then denied a petition for rehearing on the ROFR issue, stating: "In denying rehearing, we confirm . . . that it is appropriate for MISO to recognize state or local laws or regulations as a threshold matter in the regional transmission planning process." 150 FERC ¶ 61,037 at P 25 (2015), 2015 WL 285969 at *7.

LSP petitioned for judicial review, "complain[ing] about FERC's having decided to allow MISO to include in its tariff a provision that allows it to honor rights of first refusal created by state and local law." *MISO Transmission Owners*, 819 F.3d at 336. The Seventh Circuit Court of Appeals held that FERC's desire "to avoid intrusion on the traditional role of the States in regulating the siting and construction of transmission facilities . . . was a proper goal," and dismissed LSP's challenge. *Id.* (internal quotation omitted).

## V.  THE DISTRICT COURT DISMISSES LSP'S DORMANT COMMERCE CLAUSE ACTION.

After LSP's arguments against state ROFR laws failed before FERC and the Seventh Circuit, LSP filed this lawsuit, claiming that Minnesota's ROFR law violates the dormant Commerce Clause. LSP alleged that the law discriminates against interstate commerce because it gives "incumbent utilities with an existing footprint in Minnesota the exclusive right of first refusal to build transmission lines," thus providing a barrier to interstate competition and blocking LSP's entry into the marketplace. App. at 26, ¶ 85–86; 29, ¶ 95. LSP sued the Commissioners of the PUC, in their official capacities. The PUC Commissioners moved to dismiss the Complaint. Northern States Power Co., doing business as Xcel Energy, and ITC Midwest LLC were allowed to intervene as defendants, and they also moved to dismiss the Complaint.

The district court concluded that *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), foreclosed LSP's claim that the statute discriminates against interstate commerce. Add. at 14–20. The district court found that LSP's claim of overt discrimination also failed because the ROFR law "draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state." *Id.* at 20–21. Finally, the district court found that the ROFR law satisfies the Commerce Clause's *Pike* balancing test. *Id.* at 21–25.

## SUMMARY OF ARGUMENT

In *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), the Supreme Court held that private businesses and energy utilities with local monopolies are not similarly situated for purposes of the dormant Commerce Clause, and thus arguments that a state law discriminated between private businesses and local utilities with respect to energy distribution failed. The district court correctly found that the logic and holding of *Tracy* extend to the challenged energy transmission statute and foreclose LSP's claim of overt discrimination. The claim also fails because the dormant Commerce Clause does not prohibit a state from preserving longstanding local utility practices, as Minnesota did when it enacted the ROFR law. Finally, the district court correctly concluded that LSP's claim fails the *Pike* balancing test.

## ARGUMENT

The Commerce Clause establishes Congress's power over interstate commerce. U.S. Const., Art. I, § 8, cl. 3. The dormant Commerce Clause is the negative implication of the Commerce Clause and establishes that states may not enact laws that discriminate against or unduly burden interstate commerce. *South Dakota Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 592 (8th Cir. 2003). State laws violate the dormant Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005). This mandate "reflect[s] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation." *Id.*

A state law that is challenged on dormant Commerce Clause grounds is subject to a two-tiered analysis. First, the court considers whether the law in question patently or overtly discriminates against interstate commerce. *R & M Oil & Supply, Inc. v. Saunders*, 307 F.3d 731, 734 (8th Cir. 2002). A statute overtly discriminates if it is discriminatory on its face, in its purpose, or through its effects. *Id.* If the law is overtly discriminatory, it is per se unconstitutional, unless the state

can demonstrate, "under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 392 (1994). If the law is not overtly discriminatory, the second analytical tier provides that the law will be struck down only if the burden it imposes on interstate commerce "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

## I. THE DISTRICT COURT CORRECTLY DETERMINED THAT *TRACY* FORECLOSES LSP'S CLAIM OF OVERT DISCRIMINATION.

The district court correctly concluded that the reasoning behind the dismissal of the dormant Commerce Clause challenge in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), applies to this case. Add. at 17. In *Tracy*, the Supreme Court rejected a dormant Commerce Clause challenge to a state law favoring local utilities in several analytical steps, each of which applies to this case.

