# In the United States Court of Appeals for the Eighth Circuit

---

**LSP TRANSMISSION HOLDINGS, LLC**,

*Plaintiffs-Appellants,*

*v.*

**NANCY LANGE**, Commissioner and Chair, Minnesota Public Utilities Commission;
**DAN LIPSCHULTZ**, Commissioner, Minnesota Public Utilities Commission;
**MATT SCHUERGER**, Commissioner, Minnesota Public Utilities Commission;
**JOHN TUMA**, Commissioner, Minnesota Public Utilities Commission;
**KATIE SIEBEN**, Commissioner, Minnesota Public Utilities Commission; and
**MIKE ROTHMAN**, Commissioner, Minnesota Department of Commerce,
each in his or her official capacity

*Defendants-Appellees,*

*and*

**NORTHERN STATES POWER COMPANY D/B/A XCEL ENERGY**, and
**ITC MIDWEST, LLC**

*Intervenors-Appellees*

---

On Appeal from the United States District Court for the District of Minnesota
Case No. 4:17-cv-00094, Hon. Donovan W. Frank

---

## BRIEF OF GREAT RIVER ENERGY, MINNESOTA POWER, OTTERTAIL POWER COMPANY, AND SOUTHERN MINNESOTA MUNICIPAL POWER AGENCY AS AMICI CURIAE IN SUPPORT OF AFFIRMANCE AND IN SUPPORT OF DEFENDANTS-APPELLEES AND INTERVENORS-APPELLEES

---

*Counsel Listed on Inside Cover*

**STINSON LEONARD STREET LLP**
Harvey L. Reiter (DC #232942)
1775 Pennsylvania Avenue NW
Suite 800
Washington, DC 20006
Telephone: (202) 785-9100
harvey.reiter@stinson.com

Brian M. Meloy (MN #0287209)
Thomas C. Burman (MN
#0396406)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
brian.meloy@stinson.com
thomas.burman@stinson.com

*Attorneys for Great River Energy*

**MINNESOTA POWER/ALLETE**
David R. Moeller (MN #0287295)
30 West Superior Street
Duluth, MN 55802-2093
(218) 723-3963
dmoeller@allete.com

*Attorney for Minnesota Power/ALLETE*

**OTTER TAIL POWER COMPANY**
Mark B. Bring
Associate General Counsel
Otter Tail Power Company
215 S. Cascade Street
Fergus Falls, MN 56537
mbring@otpco.com

*Attorney for Otter Tail Power Company*

**DORSEY & WHITNEY LLP**
B. Andrew Brown (MN #0205357)
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-5612
Brown.Andrew@dorsey.com

*Attorney for Southern Minnesota Municipal Power Agency*

## CORPORATE DISCLOSURE STATEMENTS

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(A) and 26.1, and Local Rule 26.1A, the Amici Utilities state as follows:

1. Great River Energy ("GRE") states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

2. Minnesota Power ("MP") states that it is an operating division of ALLETE, Inc., which is a publicly held corporation. No other publicly held corporation owns 10% or more of MP's stock.

3. Otter Tail Power Company ("OPC") states that it is a wholly owned subsidiary of Otter Tail Corporation, which is a publicly held company. No other publicly held corporation owns 10% or more of its stock.

4. Southern Minnesota Municipal Power Agency ("SMMPA") states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................i

ARGUMENT ........................................................................................2

I.  State Laws Granting Exclusivity Rights to Local Utilities Reflect the Lawful Exercise of a State's Police Powers, Not Protection of In-state over Out-of-State Competitors. ...............................................4

    A.  Minnesota's Law Protects Incumbency, Not In-State Over Out-of-State Competitors. ................................................................4

    B.  Protection of Local Utility Exclusivity Rights Falls Squarely Within a State's Police Powers. .........................................11

        1.  LSP Transmission Fails to State a Claim that § 216B.246 Places an Undue Burden on Interstate Commerce. .................11

            a.  LSP Transmission Has Failed to Allege an Identifiable Burden on Interstate Commerce By Which it Is Aggrieved....................................12

            b.  Local Regulation of Utilities, Even Regulation Aimed at Limiting Competition, Does Not Thereby Burden Interstate Commerce. ......................................................14

            c.  Local Utility Regulation Presumptively Benefits the Public. .............................................15

II.  The Logic of LSP Transmission's Argument, If Accepted, Would Eviscerate Local Utility Regulation. ...........................................20

CONCLUSION ..................................................................................27

Appellate Case: 18-2559    Page: 4    Date Filed: 01/04/2019 Entry ID: 4742406

# TABLE OF AUTHORITIES

**CASES**

Ark. Elec. Coop Corp. v. Ark. Pub. Serv. Comm'n,
461 U.S. 375 (1983) ................................................................ 14

Amerada Hess Corp. v. N.J. Dep't of Treasury,
490 U.S. 66 (1989) .................................................................. 8

Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.,
476 U.S. 573 (1986) ............................................................... 11

C & A Carbone, Inc. v. Town of Clarkstown,
511 U.S. 383 (1994) ............................................................... 10

Cotto Waxo Co. v. Williams,
46 F.3d 790 (8th Cir. 1995) ................................... 11, 13, 15

FPC v. Florida Power & Light Co.,
404 U. S. 453 (1972) .............................................................. 21

General Motors, Inc. v. Tracy,
519 U.S. 278 (1997) ................................................... passim

Hughes v. Oklahoma,
441 U.S. 322 (1979) ............................................................ 8, 10

Jersey Cent. Power & Light Co. v. FERC,
810 F.2d 1168 (D.C. Cir. 1987) ......................................... 24

LSP Transmission Holdings v. Lange,
329 F. Supp. 3d 695 (D. Minn. 2018) ......................... 24, 25

Minn. Rate Cases,
230 U.S. 352 (1913) ............................................................... 15

Minnesota v. Clover Leaf Creamery Co.,
449 U.S. 456 (1981) ........................................................ 13, 16

N.C. Bd. of Dental Exam'rs v. FTC,
135 S. Ct 1101 (2015) ..................................................... 17, 18

New York v. FERC,
535 U.S. 1 (2002) ................................................................... 21

148869701.