*Tracy* involved an Ohio law that exempted state-regulated natural gas utilities from sales and use taxes. *Tracy*, 519 U.S. at 281–83. General Motors, which had purchased natural gas from out-of-state marketers whose sales were subject to the taxes, objected that the exemption for the local utilities patently discriminated against interstate commerce. *Id.* at 297–98. The Supreme Court began its analysis with a threshold question that applies to all dormant Commerce Clause cases: whether the in-state and out-of-state entities are "substantially similar"—that is, whether they compete in the same market. *Id.* at 298–99. If they

do not, then "eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a natural market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Id.* at 299.

The *Tracy* Court first found that the local utilities serve residential customers through monopolies that exist independent of the challenged law. *Id.* at 297–98, 302–03. For sales to consumers in these monopolies, the local utilities and the out-of-state marketers were not similarly situated because the entities did not and could not compete. *Id.* at 302–303. Accordingly, the Court held that "the dormant Commerce Clause has no job to do." *Id.* at 303.

The *Tracy* Court next found that the utilities did not have a monopoly with respect to the sale of natural gas to industrial consumers, or bulk buyers. *Id.* Here, at least, there was "a possibility of competition" between the private businesses and the local utilities, and thus the possibility of a dormant Commerce Clause violation. *Id.* at 302.

The Court framed the dispositive question as: "Should we accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utilities alone operate?" *Id.* at 303–04. For three reasons, the Court held that it would give controlling weight to the monopoly market:

> First and most important, we must recognize an obligation to proceed cautiously lest we imperil the delivery by regulated [utilities] of bundled gas to the noncompetitive captive market. Second, as a Court we lack the expertness and the institutional resources necessary to predict the effects of judicial intervention invalidating Ohio's tax scheme on the utilities' capacity to serve this captive market. Finally, should intervention by the National Government be necessary, Congress has both the resources and the power to strike the balance between the needs of the competitive and captive markets.

*Id.* at 304. The Court emphasized: "Where a choice is possible, as it is here, the importance of traditional regulated service to the captive market makes a powerful case against any judicial treatment that might jeopardize [the utilities'] continuing capacity to serve the captive market." *Id.* Accordingly, the Court rejected the dormant Commerce Clause challenge. *Id.*

The same analyses and reasoning that supported the dismissal of the dormant Commerce Clause claim in *Tracy* apply in this case. This action involves LSP's claim that Minnesota's ROFR law favors local utilities over out-of-state transmission developers. App. at 23, ¶ 68; 26, ¶ 85. Yet, the local utilities have monopolies with respect to the sale of electricity to consumers, because state law grants them exclusive service areas. Minn. Stat. § 216B.40. For these sales, there is no competition. Accordingly, "the dormant Commerce Clause has no job to do." *Tracy*, 519 U.S. at 303.

However, as in *Tracy*, there is one area where the local utilities and out-of-state entities may compete: the building of electric transmission lines as part of the

MISO regional planning process. LSP alleges it wants to compete against Minnesota's electric utilities here but is hindered by the state ROFR law. App. at 24–25, ¶¶ 75–78.

The question is whether to accord controlling significance to this area of competition, or to the monopoly market for electricity distribution where the utilities alone operate. *Tracy*, 519 U.S. at 303–304. *Tracy* dictates that this Court grant controlling weight to the monopoly market.

The *Tracy* Court was concerned that, by striking down an alleged barrier to competition in a competitive area, it might impact the distribution of energy to consumers in a monopoly market. *Id.* at 304–305, 309. The *Tracy* Court acknowledged that it was "far more likely" that eliminating the barrier would not, on net, weaken the utilities' position to serve consumers in the monopoly market. *Id.* at 307–308. Nevertheless, the Court determined that the mere possibility of a negative impact counseled against invalidating the law. *Id.* at 309. The *Tracy* Court emphasized "the importance of avoiding any jeopardy to service of the state-regulated captive market" for energy. *Id.* at 305.