Appellate Case: 18-2559    Page: 5    Date Filed: 01/04/2019 Entry ID: 4742406

*Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality*,
    511 U.S. 93 (1994) ........................................................................... 8, 9

*Parker v. Brown*,
    317 U.S. 341 (1943) ........................................................................... 14

*Philadelphia v. New Jersey*,
    437 U.S. 617 (1978) ........................................................................... 9

*Phoebe Putney Health Sys., Inc. v. FTC*,
    133 S. Ct. 1003 (2013) ..................................................................... 15

*Piedmont Envtl. Council v. FERC*,
    558 F.3d 304 (4th Cir. 2009) ................................................. 15, 17, 21

*Pike v. Bruce Church, Inc.*
    397 U.S. 137 (1970) ........................................................................... 12

*Rocky Mountain Farmers Union v. Corey*,
    730 F.3d 1070 (9th Cir. 2013) ......................................................... 9

*S. Motor Carriers Rate Conference, Inc. v. United States*,
    471 U.S. 48 (1985) ............................................................................. 15

*S. Union v. Mo. Pub. Serv. Comm'n*,
    289 F.3d 503 (8th Cir. 2002) ................................................... 10, 16

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) ........................................................... 4

*Transmission Planning and Cost Allocation by Transmission Owning and
Operating Public Utilities,* FERC Order No. 1000, 136 FERC ¶ 61,051
(2011), *aff'd S.C. Pub. Serv. Auth*. v. *FERC*, 762 F.3d 41 (D.C. Cir. 2014) ......... 26

*United Waste Sys. of Iowa, Inc. v. Wilson*,
    189 F.3d 762 (8th Cir. 1999) ........................................................... 10

## STATUTES

Minn. Stat. § 216B.79 ............................................................................ 25

Minn. Stat. § 216B.246 ................................................................. *passim*

ii

## OTHER AUTHORITIES

Burton N. Behling, *Competition in Public Utility Industries*
(1938), in Efficiency, Competition, and Policy (Harold Demsetz, ed.,
Blackwell 1989) ................................................................................. 22

*Hearing Before the Comm. on Energy, Utilities and Telecommunications,
S.F. 1815,* 87th Minn. Leg. (2012),
https://www.leg.state.mn.us/senatemedia/saudio/2012/
cmte_energy_032012.MP3 ................................................................. 19

Barry Kellman & Nicholas J. Marino, *City of Cleveland v. CEI: A Case
Study in Attempts to Monopolize by Regulated Utilities*,
30 Clev. St. L. Rev. 4 (1981) ............................................................ 22

Report to the Minnesota Legislature on Minnesota's Electric Transmission
System prepared by the Minnesota Department of Commerce, Division of
Energy Resources and the Minnesota Public Utilities Commission .................... 19

Shengru Zhou, *An Introduction to Retail Electricity Choice in the United
States, Nat'l Renewable Energy Labs* (Oct. 4, 2017),
https://www.nrel.gov/docs/fy18osti/68993.pdf ................................... 23

Walter J. Primeaux, Jr., *Direct Electric Utility Competition: The Natural
Monopoly Myth* (Praeger, ed. 1986) ................................................. 23

Appellate Case: 18-2559    Page: 7    Date Filed: 01/04/2019 Entry ID: 4742406

## INTEREST OF THE AMICI CURIAE

Amici curiae Great River Energy ("GRE"); Minnesota Power, an operating division of Allete, Inc. ("MP"); Otter Tail Power Company ("OTP"); and Southern Minnesota Municipal Power Agency ("SMMPA") (collectively, "Amici Utilities") respectfully submit this brief in support of Defendants-Appellees and Intervenors-Appellees (collectively, "Defendants-Appellees").[1] The Amici Utilities are electric transmission owners comprised of investor-owned utilities, rural electric cooperatives, and municipal utilities. They also participate in the Midcontinent Independent System Operator Inc.'s ("MISO") regional transmission planning process and are provided a state-based right of first refusal ("ROFR") to construct new transmission facilities by Minn. Stat. § 216B.246, as long as the transmission line is to be connected to existing facilities. Under the circumstances here, the Amici Utilities are similarly situated to Plaintiff-Appellant LSP Transmission Holdings, LLC ("LSP Transmission"), because they also were precluded by the state ROFR law from competing to construct the new transmission line that gave rise to LSP Transmission's claims. The Amici Utilities therefore have a direct interest in this appeal.

---

[1] No counsel for a party authored this brief, in whole or in part, and no person other than *amici curiae* and their counsel made any monetary contribution to fund the preparation or submission of this brief. The Amici Utilities confirm that they have received the consent of the other parties to file this brief.

148869701.

Appellate Case: 18-2559    Page: 8    Date Filed: 01/04/2019 Entry ID: 4742406

Although similarly situated to LSP Transmission, the Amici Utilities submit this brief in support of Defendants-Appellees.  As recognized by the district court, the ROFR law is one component of the broader compact in Minnesota (and which exists in most other states), through which the state grants regulated electricity providers certain benefits—for example, exclusive service territories—in exchange for imposing burdens—such as requiring infrastructure investments and the construction of new transmission lines.  As entities that are similarly situated to LSP Transmission, the Amici Utilities are uniquely positioned to address Minnesota's right to protect local monopolies through this regulatory compact, and how that compact could be impacted by LSP Transmission's challenge to the ROFR law.