The same rationale applies here. One FERC Commissioner dissented from FERC Order No. 1000 because of concerns that the elimination of the ROFR would jeopardize regional cooperation and the reliable distribution of electricity to consumers. *See* FERC Order No. 1000, 136 FERC ¶61,051 (2011), 2011 WL

2956837 (Moeller, Comm'r, dissenting in a separate statement attached). The Minnesota legislature chose to avoid the uncertain effects from the elimination of the ROFR and instead opted to codify the status quo in state law. *See* App. at 17, ¶ 53; App. 48; *see also supra* at pp. 7–8. If this Court were to strike down Minnesota's ROFR law, it would inject uncertainty and risk into Minnesota's electric energy market. The Minnesota legislature passed the ROFR law to avoid these risks, and the *Tracy* Court unequivocally counseled against judicial intervention that might create such risks. *Tracy*, 519 U.S. at 304–305, 309.

Under *Tracy*, the monopoly market for electricity sales to retail consumers, where Minnesota's utilities have no competition, is entitled to greater weight than the market for building transmission lines, where the local utilities and developers may compete. As the district court correctly found: "The reasons cited in support of giving greater weight to the monopoly market in *Tracy* apply here; namely, to avoid any jeopardy or disruption to the service of electricity to the state electricity consumers and to allow for the provision of a reliable supply of electricity." Add. at 18. Thus, Minnesota's utilities are not similarly situated to out-of-state transmission developers for purposes of the dormant Commerce Clause. Accordingly, the argument that Minnesota's ROFR law patently or overtly discriminates between local utilities and out-of-state transmission developers fails.

Moreover, the Minnesota ROFR law places more responsibility on an incumbent utility than on a non-incumbent entity, again suggesting that the two types of entities are not similarly situated. As discussed above, under the Minnesota ROFR law, the PUC may require an incumbent to build a transmission line, even if it gives notice of intent not to build the line. *See* Minn. Stat. § 216B.246, subd. 3 ("If the incumbent electric transmission owner, or owners, gives notice of intent not to build the electric transmission line, then the commission may determine whether the incumbent electric transmission owner or other entity will build the electric transmission line . . . ."). Non-incumbent entities do not face such a possibility.

The Second Circuit Court of Appeals recently applied *Tracy* when rejecting a dormant Commerce Clause challenge to a Connecticut program that distinguished between in-state and out-of-state entities in the electricity market. *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 86 (2d Cir. 2017). In *Allco*, a state program required electric utilities to purchase renewable energy credits from renewable energy producers "located in the region." 861 F.3d at 86. This requirement prejudiced renewable energy producers from states not in that region. *Id.* at 106. However, guided by "the more general language in *Tracy*," the court found that the requirement advanced legitimate interests in the state's local energy market and was not unconstitutional discrimination. *Id.* at 106-07. The court specifically

found that FERC's establishment of a regional market in electricity weighed against judicial intervention:

> [I]t is FERC itself that has instituted a sort of regionalization of the national electricity market. And neither FERC nor Congress has given any indication that this structure is unduly harmful to interstate commerce. Congress and FERC are better-situated than the courts to supervise and to determine the economic wisdom and the health and safety effects of these geographic boundaries that Connecticut has incorporated into its RPS program. It is they that, in this setting, are best suited to decide which products ought to be treated similarly, and which should not.

*Id.* at 107.

Similarly, here, FERC has given no indication that state ROFR laws are unduly harmful to interstate commerce. Indeed, FERC expressly found: "We recognize that, even if a transmission project is subject to a state right of first refusal, the regional transmission planning process still results in the selection for planning and cost allocation purposes of transmission projects that are more efficient or cost-effective than would have been developed but for such processes." 147 FERC ¶ 61,127 at P 157 (2014), 2014 WL 1997986 at *43. When LSP asked FERC to strike this finding, FERC instead reaffirmed it. 150 FERC ¶ 61,037 at P 33 (2015), 2015 WL 285969 at *11 ("Similarly, we disagree with LS Power that the Commission should strike, as unsupported, its finding that 'even if a transmission project is subject to a state right of first refusal . . . .'").