## ARGUMENT

On September 29, 2017, LSP Transmission filed a Complaint challenging the constitutionality of Minnesota Statutes Section 216B.246 ("§ 216B.246" or "the Act"). LSP Transmission's Complaint consists of two contentions invoking the dormant Commerce Clause of the U.S. Constitution:  (1) that § 216B.246 either facially discriminates, or discriminates in purpose or effect, against interstate commerce in the construction and ownership of large transmission facilities (Appendix of Appellant ("App.") 26-27, Compl. ¶¶ 85-90); or (2) that even if not discriminatory, § 216B.246 nonetheless imposes an undue burden on interstate

2

commerce. (App. 27, Compl. ¶¶ 91-92.) As discussed in Defendants-Appellees' briefs, neither contention sets forth a cognizable claim under the Constitution and accordingly, the lower court properly dismissed LSP Transmission's Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

LSP Transmission's essential argument is that competition for incumbent transmission providers is a good thing, the Federal Energy Regulatory Commission ("FERC") has said so, and FERC's determination to remove rights of first refusal from federal transmission tariffs has been affirmed by the appellate courts. LSP Transmission hinges its dormant Commerce Clause claims both on the value of this competition and on the assertion that while Congress granted states exclusive regulation of many local siting matters, it left states authority only as to "intrastate transmission," with interstate transmission, like the projects covered by Minnesota's incumbency protections, falling under federal regulation (Appellant's Br. 7.)

Amici Utilities focus our brief on two points: First, LSP Transmission has conflated protection of local regulated monopolies—which it concedes is permitted under the dormant Commerce Clause—with protection of competition, *per se*, which is not the concern of dormant Commerce Clause jurisprudence. Second, and related, LSP Transmission has rested its argument on the false premise that only state protection of local monopolies within the non-existent category of Minnesota

3

"intrastate" transmission would fall outside dormant Commerce Clause purview. Importantly, LSP Transmission's arguments ignore, and if accepted risk dismantling, the compact that exists between the State of Minnesota and regulated electricity providers. This regulatory compact represents a reasoned policy judgment by the State of Minnesota and is not subject to challenge under the dormant Commerce Clause. These points are discussed below.

## I. STATE LAWS GRANTING EXCLUSIVITY RIGHTS TO LOCAL UTILITIES REFLECT THE LAWFUL EXERCISE OF A STATE'S POLICE POWERS, NOT PROTECTION OF IN-STATE OVER OUT-OF-STATE COMPETITORS.

### A. Minnesota's Law Protects Incumbency, Not In-State Over Out-of-State Competitors.

LSP Transmission focuses much of its brief on the harm it claims will emanate from laws like Minnesota's that shield incumbent transmission providers from competition. The D.C. Circuit, it says, "found that substantial evidence supported FERC's findings that 'rights of first refusal posed a barrier to entry that made the transmission market inefficient, that transmission facilities would therefore be developed at higher-than-necessary cost, and that those amplified costs would be passed on to transmission customers.'" (Appellant's Br. 11 (citing *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76–77 (D.C. Cir. 2014).) Whether or not FERC may have been right, however, protection of competition, *per se*, is not the concern of dormant Commerce Clause jurisprudence. Rather, its focus is on discrimination by the state or its subdivisions against out-of-state competitors, not

4

state laws that, wisely or unwisely, enshrine—or even expand—local monopolies. As discussed below, the Minnesota law at issue does not discriminate against out-of-state transmission providers in either purpose or effect.

On appeal, LSP Transmission argues that the Minnesota law targets a single product—electric transmission lines approved by a FERC-regulated regional transmission organization ("RTO")—and *General Motors, Inc. v. Tracy*, 519 U.S. 278 (1997) is therefore inapposite. *Tracy*, LSP Transmission argues, "does not purport to allow states to treat in-state public utilities and out-of-state competitors differently in a context where the only thing they are doing is competing for the very same business." (Appellant's Br. 46.)

Amici agree with Defendants-Appellees and the District Court that the Supreme Court's decision in *Tracy* is dispositive (Defendant-Appellees' Br. 13–27) and will not repeat those arguments here. But even if LSP Transmission and the incumbents eligible for the right of first refusal under § 216B.246 were similarly situated, the statute still does not discriminate against out-of-state entities.

Under most circumstances § 216B.246 would preclude the Amici Utilities and other in-state incumbents from constructing new transmission lines in the State, just like LSP Transmission. No party could dispute that Minnesota has chosen to grant limited preferences to what the Act defines as an "Incumbent electric transmission owner." The preferences, however, neither favor all

5

incumbents nor do they favor in-state over out-of-state entities. Indeed, by the express terms of § 216B.246 and LSP Transmission's own description of the entities affected by the Act, there simply is no facial discrimination against out-of-state entities.

Under § 216B.246, an incumbent electric transmission owner is given the right of first refusal to "construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan *and connects to facilities owned by that incumbent electric transmission owner*." Minn. Stat. § 216B.246, subd. 2 (emphasis added). Thus, only those incumbents directly connected to the proposed line qualify for the right of first refusal.

The import of this limitation entirely undermines LSP Transmission's Complaint. Even if multiple incumbent electric transmission owners desire to build, own, and maintain a transmission line approved by "a federally registered planning authority," the incumbent(s) directly connected to the planned facilities can block them by invoking the right of first refusal. The preference is not for incumbents over non-incumbents, but for *certain* incumbents over both other incumbents as well as non-incumbents.

The Huntley-Wilmarth Project from which LSP Transmission states it was precluded by § 216B.246 from bidding to construct (App. 23-25, Compl. ¶¶ 69-78)

6

is a perfect case in point. LSP Transmission alleges that because of § 216B.246, it "and other out-of-state market participants are effectively barred from constructing" the Huntley-Wilmarth Project and other similar "transmission projects in Minnesota." (*Id.* at 25, Compl. ¶ 77.) The Huntley-Wilmarth Project connects Intervenor-Appellee Northern States Power Company d/b/a Xcel Energy Inc.'s ("Xcel") transmission system with that of Intervenor-Appellee ITC Midwest LLC (*Id.* at ¶ 70) and as a result only Xcel and ITC Midwest qualify for the right of first refusal. The Amici Utilities, just like LSP Transmission, are precluded from building the new transmission facilities.