LSP and the Department of Justice (DOJ) unsuccessfully attempt to cast doubt on whether FERC expressly allowed the use of ROFR laws in the regional transmission planning process. As discussed, MISO included language in its tariff establishing that transmission projects will be assigned in accordance with state ROFR laws, including Minnesota's ROFR law. App. at 15, ¶ 45. FERC expressly approved this language in the MISO tariff, stating:

> We continue to require the elimination of federal rights of first refusal from Commission-jurisdictional tariffs or agreements, but that is not the issue here. Rather, the issue is whether it is appropriate for the Commission to prohibit MISO from recognizing state and local laws and regulations when deciding whether MISO will hold a competitive solicitation for a transmission facility selected in the regional transmission plan for purposes of cost allocation. On balance, we conclude that the Commission should not prohibit MISO from recognizing state and local laws and regulations as a threshold issue.

147 FERC ¶61,127 at P 149 (2014), 2014 WL 1997986 at *40; *see also supra* Statement of the Case, IV. FERC then denied a petition seeking rehearing on the ROFR issue. 150 FERC ¶61,037 at PP 24–33 (2015), 2015 WL 285969 at *7–11. In denying rehearing, FERC confirmed that "it is appropriate for MISO to recognize state or local laws or regulations as a threshold matter in the regional transmission planning process." *Id.* at P 25.

When LSP challenged FERC's decision in the Seventh Circuit Court of Appeals, the court characterized FERC's decision this way: FERC "decided to allow MISO to include in its tariff a provision that allows it to honor rights of first

refusal created by state and local law." *MISO Transmission Owners*, 819 F.3d at 336. The Seventh Circuit upheld FERC's decision and expressly rejected LSP's argument that, "even if one grants that FERC can allow a state law to give an incumbent transmission company a right of first refusal, MISO should not be permitted to exclude outsiders from competing." *Id.*

In short, it cannot be disputed that FERC allowed MISO to abide by state ROFR laws, such as Minnesota's, in the regional transmission planning process. In doing so, FERC expressly recognized the appropriateness of MISO's decision. As in *Allco*, the logic of the *Tracy* holding, coupled with FERC oversight of the matter, weigh against judicial intervention. If FERC were troubled by the use of state ROFR laws, FERC could prohibit their use at any time.

## II.  LSP'S ATTEMPTS TO AVOID *TRACY* ARE UNAVAILING.

LSP offers several arguments to distinguish or avoid *Tracy*, each of which is unavailing.

First, the argument from LSP and DOJ that *Tracy* does not establish an across-the-board dormant Commerce Clause exception for laws benefiting public utilities is a strawman. Neither the district court nor the PUC adopted this broad position. There are any number of markets for which it would be unconstitutional for a state to grant a local utility special preference over out-of-state interests. For example, as the lone dissent in *Tracy* pointed out, "electric utilities may distribute

goods, such as light bulbs, in a competitive market," and a state's special preference for utilities' light bulbs over out-of-state light bulbs could violate the dormant Commerce Clause. *Tracy*, 519 U.S. at 314 (Stevens, J., dissenting).

However, while *Tracy* may not extend to a utility's decision to start selling light bulbs, it does extend to traditional regulated utility services—*i.e.,* energy generation, transmission, and distribution. The *Tracy* Court clearly applied its holding to energy distribution, and there is no principled reason why the logic does not also extend to energy transmission. Indeed, the *Tracy* Court repeatedly emphasized the importance of "traditional regulated service" by utilities and explained that "the values served by [] traditional regulation" of utilities "counsel caution" for the judiciary. *Tracy*, 519 U.S. at 304, 307.

Second, LSP argues that this case is distinguishable from *Tracy* because, in that case, the local utilities and out-of-state marketers were offering different products. Specifically, LSP argues that the marketers were selling natural gas, while the utilities were selling natural gas bundled with rights and benefits mandated by state regulators. However, contrary to LSP's characterization of *Tracy*, the local utilities and the out-of-state marketers were competing to sell the same product (natural gas) to the same customers (bulk buyers). The bundled protections mandated by state regulation were only relevant to the noncompetitive market of individual consumers, where the utilities had monopolies. *Id.* at 301.