The Act limits the bidding opportunities of non-incumbents (whether in-state or not), and it also limits the bidding opportunities of the 14 remaining incumbent electric transmission owners—including the Amici Utilities. The dormant Commerce Clause bars protectionist state and local laws that disfavor out-of-state interests, but it does not preclude states from favoring monopoly over competition, particularly where the state regulates utilities, with the long-established goals of protecting local consumers and avoiding economic waste. *Tracy*, 519 U.S. at 288–90, 303, 306–07.

Even if the Act favored all incumbent transmission providers over non-incumbents, it does not favor in-state over out-of-state interests. This is clear both from the text of the statute and LSP Transmission's own description of the

7

incumbents favored by the Act. The Act defines an "Incumbent electric transmission owner" as

> any public utility that owns, operates and maintains an electric transmission line in [Minnesota]; any generation and transmission cooperative electric association; any municipal power agency; any power district; any municipal utility; or any transmission company as defined under section 216B.02, subdivision 10.

Minn. Stat. § 216B.246, subd. 1(c).

Thus, by its express terms, the Act does not limit incumbents who can qualify for the right of first refusal to in-state entities. Indeed, as LSP Transmission's Complaint notes in listing the sixteen entities that would qualify for incumbent status under the Act, five—nearly a third—are headquartered outside Minnesota. (App. 22, Compl. ¶ 66.) And of the remaining eleven, several also operate in multiple states. (*Id.* at 20-22, Compl. ¶ 64.) The core of any facial discrimination claim under the dormant Commerce Clause is that the challenged law targets out-of-state entities for disparate treatment, i.e., "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Ore. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994). And "the burden to show discrimination rests on the party challenging the validity of the statute." *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).

While the out-of-state nature of those targeted can be inferred where not expressly stated, *Amerada Hess Corp. v. N.J. Dep't of Treasury*, 490 U.S. 66, 76

Appellate Case: 18-2559     Page: 15     Date Filed: 01/04/2019 Entry ID: 4742406

(1989), a discrimination claim cannot be sustained based on the "hypothetical possibility of favoritism." *Tracy,* 519 U.S. at 380 (rejecting facial discrimination claim, noting that state law did not preclude out-of-state entities from qualifying for favored tax exemption and holding that the court would not speculate that state would nonetheless favor in-state interests).

Even if LSP Transmission had maintained that out-of-state entities are harmed more than in-state entities, either expressly or by inference, its Complaint would still fail to state a claim of facial discrimination. "[A] regulation is not facially discriminatory simply because it affects in-state and out-of-state interests unequally," where there is "'some reason, apart from their origin, to treat them differently.'" *Rocky Mountain Farmers Union v. Corey,* 730 F.3d 1070, 1089 (9th Cir. 2013), *cert. denied,* 134 S. Ct. 2875 (2014) (quoting *Philadelphia v. New Jersey,* 437 U.S. 617, 627 (1978)). The Act makes no distinction based on the origin of the affected parties. Incumbent electric transmission owners, in fact, comprise both in-state and out-of-state entities. Rather, the Act is designed to favor incumbents building transmission lines that connect to their own systems over both other incumbents and non-incumbents, irrespective of the origin of any of them.

The same "virtually *per se* rule of invalidity" applicable to state laws that facially discriminate against out-of-state economic interests, applies also to state laws that have local protectionism as their purpose or effect. *Ore. Waste Sys., Inc.,*

9

511 U.S. at 100. But, like parties alleging facial discrimination, those challenging a state law's purpose or effect bear the burden of proving that purpose or effect. *Hughes*, 441 U.S. at 336. As with LSP Transmission's facial challenge to § 216B.246, its Complaint on this alternate ground comes up short.

"The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent." *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994). *See also United Waste Sys. of Iowa, Inc. v. Wilson*, 189 F.3d 762, 767 (8th Cir. 1999). But where there is no economic protectionism "at work" there is no constitutionally forbidden discrimination. *S. Union v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 508 (8th Cir. 2002).

Here, as in *Southern Union*, neither the purpose nor the effect of the challenged legislation is to foreclose out-of-state economic interests from competing to construct electric transmission lines. In fact, LSP Transmission's Complaint does not claim that out-of-state entities have been singled out for disadvantageous treatment. Its objection, as noted earlier, is to the favored treatment given to incumbent electric transmission owners. Since the Complaint itself concedes that a number of the incumbents are themselves out-of-state entities, the Complaint's discrimination claim fails under its own weight.

10

Nor, finally, does the fact that any transmission line subject to the Minnesota law would have to be constructed in Minnesota have any bearing on the law's constitutionality. LSP Transmission repeatedly emphasizes language in the statute referring to the fact that the definition of incumbent electric transmission owner includes public utilities and independent transmission companies that maintain transmission lines "in this state." (Appellant's Br. 4, 14, 15, 26, 42.) Beside the fact that "incumbent" also includes cooperatives, municipal power agencies, and power districts without that limitation, this faux emphasis ignores that the state only has authority to site transmission *in Minnesota* regardless of who builds it. Any incumbent electric transmission owner, by definition, will already have transmission located within the state.

## B. Protection of Local Utility Exclusivity Rights Falls Squarely Within a State's Police Powers.

### 1. LSP Transmission Fails to State a Claim that § 216B.246 Places an Undue Burden on Interstate Commerce.

A statute that does not discriminate against out-of-state economic interests may nonetheless run afoul of the dormant Commerce Clause if the statute places an undue burden on interstate commerce. *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995). But to prevail on a claim of undue burden, the complainant must demonstrate that any burden on interstate commerce "clearly exceeds the local benefits" of the law. *Brown-Forman Distillers Corp. v. N.Y. State Liquor*

11

*Auth.*, 476 U.S. 573, 579 (1986). *See also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The LSP Transmission Complaint does not contain allegations that would satisfy this stringent test.