By contrast, "bulk buyers like GMC . . . have no need for bundled protection." *Id.* at 302. Thus, as to the market for bulk buyers, the local utilities and the out-of-state marketers were offering the same product to the same buyers.

The dispositive issue for the *Tracy* Court was: "whether the opportunities for competition between marketers and [local utilities] in the noncaptive market [for bulk buyers] requires treating marketers and utilities as alike for dormant Commerce Clause purposes." *Id.* at 303. The Court held that the utilities and out-of-state marketers were not similarly situated, because the Court ultimately "accord[ed] controlling significance . . . to the noncompetitive, captive market in which the local utilities alone operate." *Id.* at 303–04. The same dispositive issue is present here, and the same analysis applies.

Third, LSP attempts to distinguish *Tracy* by arguing that the ROFR law not only benefits local utilities but also transmission companies, which do not generate or distribute electricity and do not have monopoly service areas. LSP, however, concedes in its Complaint that the ROFR law was intended to benefit four local utilities that own nearly eighty percent of the transmission line assets in Minnesota. App. at 22–23, ¶ 67. The Complaint specifically alleges the ROFR law "protects these [four] incumbent utilities from competition from out-of-state developers for the right to develop transmission lines," *id.*, and that the "statute was intended to protect those owners from competition." *Id.* at 26, ¶ 87. These utilities distribute

electricity to consumers in service areas where they, or their members, have monopolies.[4]  *See* App. at 22–24, ¶ 64; Minn. Stat. §§ 216B.38, subd. 5, and 216B.40.  Thus, the primary effect and purpose of the law is to benefit energy utilities performing a core utility function, just as in *Tracy*.

LSP's attempt to focus on transmission companies' small role in the market fails to show discrimination because, under Minnesota law, competition among transmission companies is determined by non-discriminatory factors, such as cost and reliability.  The ROFR statute contemplates that a transmission company can build new transmission in a local utility's service area, if the utility chooses not to build the lines and the PUC decides not to order the utility to do so.  *See* Minn. Stat. § 216B.246, subd. 3.  In this situation, the PUC may select another transmission builder by "taking into consideration issues such as cost, efficiency, reliability, and other factors."  *Id.*  Any transmission company, including LSP, could be selected through this process, based on these non-discriminatory factors.

---

[4]  Three of these utilities are structured as investor-owned utilities that distribute electricity directly to consumers.  App. at 20–23, ¶¶ 64, 67.  The fourth, Great River Energy, is structured as a generation and transmission cooperative, which means it is made up of cooperative members, each of which distributes electricity in its service area.  *Id.*; Minn. Stat. §§ 216B.38, subd. 5, and 216B.40; *see also Great River Energy*, 148 FERC  ¶62,112 (2014), 2014 WL 3843210 (noting that Great River supplies electricity to its member distribution cooperatives, who in turn distribute it).  LSP does not suggest that this difference in organizational structure has constitutional significance.

Thus, the law does not discriminate among transmission companies with respect to entering the Minnesota transmission market when opportunities arise.

With respect to the incumbency advantage granted to transmission companies that already own lines in Minnesota, this too is based on non-discriminatory decisions. No transmission company can build transmission lines in Minnesota without first receiving a certificate of need from the PUC. Minn. Stat. § 216B.243, subds. 2 & 3; *see also supra* at pp. 6–7. The company must justify the need for its project based on the demand for electricity, the project's cost-effectiveness, its reliability, its impact on energy conservation, and other factors. Minn. Stat. § 216B.243, subd. 3. The PUC only grants a certificate if it determines that "a more reasonable and prudent alternative to the proposed facility has not been demonstrated by a preponderance of the evidence on the record." Minn. Admin. R. 7849.0120. Thus, the incumbent utilities are not protected from all competitive pressures, as LSP claims.