LSP Transmission claims that even if § 216B.246 regulates evenhandedly, it nonetheless "unduly burdens interstate commerce by restricting entry to the transmission market in Minnesota, thus walling the state from new market participants." (App. 27, Compl. ¶ 91.)  In considering the Defendants' motion to dismiss LSP Transmission's Complaint, the lower court accepted LSP Transmission's contention that the right of first refusal, where it operates, effectively serves as a bar to bidding by those entities that do not qualify for the right of first refusal.[2] That assumption notwithstanding, there remain three insuperable obstacles to entertaining LSP Transmission's claim.

### a. LSP Transmission Has Failed to Allege an Identifiable Burden on Interstate Commerce By Which it Is Aggrieved.

LSP Transmission cites the Eighth Circuit's decision in *Cotto, supra,* to support its claim that a loss of business by out-of-state entities would constitute

---

[2] As LSP Transmission concedes, the Act creates only a right of first refusal, not an outright bar on the construction of new transmission facilities by non-incumbents. (App. 19, Compl. ¶ 61.) There is no evidence on the degree to which the right of first refusal would actually prevent construction of new transmission facilities in Minnesota by non-incumbents. But for purposes of the motion to dismiss the lower court correctly assumed the validity of LSP Transmission's assertion that the right of first refusal serves as a *de facto* bar. (*Id.* at 19, Compl. ¶¶ 61-62.)

12

evidence of a burden on interstate commerce. But in *Cotto*, although the "evidence of a burden on interstate commerce [was] slight," the court found that the plaintiff had been selling "petroleum-based sweeping compounds to Minnesota wholesalers and distributors" when a Minnesota state law made it ineligible to continue doing so. 46 F.3d at 792, 795. In other words, in *Cotto*, there was an allegation of some nominal loss of interstate commerce. Here, by contrast, the legislation challenged by LSP Transmission does not change the status quo—LSP Transmission does not allege that the legislation will halt any ongoing business it has in the state building transmission facilities. The Commerce Clause, in any event, "protects the interstate *market*, not particular interstate *firms*, from prohibitive or burdensome regulations." *Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 474 (1981) (emphasis added). As a result, even if the effect of the Act is to shift business away from LSP Transmission and toward entities with an in-state presence, that does not implicate the dormant Commerce Clause. *See id.* ("A nondiscriminatory regulation serving substantial state purposes is not invalid simply because it causes some business to shift from a predominantly out-of-state industry to a predominantly in-state industry.").

Appellate Case: 18-2559    Page: 20    Date Filed: 01/04/2019 Entry ID: 4742406

b. *Local Regulation of Utilities, Even Regulation Aimed at Limiting Competition, Does Not Thereby Burden Interstate Commerce.*

As a centerpiece to its Complaint, LSP Transmission alleges that § 216B.246 burdens interstate commerce by the limits it places on competition to construct, operate and maintain transmission facilities. (App. 27, Compl. ¶ 91.) But the courts have long recognized that it is within the state's traditional police power to restrict competition to advance local concerns without running afoul of the Commerce Clause, *Parker v. Brown*, 317 U.S. 341, 359–68 (1943), and that this is so even where the resulting conduct of private parties would otherwise violate the antitrust laws. *Id*. at 350–52. "[R]egulation of utilities," in fact, "is one of the most important functions traditionally associated with the police powers of the state." *Ark. Elec. Coop Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983). As the Supreme Court stated more than a century ago:

> [T]here necessarily remains to the States until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. It extends to those matters of a local nature as to which it is impossible to derive from the constitutional grant an intention that they should go uncontrolled pending Federal intervention. Thus, there are certain subjects having the most obvious and direct relation to interstate commerce, which nevertheless, with the acquiescence of Congress, have been controlled by state legislation from the foundation of the government because of the necessity that they should not remain unregulated, and that their regulation should be adapted to varying local exigencies.

14

*The Minn. Rate Cases*, 230 U.S. 352, 402 (1913). Regulation of transmission siting is an area that has been left exclusively to the states to regulate. "[S]tates have traditionally assumed *all* jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) (emphasis added).

### c. Local Utility Regulation Presumptively Benefits the Public.

Finally, unlike the situation in *Cotto*, where the court found that evidence of a public benefit from the challenged legislation was "miniscule," 46 F.3d at 795,[3] the benefits of utility regulation are both presumed as a matter of law, and well-documented. That public utility regulation may limit competition, in fact is one of its intended benefits. LSP Transmission's Complaint alleges that § 216B.246 has the effect of "walling off the state from new market participants." (App. 27, Compl. ¶ 91.) That, however, is the very nature of local utility regulation, which controls both prices and entry. *See, e.g.*, *S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 64 (1985) (acknowledging the "inherently anticompetitive" nature of rate setting); *Phoebe Putney Health Sys., Inc. v. FTC*, 133 S. Ct. 1003, 1013 n.7 (2013) (same). But as important, the competition-

---

[3] It bears emphasis that in *Cotto* the court did not find that the statute in question unduly burdened interstate commerce, but only that, given the "miniscule evidence" before it on the benefits of the legislation, the statute's constitutionality "should be tested at trial." 46 F.3d at 795.

Appellate Case: 18-2559    Page: 22    Date Filed: 01/04/2019 Entry ID: 4742406

limiting effect of state local utility regulation creates no undue burden on interstate commerce.