After receiving a certificate and building its transmission lines, the company receives a right of first refusal to expand those lines, if the regional transmission plan calls for such an expansion. Minn. Stat. § 216B.246, subd. 2. Even with the right of first refusal, though, the company must still receive a certificate of need for the expansion project. Minn. Stat. § 216B.243, subds. 2 & 3; Minn. Stat. § 216B.246, subd. 3; *see also supra* at pp. 6–7. The project is subject to disapproval

if its need is not justified, including if there were a more prudent alternative on the record before the PUC. Minn. Stat. § 216B.243, subd. 3.

In short, for transmission companies seeking to enter the Minnesota market, the ROFR law contemplates competition based on "cost, efficiency, reliability, and other factors." Minn. Stat. § 216B.246, subd. 3. For transmission companies seeking to expand their existing lines in Minnesota, the ROFR law grants them the right to build the expansion, but only where they have already demonstrated that their existing lines can efficiently and reliably transmit electricity and they can justify a need for the expansion through the PUC's certificate of need process. The dormant Commerce Clause does not require Minnesota to ignore the proven efficiency and reliability of an incumbent transmission company's lines and force the company into further competition each time it demonstrates a need to expand its lines. *See Colon Health Centers of America, LLC v. Hazel*, 813 F.3d 145, 154 (4th Cir. 2016) ("[I]ncumbency is not the focus of the dormant Commerce Clause," and "incumbency bias" does not by itself show unconstitutional discrimination.). Thus, LSP's attempt to shift the focus to transmission companies, and away from the local utilities that are indisputably the primary beneficiaries of the ROFR statute, is misguided and does not show unconstitutional discrimination.

Fourth, LSP argues that eliminating the ROFR law will not harm or impact electricity distribution to consumers. The *Tracy* Court, though, made clear that it

is not a court's role to assess how eliminating a utilities law might affect consumers dependent on utilities for energy distribution. *Tracy*, 519 U.S. at 307. In *Tracy*, the Court suggested that eliminating the law might weaken the utilities' abilities to serve customers, but also that it was "far more likely" that eliminating the law would not, on net, have a negative effect. *Id.* at 307–308. The Court ultimately concluded that such predictions were impossible to make because "the Court is institutionally unsuited to gather the facts upon which economic predictions can be made." *Id.* at 308. The mere possibility of a negative impact on the distribution of energy to consumers was enough to justify upholding the law. *Id.* at 309.

Here, there are concerns about electricity distribution and cooperation among utilities, as discussed above. One FERC commissioner expressed concerns that eliminating federal ROFR laws could jeopardize regional cooperation and the reliable distribution of electricity to consumers. *See* FERC Order No. 1000, 136 FERC ¶61,051 (2011), 2011 WL 2956837 (Moeller, Comm'r, dissenting in a separate statement attached). Indeed, the Minnesota legislature enacted the ROFR law to avoid the uncertain effects from the elimination of the federal ROFR. *See supra* at pp. 7–8 (citing statement of Senator David Brown). LSP suggests there is a fact issue as to whether consumers would, on net, be hurt by the elimination of the ROFR. However, *Tracy* instructs this Court to decline LSP's request to have

courts estimate how Minnesota consumers of electricity might benefit or suffer if the ROFR law were invalidated. The mere possibility that eliminating the law could impede electricity distribution is sufficient, under *Tracy*, to uphold the law.

Finally, to the extent LSP suggests *Tracy* is distinguishable because it involved a tax, the *Tracy* Court expressly extended its holding to any "regulatory differential," stating that, where the plaintiff is not similarly situated to the favored in-state entities, "eliminating the tax or other regulatory differential would not serve the dormant Commerce Clause's fundamental objective . . . ." *Tracy*, 519 U.S. at 299.

Overall, the core rationale for the *Tracy* opinion applies here, and LSP's attempts to distinguish or avoid the Supreme Court's holding in *Tracy* are unavailing.

### III. LSP'S CLAIM ALSO FAILS BECAUSE THE DORMANT COMMERCE CLAUSE DOES NOT PROHIBIT STATES FROM PRESERVING LONGSTANDING LOCAL UTILITY PRACTICES.

The dormant Commerce Clause does not forbid states from preserving longstanding local utility practices, as Minnesota did in enacting the ROFR law. Indeed, the Supreme Court has cautioned against accepting an "invitation to the adventurism of overturning a traditional local . . . practice" on dormant Commerce Clause grounds. *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 356 (2008).