The purpose of that traditional utility regulation, as the Supreme Court stated in *Tracy, supra*, is to protect against "wasteful competition" by authorizing, but regulating, local monopolies. 519 U.S. at 289–90. And, even where Congress has chosen to regulate the interstate transportation of natural gas and transmission of electricity, "[a] major purpose of these laws was to preserve and protect state and local regulation of the distribution of natural gas and electricity to local retail customers." *S. Union*, 289 F.3d at 507. Thus, far from establishing a Commerce Clause violation, state-established rights of first refusal like Minnesota's underscore why "local public utility rate regulation is presumptively valid." *Id.* at 509.

Of course, "[s]tates are not required to convince the courts of the correctness of their legislative judgments." *Clover Leaf Creamery Co*., 449 U.S. at 464. And it may well be that some other alternative to Minnesota's right of first refusal provision would serve the public better. But where, as in this case, the state legislation has a valid public purpose, the burden is on the complainant to show that the harm to interstate commerce "clearly exceeds" the statute's local benefits. Against the presumptive validity of § 216B.246, however, LSP offers nothing but the bare assertion that any benefits "are a mere pretext for discrimination against

16

non-incumbent transmission developers" and that "basic economic theory leads to the conclusion that competition benefits the markets and consumers." (App. 27, Compl. ¶ 92.) The short answer to this argument is that states "need not adhere in all contexts to a model of unfettered competition." *N.C. Bd. of Dental Exam'rs v. FTC*, 135 S. Ct 1101, 1109 (2015).[4]

On the contrary, even if "basic economic theory" could be treated as evidence, the Supreme Court has recognized that, particularly in the utility industry, competition does not always protect consumers. *Tracy, supra*, 519 U.S. at 290. While LSP Transmission offers the bare, unsupported assertion that Minnesota law would unduly burden interstate commerce, the effect of granting its Complaint would produce the opposite result. "If every duly enacted state law or policy were

---

[4] LSP Transmission devotes a considerable portion of its Complaint to a discussion of FERC's decision to eliminate "federal" rights of first refusal from interstate transmission tariffs and the competitive benefits FERC hoped that action might bring. (App. 7-12, Compl. ¶¶ 21-34.) Conspicuous by its absence, however, is any claim that FERC's rules have preempted state authority to make a different policy choice, i.e., to enforce their own rights of first refusal. And for good reason. The Complaint acknowledges that FERC's rules are not intended to override state transmission siting decisions *and* that it has approved a provision in the MISO tariff that incorporates the right of first refusal provisions in Minnesota law. (*Id.* at 15, Compl. ¶¶ 44-45.) It bears emphasis that these actions by FERC were not mere policy choice, but flowed from the fact that, with a limited exception not applicable here, *Piedmont Envtl. Council*, 558 F.3d at 312–13 (giving FERC power to authorize the construction of transmission facilities in "national interest corridors" where the state has withheld action on permit applications for more than a year), "states have traditionally assumed *all* jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Id.* at 310 (emphasis added).

17

required to conform to the mandates of [the federal antitrust statues], thus promoting competition at the expense of other values a state may deem fundamental, federal antitrust law would impose an impermissible burden on the States' power to regulate." *N.C. Bd. of Dental Exam'rs,* 135 S. Ct at 1109.

The Supreme Court observed in *Tracy* the historic purpose behind state local utility regulation:

> It seemed virtually an economic necessity for States to provide a single, local franchise with a business opportunity free of competition from any source, within or without the State, so long as the creation of exclusive franchises under state law could be balanced by regulation and the imposition of obligations to the consuming public upon the franchised retailers.

*Tracy,* 519 U.S. at 290. As LSP Transmission noted in its Complaint, testimony offered in support of the challenged Minnesota law (adopted unanimously by the states' legislators) invoked these same concerns, namely that "elimination of the incumbents' right of first refusal would remove local control over transmission projects and shift 'critical decisions'" out of the state's control. (App. 17, Compl. ¶ 53.) What LSP Transmission omits is the reason why the state believed local control is important. The right of first refusal applies to transmission facilities that connect directly to the system of an incumbent.

As Xcel witness Rick Evans testified before the state Senate, incumbent utilities retain the obligation to serve their customers, but if they had no right of first refusal over the ownership, operation, and maintenance of lines connecting to

18

their systems, the loss of that control would compromise their ability to meet their service obligation. *See Hearing Before the Comm. on Energy, Utilities and Telecommunications, S.F. 1815, 87th Minn. Leg.* (2012) (Statement of Rick Evans at 00:06:35), *available at* https://www.leg.state.mn.us/senatemedia/saudio/2012/cmte_energy_032012.MP3.[5]  The Amici Utilities are similarly obligated to provide reliable service to their customers.

This understanding of the consumer protection purpose of § 216B.246 is reflected in the January 15, 2013 Report to the Minnesota Legislature on Minnesota's Electric Transmission System prepared by the Minnesota Department of Commerce, Division of Energy Resources and the Minnesota Public Utilities Commission.  (Report), *available at* https://www.leg.state.mn.us/docs/2013/mandated/130074.pdf. The Report notes that § 216B.246 was intended to ensure that transmission lines are built in Minnesota "when such lines are needed and only if they are needed," and adds that "this new statute works in conjunction with Minnesota's existing statutes [governing need, reasonable rate, standard of service, regulation of construction, etc.] to ensure that Minnesota utilities provide reliable service, at reasonable costs, in consideration of Minnesota's policy objectives." (Report 8; s*ee also id.* at App. C, 3-4.)  Whether

_____

[5] A transcript of this committee hearing is attached as Exhibit A to the Affidavit of Julie Peick in support of Defendants'-Appellees' Motion to Dismiss before the District Court.

Appellate Case: 18-2559     Page: 26     Date Filed: 01/04/2019 Entry ID: 4742406

Minnesota's legislative judgments were right or wrong, "[p]rudence thus counsels against running the risk of weakening or destroying a regulatory scheme of public service and protection recognized by Congress despite its noncompetitive, monopolistic character." *Tracy*, *supra*, 519 U.S. at 309.