While the purpose of the dormant Commerce Clause is to prevent economic Balkanization among the states, the "law has had to respect a cross-purpose as well, for the Framers' distrust of economic Balkanization was limited by their federalism favoring a local degree of autonomy." *Davis*, 553 U.S. at 338. In *Department of Revenue of Kentucky v. Davis*, the Supreme Court upheld Kentucky's differential tax scheme, which exempted interest on its own state bonds from state income taxes. *Id.* at 331–32. The scheme had been common among states for about a century. *Id.* The dissent would have invalidated the scheme based on "the virtues of the free market." *Id.* at 356. However, the majority declined the "invitation to the adventurism of overturning a traditional local taxing practice." *Id.* Quoting Justice Holmes, the Court stated: "[T]he fact that the system has been in force for a very long time is of itself a strong reason . . . for leaving any improvement that may be desired to the legislature." *Id.* at 357 (quoting *Paddell v. City of New York*, 211 U.S. 446, 448 (1908)).

The Second Circuit Court of Appeals relied on a similar principle when, in *Allco*, it upheld Connecticut's renewable energy program in part because the "means and ends are well within the scope of what Congress and FERC have traditionally allowed the States to do in the realm of energy regulation." 861 F.3d at 106.

The same principle applies here.  Going back to the early part of the twentieth century, utilities have constructed and operated the transmission facilities in their areas of operation.  App. at 3, ¶ 9.  Until 2011, the federal ROFR continued this historical preference for local utilities to build their own transmission.  When FERC ended the federal ROFR with Order No. 1000, state ROFR laws were enacted to preserve this longstanding preference for local utilities to build their own transmission.  In Minnesota, the ROFR law provides that local utilities may choose to propose to build the transmission facilities in their exclusive areas.  Minn. Stat. § 216B.246, subd. 2.  However, if they choose not to build planned transmission, the PUC can order them to build it anyway.  *Id.* § 216B.246, subd. 3.  In this way, the ROFR law reflects the longstanding preference that local utilities build the transmission facilities in their areas.

As noted above, the Minnesota ROFR bill's senate sponsor explained the law's purpose as follows:

> If we choose not to pass this legislation, we are moving into the world of the unknown, versus we have a very known process right now, members.  And I think it's best to stick with that process because FERC's process is unknown.

App. at 48.  The supposedly protectionist statements cited by LSP at page 36 of its brief are not from the bill's sponsor, or even a legislator, but rather are stray comments by a single witness before the legislative committee.  "[T]he testimony of witnesses before congressional committees prior to passage of legislation is

generally weak evidence of legislative intent." *Public Citizen v. Farm Credit Admin.*, 938 F.2d 290, 292 (D.C. Cir. 1991). Furthermore, the statements by the witness do not reveal a protectionist intent but rather support that witness's position that the "system is doing perfectly well right now" and should be preserved through the passage of the ROFR bill. App. at 37. The publicly available evidence makes clear that the ROFR law was designed to preserve the status quo as to electricity transmission in Minnesota. *See, e.g.,* App. at 17, ¶ 53; App. at 48; *see also supra* at pp. 7–8.

If FERC were so inclined, it could prohibit MISO from recognizing state ROFR laws for electricity transmission. In that situation, MISO would select a transmission developer through a competitive bidding process. But instead of prohibiting recognition of state ROFR laws in MISO's transmission developer selection process, FERC has repeatedly decided to allow MISO to recognize such laws. *See supra* Statement of the Case, IV. Given FERC's active presence in this regulatory space, this is not a case where courts should accept an "invitation to the adventurism of overturning a traditional local . . . practice" on dormant Commerce Clause grounds. *Davis*, 553 U.S. at 356. State ROFR laws are "well within the scope of what Congress and FERC have traditionally allowed the States to do in the realm of energy regulation." *Allco*, 861 F.3d at 106. Any changes to these longstanding utility practices and preferences should be left to FERC or Congress.