LSP Transmission cannot support a claim that the Act unduly burdens interstate commerce because Minnesota's legislation serves a purpose the courts have found to be presumptively valid.

## II. THE LOGIC OF LSP TRANSMISSION'S ARGUMENT, IF ACCEPTED, WOULD EVISCERATE LOCAL UTILITY REGULATION.

LSP Transmission acknowledges Minnesota's right to enact legislation that governs the operation of local monopolies without running afoul of the dormant Commerce Clause. "[T]he FPA," it admits, "largely left to the states matters they had traditionally regulated, including the siting and permitting of transmission facilities used to generate electricity or facilities used in local distribution of electricity." (Appellant's Br. 7-8.) But it claims that as to transmission siting, "the FPA only left wholly *intrastate* transmission to the state." (*Id*. at 7 (emphasis added).) LSP Transmission's reason for drawing this distinction between "wholly intrastate" and interstate transmission is clear enough. Such a distinction would presumably justify allowing local monopolies over distribution to continue, while recognizing that interstate transmission is not inherently local:

20

> Distribution and transmission are distinct components of the three-step, generation-transmission-distribution electricity market. While some entities continue to provide all three components, the business of building and owning transmission lines is separate from the businesses of generating electricity and distributing electricity to customers, and companies can and do provide one without the others. There is no need for a retail electricity distributer [sic] to build regional transmission lines to be able to continue serving its retail customers. Those transmission lines will be every bit as available to retail distributors (and available at the FERC-set tariff, moreover) if they are built by an independent transmission company.

(Appellant's Br. 46.) The problem with this argument is twofold.

First, outside of Texas, there is no such thing as a "wholly intrastate transmission" line in the contiguous 48 states. Since the Supreme Court's decision in *FPC v. Florida Power & Light Co.*, 404 U.S. 453, 466-467 (1972), all "transmission [outside Alaska, Hawaii and parts of Texas] is inherently interstate," *New York v. FERC*, 535 U.S. 1, 31 (2002) (Thomas, J., dissenting in part). Yet, this fact notwithstanding, "states have traditionally assumed *all* jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009) (emphasis added).

Second, and more fundamentally, LSP Transmission's argument rests on faulty logic. LSP Transmission argues that competition in the construction and operation of transmission lines is possible. Thus, it reasons that allowing independent transmission providers to compete with local utilities would not "jeopardize the ability of local electricity distributing public utilities to serve their

21

retail customers." (Appellant's Br. 47.) But this logic would also invalidate scores of state laws granting exclusive franchises to local gas, electric, telephone or cable companies.

After all, just as there is "no need for a retail electricity distributer [sic] to build regional transmission lines to be able to continue serving its retail customers," (Appellant's Br. 47), there is no need for the local utility to be the sole entity building and operating *distribution* facilities. For many years, in fact, one could find multiple distribution lines of competing utilities running side-by-side in neighborhoods. For example, "[f]orty-five electric light enterprises had the legal right to operate in Chicago in 1907. Prior to 1895, Duluth, Minnesota, was served by five electric lighting companies." Burton N. Behling, *Competition in Public Utility Industries* (1938), in Efficiency, Competition, and Policy at 78 (Harold Demsetz, ed., Blackwell 1989). Indeed, in Cleveland, the city's municipal-owned utility still competes "street-by-street and house-by-house for the same customers" with Cleveland Electric Illuminating Company, the privately-owned utility operating in that city. Barry Kellman & Nicholas J. Marino, *City of Cleveland v. CEI: A Case Study in Attempts to Monopolize by Regulated Utilities*, 30 Clev. St. L. Rev. 4, 7 (1981).[6] Similar direct competition in retail distribution existed in

---

[6] *See also Make the Switch Today*, Cleveland Public Power, http://www.cpp.org/switch.html (last visited Dec. 19, 2018) (noting customers of Cleveland Electric Illuminated Company can still switch their provider of retail electric services to the

Appellate Case: 18-2559    Page: 29    Date Filed: 01/04/2019 Entry ID: 4742406

nine other smaller communities in the United States as late as the 1980s.  *Id.*  As observed in *Tracy*, most states have authorized exclusive distribution franchise areas based on the view that local distribution is a natural monopoly and that wasteful duplication is to be avoided.  *Tracy*, 519 U.S. at 289–90.  This, however, is not a universally-held view among economists. *See* Walter J. Primeaux, Jr., Direct Electric Utility Competition: The Natural Monopoly Myth at 175 (Praeger, ed. 1986). But the fact that there is an argument for permitting competition in the distribution of electricity does not mean that states that have rejected this argument are therefore burdening interstate commerce by blocking such competition.

Similarly, there is no physical reason that retail electric service must remain a monopoly either. While Minnesota is one of many states that establishes exclusive retail service areas, in several other states the local distribution companies only have exclusivity as to the *delivery* of power—their customers take delivery service from the local utility, but may choose from competing power suppliers. As noted in a recent report from the National Renewable Energy Laboratory, as of 2017 thirteen states and the District of Columbia had fully restructured their retail electricity markets to allow end-use customers to buy electricity from competitive retail suppliers.  *See* Shengru Zhou, *An Introduction to Retail Electricity Choice in the United States* at 1, Nat'l Renewable Energy Labs.

municipal owned utility).

Appellate Case: 18-2559     Page: 30     Date Filed: 01/04/2019 Entry ID: 4742406

(Oct. 4, 2017), *available at* https://www.nrel.gov/docs /fy18osti/ 68993.pdf. The fact that Minnesota does not allow for retail electricity choice does not mean it is unlawfully restricting interstate competition. But by LSP Transmission's logic, a state's choice to establish exclusive distribution franchise areas and/or require that retail electric service be sold only as a bundled sales/delivery service—legislative choices that have been in place for decades—would all violate the dormant Commerce Clause because competition in the sale of electricity between the local utility franchise and out-of-state entities is *possible*.