The preservation of the historically-proven status quo is a legitimate, non-discriminatory rationale that supports enactment of the ROFR law and distinguishes it from the waste flow cases relied on by LSP. Those cases involve state and local governments addressing the problem that "solid waste output continues apace and landfill capacity becomes more costly and scarce." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 385–86 (1994). In *C&A Carbone*, the town developed a new scheme to fix this problem: a flow control ordinance that "allows only the favored [local] operator to process waste that is within the limits of the town." *Id.* at 391. The rationale was to "ensure[] that the town-sponsored facility will be profitable." *Id.* at 393. "In other words, . . . the flow control ordinance is a financing measure." *Id.* The Supreme Court found this scheme and rationale unconstitutional. *Id.* at 393–95.

Unlike *C&A Carbone*, the ROFR law is not a new scheme designed to ensure the profitability of local businesses. Rather, the ROFR law preserved a longstanding practice that had resulted in regional cooperation and reliable transmission. Instead of jeopardizing these results, the Minnesota legislature decided to act cautiously and preserve the existing system.

Because the dormant Commerce Clause does not forbid states from favoring historically-proven, longstanding local utility practices, LSP's claim fails.

## IV. THE DISTRICT COURT CORRECTLY DETERMINED THAT LSP'S CLAIM CANNOT SATISFY THE *PIKE* TEST.

Where a law is not patently discriminatory, it may still violate the dormant Commerce Clause if it fails the so-called *Pike* test—*i.e.*, if its burden on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. 142. Laws that are not patently discriminatory have only been invalidated "where such laws undermined a compelling need for national uniformity in regulation." *Tracy*, 519 at 298 n. 12. Where a law is not inconsistent with federal goals, it will pass the *Pike* test if it was enacted in a "legitimate state pursuit." *Allco*, 861 F.3d at 108. In *Tracy*, the Court held that "the fact that Ohio exempts local utilities from its sales and use taxes could not support any claim of undue burden in this nondiscriminatory sense, since the exemption itself does not give rise to conflicting regulation of any transaction or result in malapportionment of any tax." *Tracy*, 519 at 298 n. 12.

The ROFR law does not undermine a compelling need for national uniformity. Indeed, FERC, the agency charged by Congress with ensuring national regulation of electric markets, expressly allowed the use of state ROFR laws in the regional transmission planning process, as discussed. *See supra* Statement of the Case, IV.

Because the ROFR law does not interfere with national goals, it will be upheld so long as it was enacted in a "legitimate state pursuit." *Allco*, 861 F.3d at

108.  The ROFR law was enacted to preserve the historically-proven status quo for the construction and maintenance of electric transmission lines.  *See* App. at 17, ¶ 53; App. at 48; *see also supra* at pp. 7–8.  This purpose is legitimate, particularly when examined in light of Minnesota's well-recognized interests in regulating electricity.  *See, e.g., Ark. Elec. Coop Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983) ("[T]he regulation of utilities is one of the most important functions traditionally associated with the police powers of the States.").  Thus, the district court correctly determined that the ROFR law survived the *Pike* test.

## CONCLUSION

For these reasons, this Court should affirm the district court's order dismissing Appellants' dormant Commerce Clause challenge.

Dated:  December 27, 2018

Respectfully submitted,

OFFICE OF THE ATTORNEY GENERAL
State of Minnesota

s/ Jason Marisam
JASON MARISAM
Assistant Attorney General
Atty. Reg. No. 0398187

445 Minnesota Street, Suite 1100
St. Paul, Minnesota 55101-2128
(651) 757-1275 (Voice)
(651) 296-1410 (TTY)
jason.marisam@ag.state.mn.us

**CERTIFICATE OF COMPLIANCE**
**WITH FRAP 32**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,061 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14 pt Times New Roman font.


s/ Jason Marisam
JASON MARISAM
Assistant Attorney General

## CERTIFICATE OF COMPLIANCE
## WITH 8th Cir. R. 28A(h)(2)

The undersigned, on behalf of the party filing and serving this brief, certifies

that the brief has been scanned for viruses and that the brief is virus-free.

s/ Julie Peick
JULIE PEICK