Although LSP Transmission attempts to draw a material distinction for purposes of its dormant Commerce Clause analysis between states' ability to regulate transmission and distribution, the district court correctly observed that § 216B.246 is part of the State of Minnesota's "broader scheme regulating utilities." *LSP Transmission Holdings v. Lange*, 329 F. Supp. 3d 395, 709 (D. Minn. 2018); Appellant's Add. 18. The Act is simply one aspect of the compact that exists between states and regulated electricity providers. Under this regulatory compact, "utility businesses represent a compact of sorts; a monopoly on service in a particular geographical area (coupled with state-conferred rights of eminent domain or condemnation) is granted to the utility in exchange for a regime of intensive regulation, including price regulation, quite alien to the free market." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1189 (D.C. Cir. 1987).

24

Although one may disagree with the regulatory compact as a matter of policy, that policy question cannot be challenged in the courts. *See id.* ("Whether this regime is wise or not is, needless to say, not before us.").

As regulated electricity providers in the state, the Amici Utilities enjoy the benefits of and adhere to the obligations imposed by this compact. Minnesota grants regulated utilities exclusive service areas, but in return for this monopoly grant the state also imposes significant obligations on those utilities that are not imposed on LSP Transmission. *LSP Transmission Holdings*, 329 F. Supp. 3d at 701; Appellant's Add. 4. This includes the obligation to provide safe, adequate, efficient and reasonable service. *Id.* In addition, the Public Utilities Commission can—and does—order the Amici Utilities and other regulated utilities to "make adequate infrastructure investments and undertake sufficient preventative maintenance with regard to generation, transmission, and distribution facilities." Minn. Stat. § 216B.79. The Act includes a similar balancing of benefits and burdens. While it grants incumbents a state-based right of first refusal, it also imposes a corresponding obligation whereby the incumbent can be ordered to build the new transmission line identified through the federal planning process, even if the incumbent states it does not intend to do so. Minn. Stat. § 216B.246, subd. 3(b).

25

Opening up competition throughout all aspects of electricity generation, transmission, and distribution would eviscerate this carefully balanced regulatory compact. If LSP Transmission's argument—namely, that because competition can exist it must be allowed to exist—is accepted, there is no legitimate reason it would not also apply to the entirety of public utility regulation in Minnesota. Yet the fact is that electric utility exclusivity laws, and other areas of public utility regulation that have been in place for many decades, are entirely within the state's traditional police powers to determine whether it prefers monopoly over competition. That determination has never been solely about whether the state could better control the operations of an in-state entity. Rather, most states decided decades ago—rightly or wrongly—that competition would be wasteful and inefficient.[7] As regulated utilities in the state, the Amici Utilities both benefit from and adhere to the obligations imposed under the regulatory scheme that has followed from this decision. Indeed, the circumstances of this dispute aptly demonstrate that the Amici Utilities, just like LSP Transmission, are not always allowed to compete, due to policy judgments made by the state. The fact that LSP Transmission disagrees with

---

[7] It bears noting that even under FERC's rules, the bar on federal rights of first refusal do not extend to transmission facilities located within the local utility's service area that upgrade existing transmission facilities. *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, FERC Statutes and Regulations ¶ 31,323 at P 319 (2011). The Act simply extends that protection to cover transmission facilities that will interconnect directly with the incumbent utility's system.

26

these policy decisions does not mean they run afoul of the dormant Commerce Clause.

## <u>CONCLUSION</u>

For the reasons discussed herein, the Amici Utilities respectfully request that the judgment of the District Court be affirmed in its entirety.

Dated: January 3, 2019

/s/ Brian M. Meloy

Brian M. Meloy (MN #0287209)
Thomas C. Burman (MN #0396406)
**STINSON LEONARD STREET LLP**
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: 612-335-1500
brian.meloy@stinson.com
thomas.burman@stinson.com

Harvey L. Reiter (DC #232942)
**STINSON LEONARD STREET LLP**
1775 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006
Telephone: (202) 785-9100
harvey.reiter@stinson.com

*Attorneys for Great River Energy*

Dated: January 3, 2019

/s/ David R. Moeller

David R. Moeller (MN #0287295)
**Minnesota Power/ALLETE**
30 West Superior Street
Duluth, MN 55802-2093
Telephone:  218-723-3963
dmoeller@allete.com

27

_____

*Attorney for Minnesota Power/ALLETE*

Dated: January 3, 2019          */s/ Mark Bring*
_____
Mark Bring (#96-0593)
**OTTER TAIL POWER COMPANY**
Associate General Counsel
Otter Tail Power Company
215 S. Cascade Street
Fergus Falls, MN 56537
mbring@otpco.com

*Attorney for Otter Tail Power Company*

Dated: January 3, 2019          */s/ B. Andrew Brown*
_____
B. Andrew Brown (MN #0205357)
**DORSEY & WHITNEY LLP**
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402-1498
Telephone:  612-340-5612
Brown.Andrew@dorsey.com

*Attorney for Southern Minnesota*
*Municipal Power Agency*

28

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned counsel of record hereby certifies that:

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B)(i) because this brief contains 6,177 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14.

3.      This brief complies with 8th Cir. R 28A(h)(2) because it has been scanned for viruses and is virus-free.


Dated: January 3, 2019                    */s/ Brian M. Meloy*                    

29

## **CERTIFICATE OF SERVICE**

I certify that on January 3, 2019, I caused the foregoing to be filed through this Court's CM/ECF filer system, which will serve a notice of electronic filing on all registered users, including counsel of record for all parties and amici curiae.

Dated: January 3, 2019          */s/ Brian M. Meloy*
                                      Brian M. Meloy

Appellate Case: 18-2559    Page: 37    Date Filed: 01/04/2019 Entry ID: 4742406