No. 18-2559

_____

**In the United States Court of Appeals
for the Eighth Circuit**

_____

LSP Transmission Holdings, LLC,

*Plaintiff - Appellant,*

v.

Nancy Lange, Commissioner and Chair, Minnesota Public Utilities Commission; Dan
Lipschultz, Commissioner, Minnesota Public Utilities Commission;
Matt Schuerger, Commissioner, Minnesota Public Utilities Commission;
John Tuma, Commissioner, Minnesota Public Utilities Commission;
Katie Sieben, Commissioner, Minnesota Public Utilities Commission; and Mike
Rothman, Commissioner, Minnesota Department of Commerce,
each in his or her official capacity,

*Defendants - Appellees,*

*and*

Northern States Power Company d/b/a Xcel Energy, and ITC Midwest LLC,

*Intervenors – Defendants - Appellees.*

_____

ON APPEAL FROM
THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA
Civ. No. 0:17-cv-04490-DWF/HB, Hon. Donovan W. Frank

_____

**RESPONSE OF INTERVENORS-DEFENDANTS-APPELLEES
NORTHERN STATES POWER COMPANY D/B/A XCEL ENERGY AND
ITC MIDWEST LLC**

Aaron D. Van Oort (#0315539)
Nathaniel J. Zylstra (#0314328)
Lauren W. Linderman (#0398466)
David Archer (#0399150)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
Minneapolis, MN 55402-3901
(612) 766-8726
aaron.vanoort@FaegreBD.com
nathaniel.zylstra@FaegreBD.com
lauren.linderman@FaegreBD.com
david.archer@FaegreBD.com

Max J. Minzner
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, D.C. 20001
(202) 639-6000
mminzner@jenner.com
mprice@jenner.com

*Attorneys for Intervenor-Defendant-Appellee*
*Northern States Power Company d/b/a Xcel*
*Energy*

Richard D. Snyder (#0191292)
Lisa M. Agrimonti (#0272474)
Leah C. Janus (#0337365)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
rsnyder@fredlaw.com
lagrimonti@fredlaw.com
ljanus@fredlaw.com

*Attorneys for Intervenor-Appellee*
*ITC Midwest LLC*

## SUMMARY OF THE CASE

Regulating the physical infrastructure required to transmit electricity has been a core concern of the States since the 1800s. When Congress enacted the Federal Power Act in 1935, it expressly preserved State authority over transmission infrastructure. When the Federal Energy Regulatory Commission issued Order 1000 in 2011, it did the same. Consistent with both authorities, Minnesota enacted Minn. Stat. § 216B.246 in 2012. Concluding that safe, reliable, affordable electricity could best be provided for its citizens through the use of a limited number of regulated entities, the legislature (1) gave the existing, regulated transmission providers the right of first refusal to build new, regionally-approved transmission lines that would be located in their areas and connect to their facilities and (2) gave Minnesota's Public Utilities Commission the authority to *compel* the providers to build those lines, even if they did not want to.

LSP argues that competition is a better policy than regulation. It made this same argument to the Minnesota legislature, which found otherwise, and to FERC, which deferred to Minnesota's choice. Contrary to LSP's arguments, the dormant Commerce Clause does not delegate these policy choices to the courts. It prohibits States from discriminating against or unduly burdening interstate commerce—but § 216B.246 does neither. The statute is a legitimate, non-discriminatory exercise of Minnesota's authority to regulate critical, physical infrastructure located within its borders in the public interest. The district court correctly dismissed LSP's complaint. This Court should affirm. No oral argument is required.

## CORPORATE DISCLOSURE STATEMENT

Northern States Power Company d/b/a Xcel Energy is a Minnesota public utility corporation that is wholly owned by Xcel Energy, Inc. No publicly held corporation owns 10% or more of Xcel Energy, Inc.'s stock.

ITC Midwest LLC is a Michigan limited liability company owned by ITC Holdings Corp., its sole member. The shares of ITC Holdings are not publicly traded. Approximately 80.1% of the shares of ITC Holdings, however, are owned by Fortis, Inc., a Canadian company which is publicly traded in the United States and Canada. The remaining 19.9% of ITC Holdings' shares are owned by a privately held entity that is not publicly traded.

# TABLE OF CONTENTS

**Page**

SUMMARY OF THE CASE ................................................................................i

CORPORATE DISCLOSURE STATEMENT...............................................ii

TABLE OF CONTENTS ...............................................................................iii

TABLE OF AUTHORITIES ......................................................................... vi

JURISDICTIONAL STATEMENT................................................................ 1

STATEMENT OF THE ISSUES ................................................................... 2

STATEMENT OF THE CASE ....................................................................... 3

    A.    States learn from "chastening experience" that the public interest requires them to regulate the provision of electricity. ............................................................................... 4

    B.    The federal government assumes a limited role in regulating certain interstate issues but preserves the States' regulatory authority over all other matters, including the construction and ownership of transmission facilities located within their borders. ............................................................................... 6

    C.    FERC promulgates Order No. 1000 to address transmission planning and rates, and it expressly preserves state regulatory authority over the construction and ownership of transmission facilities. ............................................ 8

    D.    Minnesota enacts Minn. Stat. § 216B.246 in an exercise of its traditional regulatory authority to select the builders and owners of physical transmission facilities located within its borders. ............................................................................. 11

    E.    FERC approves the regional tariff recognizing Minnesota's statute and rejects LSP's objection to it. ..................................... 12

    F.    The Seventh Circuit rejects LSP's statutory challenge to FERC's implementation of Minnesota's statute. ....................... 13

G.    Xcel Energy and ITC Midwest exercise their rights of first refusal in connection with the proposed Huntley-Wilmarth line. ................................................................................. 14

H.    LSP files this suit, and the district court dismisses its complaint. ......................................................................... 16

SUMMARY OF THE ARGUMENT ........................................................... 18

ARGUMENT .......................................................................................... 22

I.    Minnesota's Even-Handed Regulation Of Critical, Physical Infrastructure Located Within Its Borders Does Not Violate The Dormant Commerce Clause. ............................................................... 22

A.    Under the Supreme Court's decision in *Tracy*, Minnesota may choose to treat regulated incumbents differently from would-be competitors. ........................................................ 23

1.    Would-be competitors are not similarly situated to regulated incumbents. ................................................ 24

2.    LSP offers no valid basis for distinguishing *Tracy*. ......................... 27

3.    All of the reasons given by *Tracy* for deferring to a State's policy choice on how to regulate utilities apply here. ............................................................. 29

B.    Section 216B.246 does not discriminate against out-of-state entities because its regulatory burdens and benefits apply even-handedly regardless of state of incorporation or principal place of business. .......................................... 35

1.    The statute is neutral on its face. ...................................... 35

a.    Section 216B.246 is not a "flow control" ordinance, nor can it reasonably be compared to such an ordinance. ......................................... 36

b.    Reducing competition is not the same thing as discriminating against interstate commerce. ................. 38

    c.  Companies that merely own facilities in a
       State are not the same as companies that are
       incorporated or headquartered in a State. ........................... 40

   2.  The statute does not discriminate in effect...................................... 44

   3.  The statute does not have a discriminatory purpose.................... 47

II. Minnesota's Statute Does Not Place Clearly Excessive Burdens
  On Interstate Commerce ......................................................................... 49

III. The Amicus Brief Of The United States Does Not Identify Any
  Valid Basis For Remand............................................................................ 54

CONCLUSION ................................................................................................... 56

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allco Fin. Ltd. v. Klee,*
  861 F.3d 82 (2d Cir. 2017) ..............................................................................passim

*Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n,*
  461 U.S. 375 (1983) ................................................................................... 5, 19

*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984) ........................................................................................ 37

*Balt. Gas & Elec. Co. v. Heintz,*
  760 F.2d 1408 (4th Cir. 1985) ....................................................................... 31

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.,*
  115 F.3d 1372 (8th Cir. 1997) ........................................................ 36, 37, 42, 43

*C & A Carbone, Inc. v. Town of Clarkstown,*
  511 U.S. 383 (1997) ........................................................................................ 37

*Camps Newfound/Owatonna, Inc. v. Town of Harrison,*
  520 U.S. 564 (1997) ........................................................................................ 46

*Colon Health Ctrs. of Am., L.L.C. v. Hazel,*
  813 F.3d 145 (4th Cir. 2016) .........................................................................passim

*Commonwealth Edison Co. v. Montana,*
  453 U.S. 609 (1981) ........................................................................................ 45

*Cotto Waxo Co. v. Williams,*
  46 F.3d 790 (8th Cir. 1995)............................................................................ 51

*CTS Corp. v. Dynamics Corp. of America,*
  481 U.S. 69 (1987) .......................................................................................... 45

*Dean Milk. Co. v. Madison,*
  340 U.S. 349 (1951) ........................................................................................ 37

*Doran v. Mass. Turnpike Auth.,*
  256 F. Supp. 2d 48 (D. Mass. 2003) ...................................................... 44, 50

*FERC v. Elec. Power Supply Ass'n*,
   136 S. Ct. 760 (2016) ............................................................ 6, 33

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*,
   703 F.3d 1230 (11th Cir. 2012) ............................................ 43

*Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*,
   757 F. Supp. 2d 1260 (S.D. Fla. 2010) ................................ 43

*Fort Gratiot Sanitary Landfill, Inc. v. Mich. Dep't of Nat. Res.*,
   504 U.S. 353 (1992) ................................................................ 36

*Gen. Motors Corp. v. Tracy*,
   519 U.S. 278 (1997) .......................................................... passim

*Gonzalez v. Raich*,
   545 U.S. 1 (2005) ..................................................................... 33

*Grand River Enters. Six Nations, Ltd. v. Beebe*,
   574 F.3d 929 (8th Cir. 2009) ................................................ 49

*Granholm v. Heald*,
   544 U.S. 460 (2005) ................................................................ 37

*Heffner v. Murphy*,
   745 F.3d 56 (3d Cir. 2014) .................................................... 39

*Hughes v. Oklahoma*,
   441 U.S. 322 (1979) ................................................................ 35

*IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgt. Dist.*,
   433 F.3d 600 (8th Cir. 2006) .......................................... 23, 43

*Jersey Cent. Power & Light Co. v. FERC*,
   810 F.2d 1168 (D.C. Cir. 1987) .............................................. 6

*MISO Transmission Owners v. FERC*,
   819 F.3d 329 (7th Cir. 2016) ..................................... 9, 14, 52

*Munn v. Illinois*,
   94 U.S. 113 (1876) .................................................................... 5

*New York v. FERC*,
   535 U.S. 1 (2002) ....................................................................... 7

*Norfolk S. Corp. v. Oberly*,
    822 F.2d 388 (3d Cir. 1987) ........................................................... 41, 42

*North Dakota v. Heydinger*,
    825 F.3d 912 (8th Cir. 2016) ............................................................... 8

*Nw. Airlines, Inc. v. Minnesota*,
    322 U.S. 292 (1944) ............................................................................ 33

*Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*,
    341 U.S. 329 (1951) ....................................................................... 31, 38

*Piedmont Envt'l Council v. FERC*,
    558 F.3d 304 (4th Cir. 2009) ............................................................... 7

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970) ........................................... 23, 43, 49, 50, 51

*Pioneer Military Lending, Inc. v. Manning*,
    2 F.3d 280 (8th Cir. 1993) ................................................................. 51

*Pub. Util. Comm'n v. Attleboro Steam & Elec. Co.*,
    273 U.S. 83 (1927) .......................................................................... 6, 7

*S.C. Pub. Serv. Auth. v. FERC*,
    762 F.3d 41 (D.C. Cir. 2014) ........................................................ 8, 13

*SDDS, Inc. v. South Dakota*,
    47 F.3d 263 (8th Cir. 1995) ............................................................... 46

*South Dakota v. Wayfair, Inc.*,
    138 S. Ct. 2080 (2018) ................................................................ 19, 22, 23

*S. Union Co. v. Mo. Pub. Serv. Comm'n*,
    289 F.3d 503 (8th Cir. 2002) ................................................... passim

*S. Wine & Spirits v. Alcohol & Tobacco Control*,
    731 F.3d 799 (8th Cir. 2013) ....................................................... 47, 49

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*,
    550 U.S. 330 (2007) ............................................................................ 44

*United States v. Lopez*,
    514 U.S. 549 (1995) ............................................................................ 33

*Walgreen Co. v. Rullan*,
    405 F.3d 50 (1st Cir. 2005) .......................................................................... 43

**FEDERAL AGENCY RULES AND ADJUDICATIONS**

*Midwest Indep. Transmission Sys. Operator, Inc.*, Order On Rehearing,
    150 FERC ¶ 61037, 2015 WL 285969 (Jan. 22, 2015) ........................... 12, 13, 50, 52

*PJM Interconnection, L.L.C. Indicated PJM Transmission Owners PJM
    Interconnection, L.L.C. Pub. Serv. Elec. & Gas Co.*,
    147 FERC ¶ 61128, 2014 WL 1997984 (May 15, 2014) ........................... 10

*Reg'l Transmission Organizations*, Order No. 2000,
    89 FERC ¶ 61285, 1999 WL 33505505 (Dec. 20, 1999) ............................ 8

*S.C. Elec. & Gas Co.*, Order on Rehearing,
    147 FERC ¶ 61126; 2014 WL 1997987 (May 15, 2014) .......................... 10

*Transmission Planning & Cost Allocation by Transmission Owning & Operating
    Pub. Utilities*, Order No. 1000,
    136 FERC ¶ 61051, 2011 WL 2956837 (July 21, 2011) ................................. 8, 9, 52

**STATE CASES**

*Indus. Gas Co. v. Pub. Util. Comm'n of Ohio*,
    21 N.E.2d 166 (Ohio 1939) ......................................................................... 25

*State v. Smith*,
    899 N.W.2d 120 (Minn. 2017) ................................................................... 48

**FEDERAL STATUTES**

15 U.S.C. § 717f .............................................................................................. 33

16 U.S.C. § 824 *et seq.* ....................................................... 6, 7, 28, 37, 50, 51

28 U.S.C. § 1291 .............................................................................................. 1

28 U.S.C. § 1331 .............................................................................................. 1

42 U.S.C. § 1983 .............................................................................................. 1

Federal Power Act, Chapter 687, Title II, 49 Stat. 838 (1935) ........................ 6

**STATE STATUTES**

Minn. Stat. § 216B.01 ..........................................................................4, 5, 31, 47

Minn. Stat. § 216B.16 ................................................................................... 12, 36

Minn. Stat. § 216B.243 ................................................................................. 11, 14

Minn. Stat. § 216B.246 ...............................................................................passim

Minn. Stat. § 216B.2421 ..................................................................................... 11

Minn. Stat. § 216B.2425 ..................................................................................... 26

Minn. Stat. § 216B.50 ................................................................................... 12, 36

Minn. Stat. § 216C.054 ...................................................................................... 48

**REGULATIONS**

18 C.F.R. § 35.34 ............................................................................................. 8, 9

Minn. R. 7829.2550 ........................................................................................... 14

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Article I, § 8, cl. 3....................................................................2, 22, 33

**OTHER AUTHORITIES**

Alfred E. Kahn, THE ECONOMICS OF REGULATION 20 (1988)........................................ 5

Joseph P. Tomain, *The Persistence of Natural Monopoly*, 16 Nat. Resources
    & Env't 242, 242 (2002)................................................................................... 4

# JURISDICTIONAL STATEMENT

LSP's jurisdictional statement is incomplete and inaccurate. Xcel Energy and ITC Midwest therefore provide this correct statement. The district court had jurisdiction under 28 U.S.C. § 1331 over LSP's claims, which were brought under 42 U.S.C. § 1983. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291. LSP is appealing from a final judgment disposing of all claims that was entered in the district court on June 22, 2018. (ADD26.) LSP timely filed its notice of appeal under Fed. R. App. P. 4(a)(1)(A) on July 20, 2018. (District Ct. Dkt. 79.)

## <u>STATEMENT OF THE ISSUES</u>

Whether Minnesota is prohibited by the dormant implication of the Commerce Clause to the U.S. Constitution from enacting a facially neutral regulation of the owners and operators of physical transmission infrastructure located within its borders, in order to ensure the provision of safe, reliable electricity to its citizens?

The most apposite cases and constitutional provisions are:

- U.S. Const., Art. I, § 8, cl. 3

- *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997)

- *Southern Union Co. v. Missouri Public Service Commission*, 289 F.3d 503 (8th Cir. 2002)

- *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017)

# STATEMENT OF THE CASE

Exercising its long-recognized authority to regulate the provision of electricity in the public interest, Minnesota enacted Minn. Stat. § 216B.246 in 2012 to govern the selection of the builders and operators of certain electric transmission lines located within its borders. In a classic example of the regulatory compact, Minnesota provided that the incumbent, regulated transmission owners could be compelled to build the new lines, and also that they would have the right of first refusal to build them. Minnesota imposed these burdens and gave these benefits even-handedly to all incumbents, regardless of their state of incorporation or principal place of business.

Plaintiff-Appellant LSP Transmission Holdings, LLC ("LSP"), which is not an incumbent, lobbied against § 216B.246, arguing for an open-market approach so it could selectively compete for the most profitable projects. Minnesota decided against that approach. LSP then attempted to persuade FERC to order Minnesota to take an open-market approach and sued to require FERC to issue that order. Both attempts were unsuccessful. Finally, LSP filed the suit below, seeking to have the federal courts override Minnesota's regulatory policy choice as a matter of constitutional law.

The district court correctly dismissed LSP's complaint, and this Court should affirm.

## A. States learn from "chastening experience" that the public interest requires them to regulate the provision of electricity.

When electricity was first introduced in this country, many governments followed a laissez-faire, open-market approach. As the Supreme Court recounted in *General Motors Corp. v. Tracy*, "[t]he results were both predictable and disastrous, including an initial period of 'wasteful competition,' followed by massive consolidation and the threat of monopolistic pricing." 519 U.S. 278, 289 (1997); *see also id.* at 289 & n.7 (referring to natural gas and noting that "[t]he public suffered through essentially the same evolution in the electric industry," where the open-market approach was "ruinous and short-lived"); Joseph P. Tomain, *The Persistence of Natural Monopoly*, 16 Nat. Resources & Env't 242, 242 (2002) ("A specific service area needs only one set of electric or telephone wires—the investment in any other set of wires is wasteful."). The States thus "learned from chastening experience" that "competition would simply give over to monopoly in due course" and hence that it was "virtually an economic necessity for States to provide a single, local franchise with a business opportunity free of competition from any source," balanced "by regulation and the imposition of obligations to the consuming public." *Tracy*, 519 U.S. at 290.

Minnesota was among the States that learned the necessity of regulation. Its legislature found it "to be in the public interest that public utilities be regulated in order to provide the retail consumers of . . . electric service in this state with adequate and reliable services at reasonable rates." Minn. Stat. § 216B.01. A Public Utilities

Commission ("Commission") was created and given expansive authority over the provision of electricity, including the authority to "order public utilities to make adequate infrastructure investments and undertake sufficient preventative maintenance with regard to generation, transmission, and distribution facilities." *Id.* § 216B.79. This authority extends "to any transmission company that owns or operates electric transmission lines in Minnesota." *Id.*

Because of the lessons of history, state regulation of industries deemed to be in the public interest has been recognized since the 1800s to be a valid exercise of States' police powers. *See Munn v. Illinois*, 94 U.S. 113, 126 (1876). Indeed, "'regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States.'" *S. Union Co. v. Mo. Pub. Serv. Comm'n*, 289 F.3d 503, 508 (8th Cir. 2002) (quoting *Ark. Elec. Co-op Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 377 (1983)).

In a regulated environment, "the two prime requirements of competition as the governing market institution—freedom of entry and independence of action—are deliberately replaced." Alfred E. Kahn, THE ECONOMICS OF REGULATION 20 (1988). Instead, the regulator "determines specifically who shall be permitted to serve; and when it licenses more than one supplier, it typically imposes rigid limitations on their freedom to compete." *Id.* In addition, "the government determines price, quality and conditions of service, and imposes an obligation to serve." *Id.*

Over time, the relationship between regulators and regulated became described as a "compact of sorts," where "[e]ach party to the compact gets something in the bargain." *Jersey Cent. Power & Light Co. v. FERC*, 810 F.2d 1168, 1189 (D.C. Cir. 1987). The regulated entity receives "a monopoly on service in a particular geographical area . . . in exchange for a regime of intensive regulation, including price regulation, quite alien to the free market." *Id.* As a consequence, "utility investors are provided a level of stability in earnings and value less likely to be attained in the unregulated or moderately regulated sector; in turn, ratepayers are afforded universal, non-discriminatory service and protection from monopolistic profits through political control over an economic enterprise." *Id.*

B.  **The federal government assumes a limited role in regulating certain interstate issues but preserves the States' regulatory authority over all other matters, including the construction and ownership of transmission facilities located within their borders.**

Early in the history of the country, "state and local agencies oversaw nearly all generation, transmission, and distribution of electricity." *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 767 (2016). In 1927, however, the Supreme Court held that States could not regulate the interstate sale of electricity. *Pub. Util. Comm'n v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 90 (1927).

In response, Congress in 1935 enacted the Federal Power Act ("FPA"). *See* FPA, ch. 687, Title II, 49 Stat. 838 (1935) (codified as amended 16 U.S.C. § 824 *et seq.* (2015)). In the FPA, Congress reaffirmed that "the business of transmitting and

6

selling electric energy for ultimate distribution to the public is affected with a public interest." 16 U.S.C. § 824(a). To fill the regulatory gap created by *Attleboro*, Congress gave a federal agency (now FERC) authority over "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." *Id.* But Congress limited federal regulation "to those matters which are not subject to regulation by the States," *id.*, and it expressly preserved to the States jurisdiction over facilities used for "the generation of electric energy," "local distribution," and "transmission of electric energy in intrastate commerce," *id.* § 824(b)(1).

As this Court explained in *Southern Union*, "[a] major purpose" of the FPA "was to preserve and protect state and local regulation" on matters of local interest. 289 F.3d at 507. Chief among those matters is the physical infrastructure used to transmit electricity. Under the FPA, "[t]he states have traditionally assumed all jurisdiction to approve or deny permits for the siting and construction of electric transmission facilities." *Piedmont Envt'l Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). Not just Congress, but FERC also has emphasized the strength of the state interest in regulating "transmission siting." *New York v. FERC*, 535 U.S. 1, 24 (2002) (quoting FERC). "We acknowledge," FERC recently stated, "that there is longstanding state authority over certain matters that are relevant to transmission planning and expansion, such as matters relating to siting, permitting, and construction."

*Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utilities*, Order No. 1000, 136 FERC ¶ 61051, ¶ 107, 2011 WL 2956837, at *33 (July 21, 2011) (hereinafter "Order No. 1000").

Thus today, "the States' traditional role in regulating siting and construction requires little discussion." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 62 (D.C. Cir. 2014). Specifically as to Minnesota, this Court has recognized that "Minnesota retains broad regulatory authority to protect the health and safety of its citizens" and has long exercised that authority with respect to "the siting, construction, and operation" of physical infrastructure located within its borders. *North Dakota v. Heydinger*, 825 F.3d 912, 922 (8th Cir. 2016).

### C. FERC promulgates Order No. 1000 to address transmission planning and rates, and it expressly preserves state regulatory authority over the construction and ownership of transmission facilities.

This case arises out of Minnesota's regulation of the siting, construction, and operation of certain electric transmission facilities located within Minnesota. *See* Minn. Stat. § 216B.246. It does not address the planning of those lines or the rates for transmission of electricity on them, both of which are regulated by FERC.

In 1999, FERC began shifting the responsibility for transmission planning to a regional level, allowing regions that cross state (and even national) borders. *See Reg'l Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61285, ¶ 1, 1999 WL 33505505, at *3 (Dec. 20, 1999); 18 C.F.R. § 35.34. To assist regional planning, FERC

authorized the creation of non-governmental, non-profit entities known as either Regional Transmission Organizations ("RTOs") or Independent System Operators ("ISOs"). *Id.*

Even as it supported grid planning at the regional level, FERC left the regulation of the builders and operators of transmission lines to the States. Originally, FERC had approved federal tariffs providing that the right to build and operate any new transmission project approved by the ISOs would belong to whomever the incumbent transmission owner was in that area—the owner that the State had selected. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016).

In 2011, however, in order to give States the ability to shift to a more competitive approach if they wanted to do so, FERC eliminated provisions in *federal* tariffs requiring new projects to be directed to the incumbent owner, while simultaneously declaring that it would defer to whomever the States selected. *Id.* at 333; *see also* Order No. 1000, 136 FERC ¶ 61051, at ¶¶ 7, 107, 227, 253 n.231, 287, 2011 WL 2956837, at *3, 33, 72, 81, 92. Some commenters objected that, by eliminating the federal right of first refusal, FERC was intruding on the States' traditional authority to regulate. But as FERC explained, "[e]liminating a *federal* right of first refusal in Commission-jurisdictional tariffs and agreements does not, as some commenters contend, result in the regulation of matters reserved to the states." *Id.* at ¶ 287, 2011 WL 2956837, at *92. Quite the contrary, FERC was deferring to the

States, some of which would continue to grant their own rights of first refusal to incumbent providers: "The Commission acknowledges that there may be restrictions on the construction of transmission facilities by nonincumbent transmission providers under rules or regulations enforced by other jurisdictions," and Order No. 1000 would not "limit, preempt, or otherwise affect state or local laws or regulations" on that topic. *Id.*; *see also id.* at ¶¶ 107, 227, 253 n.231.

Since promulgating Order No. 1000, FERC has repeatedly reaffirmed its deference to state policy decisions regarding the construction and ownership of transmission facilities. *See, e.g.*, *S.C. Elec. & Gas Co.*, Order on Rehearing, 147 FERC ¶ 61126, ¶¶ 61562–64, 2014 WL 1997987 at **34-37 (May 15, 2014). It has reiterated that "state-granted rights of first refusal . . . still exist under state or local law . . . and nothing in Order No. 1000 changes that law or regulation, for Order No. 1000 is clear that nothing therein is 'intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities.'" *Id.* at ¶ 127, **36. A federal policy of cooperating with and deferring to state laws, the Commission said, advances the "purpose of Order No. 1000 . . . to facilitate the likelihood that needed transmission facilities will move forward." *Id.*; *see also PJM Interconnection, L.L.C. Indicated PJM Transmission Owners PJM Interconnection, L.L.C. Pub. Serv. Elec. & Gas Co.*, Order On Rehearing, 147 FERC ¶ 61128, ¶¶ 61730–32, 2014 WL 1997984, at *37 (May 15, 2014).

**D.** **Minnesota enacts Minn. Stat. § 216B.246 in an exercise of its traditional regulatory authority to select the builders and owners of physical transmission facilities located within its borders.**

In 2012, the year after FERC promulgated Order No. 1000, Minnesota enacted § 216B.246 in an exercise of its traditional authority to regulate physical infrastructure located within its borders.

Section 216B.246 lies within Minnesota's broader regulatory program governing "large energy facilit[ies]," which are defined to include significant electric transmission lines. Minn. Stat. §§ 216B.243 & 216B.2421, subd. 2. The core provisions of § 216B.246 reflect both the benefits and the burdens of the regulatory compact. On the one hand, "the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan" is given to the "incumbent electric transmission owner" whose facilities the new line will "connect[] to." *Id.* § 216B.246, subd. 2. On the other hand, the statute authorizes the Minnesota Public Utilities Commission to *require* an incumbent to "build the electric transmission line," even if the incumbent does not want to build it. *Id.*, subd. 3(b).

The rights and obligations granted by § 216B.246 apply neutrally to all incumbent transmission owners, regardless of their state of organization or principal place of business. Section 216B.246 defines an "incumbent electric transmission owner" as "any public utility that owns, operates, and maintains an electric

11

transmission line in this state; any generation and transmission cooperative electric association; any municipal power agency; any power district; any municipal utility; or any transmission company . . . ." *Id.*, subd. 1(c). Many of these incumbent electric transmission owners are out-of-state entities, including entities headquartered in Iowa, North Dakota, South Dakota, and Wisconsin. ADD7.[1] Additional out-of-state companies may become incumbents by buying existing transmission facilities, *see* Minn. Stat. §§ 216B.16, subd. 7c(a) and 216B.50, which is how intervenor ITC Midwest, a Michigan company, entered the Minnesota market.

E.     **FERC approves the regional tariff recognizing Minnesota's statute and rejects LSP's objection to it.**

After Minnesota enacted § 216B.246, the regional planning entity covering Minnesota—the Midcontinent Independent System Operator ("MISO"), which governs 15 U.S. states and parts of Canada APP5 (Compl. ¶ 16)—amended its tariff to implement the rights of first refusal that Minnesota and other states had enacted. In 2015, FERC approved MISO's tariff. *Midwest Indep. Transmission Sys. Operator, Inc.*, Order On Rehearing, 150 FERC ¶ 61037, ¶ 61176, 2015 WL 285969, at *7 (Jan. 22, 2015).

---

[1] In this brief, Appellees cite to the Appendix of Plaintiff-Appellant as "APP," the Addendum of Plaintiff-Appellant as "ADD," and the Separate Appendix of Appellees as "SAPP."

Plaintiff-Appellant LSP sought reconsideration of FERC's approval, arguing that because FERC had eliminated the federal right of first refusal, it was obligated also to override State rights of first refusal. *Id.* ¶¶ 2, 17-22. FERC, however, rejected LSP's argument as fundamentally misunderstanding Order No. 1000. By removing a *federal* right of first refusal but honoring *state* rights, FERC explained, Order No. 1000 had "struck an important balance between removing barriers to participation by potential transmission providers in the regional transmission planning process and ensuring the nonincumbent transmission developer reforms ***do not result in the regulation of matters reserved to the states***." *Id.* ¶ 27 (emphasis added). Thus, it was entirely "appropriate for MISO to recognize state or local laws or regulations as a threshold matter in the regional transmission planning process." *Id.* ¶ 25.

F. **The Seventh Circuit rejects LSP's statutory challenge to FERC's implementation of Minnesota's statute.**

After FERC promulgated Order No. 1000 and approved the MISO tariff, the balance it struck between federal and state regulatory power was challenged in court from both sides. Some parties argued that Order No. 1000 intruded too much on state authority by requiring regional planning processes. *See S.C. Pub. Serv. Auth.*, 762 F.3d at 62-63. Although the D.C. Circuit found that argument to be "not without force," it concluded that FERC had acted within its authority. *Id.*

Other parties, including Plaintiff-Appellant LSP, argued that FERC had not gone far enough and was required to override state rights of first refusal. *See MISO*

*Transmission Owners*, 819 F.3d at 336 (noting LSP's objection to Minn. Stat. § 216B.246). The Seventh Circuit, however, rejected LSP's argument, holding that FERC's desire "to avoid intrusion on the traditional role of the States' in regulating the siting and construction of transmission facilities" was a "proper goal." *Id.*

**G.    Xcel Energy and ITC Midwest exercise their rights of first refusal in connection with the proposed Huntley-Wilmarth line.**

Intervenor-Appellees Xcel Energy and ITC Midwest are among the existing owners of transmission facilities in Minnesota regulated by § 216B.246. In 2017, they exercised their rights of first refusal to build a proposed 345-kilovolt electric transmission line located in Minnesota. Named the Huntley-Wilmarth line, the proposed line will run approximately 40 miles, connecting Xcel Energy's Wilmarth substation, north of Mankato, Minnesota, to ITC Midwest's Huntley substation, south of Winnebago, Minnesota. APP23 (Compl. ¶ 70); *see also* SAPP49. As required by Minnesota's regulatory scheme, they filed a Notice Plan on June 30, 2017, *see* Minn. R. 7829.2550; SAPP62, and later submitted a certificate-of-need application, *see* Minn. Stat. §§ 216B.243 and 216B.246. The project is scheduled for completion by January 1, 2022. APP24 (Compl. ¶ 72). The following map depicts the proposed route area:

FIGURE 1



Figure 1: Huntley-Wilmarth Notice Area

SAPP75.

**H.    LSP files this suit, and the district court dismisses its complaint.**

LSP filed this lawsuit in September 2017, claiming that Minn. Stat. § 216B.246 violates the dormant aspect of the Commerce Clause to the U.S. Constitution. Both Xcel Energy and ITC Midwest intervened. All Defendants moved to dismiss. In a well-reasoned, 25-page order, the district court granted the motions to dismiss. ADD1-ADD25.

The court first summarized the regulatory history recounted above, including States' long-recognized authority to regulate electric utilities, especially with respect to physical infrastructure located within their borders, *id.* at 3; Congress's preservation of that authority in the FPA, *id.* at 3-4; FERC's striking of a balance between federal and state authority by disapproving federal rights of first refusal for incumbents to build new transmission lines but deferring to State rights of first refusal, *id.* at 5-6; Minnesota's enactment of a right of first refusal in Minn. Stat. § 216B.246, *id.* at 6-7; and FERC's and the Seventh Circuit's rejections of LSP's challenge to Minnesota's statute, *id.* at 7-8.

Next, the court rejected LSP's argument that § 216B.246 discriminates against interstate commerce for two reasons. First, applying the Supreme Court's holding in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), "that there cannot be discrimination between entities that are not similarly situated," ADD19, the district court held that non-incumbent, would-be competitors such as LSP are not similarly situated to the

regulated, incumbent transmission facility owners to whose facilities a new line will connect, and hence that distinguishing between them is not discrimination under the dormant Commerce Clause, *id.* at 19-20. *Tracy* calls for courts to defer to States' decisions on matters of utility regulations. *Id.* at 18-19. In addition, "Congress and FERC have both indicated that Minnesota is entitled to make the policy decision" regarding how to regulate the construction and ownership of transmission lines. *Id.* at 19. Finally, "Congress, FERC, and the Minnesota legislature are 'better-situated than the courts' to 'determine the economic wisdom and the health and safety effects'" of varying regulatory structures for electricity. *Id.* at 19 (quoting *Allco Fin. Ltd. v. Klee*, 861 F.3d 82, 107 (2d Cir. 2017)). The district court, "therefore, properly defer[red] to their judgment." *Id.*

Second, even if incumbents and non-incumbents could be deemed similarly situated, the district court held that LSP's argument of discrimination still failed because the preference given to incumbents "does not discriminate against out-of-state entities." *Id.* at 20. Rather, the "statute draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state." *Id.* at 20-21. Indeed, of the sixteen entities that would qualify as incumbents, five "are headquartered outside of Minnesota." *Id.* at 21. The court rejected LSP's argument that "any owner of a transmission facility in Minnesota, regardless of their actual

17

headquarters, should be considered 'in-state,'" stating that "[i]ncumbency bias is not the same as discrimination against out-of-state interests." *Id.* (citing *Colon Health Ctrs. of Am., L.L.C. v. Hazel*, 813 F.3d 145, 158 (4th Cir. 2016)).

Finally, the district court held that Minn. Stat. § 216B.246 does not violate the dormant Commerce Clause by unduly burdening interstate commerce. Recognizing that LSP would have to show that Minnesota's regulation placed a "burden on interstate commerce" that is "clearly excessive in relation to the putative local benefits," *id.* at 22 (quoting *S. Union*, 289 F.3d at 507), along with a "compelling need for national uniformity in regulation," *id.* at 24 (quoting *Tracy*, 519 U.S. at 298 n.12), the court held that LSP's claim failed as a matter of law because of Minnesota's "strong and well-recognized interest in regulating the market for electricity that serves its citizens," *id.* at 22, as well as FERC's decision to strike "an important balance" between federal and state regulation by deferring to State rights of first refusal, *id.* at 24.

## SUMMARY OF THE ARGUMENT

LSP is asking this Court to do something no court has ever done: use the dormant Commerce Clause to the U.S. Constitution to hold that a State that has historically ensured the provision of safe, reliable, affordable electricity for its citizens through regulated entities cannot make the policy choice to have new infrastructure

18

be built by the entities to whose facilities it will connect. The district court correctly rejected LSP's novel claim, and this Court should affirm.

Although the Supreme Court has recognized a dormant implication of the Commerce Clause that "prohibits state taxation or regulation that discriminates against or unduly burdens interstate commerce," *S. Union,* 289 F.3d at 507 (quoting *Tracy*, 519 U.S. at 287), it has emphasized that courts cannot use this implication to "prohibit the States from exercising their lawful sovereign powers in our federal system," *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2096 (2018).

Since the 1800s, courts have universally recognized that the "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *Ark. Elec. Co-op Corp.*, 461 U.S. at 377. "A major purpose" of the FPA, enacted by Congress in 1935, likewise "was to preserve and protect state and local regulation" on matters of local interest, such as the ownership and operation of transmission lines. *S. Union*, 289 F.3d at 507.

Minnesota's enactment of Minn. Stat. § 216B.246 to regulate the construction and ownership of physical infrastructure located within its borders falls directly within its core, historical authority, and the district court correctly refused to invoke the dormant aspect of the Commerce Clause to preclude it.

For two separate reasons, § 216B.246 is not subject to the rule of virtually *per se* invalidity that applies to laws that patently discriminate against interstate commerce.

First, under the Supreme Court's decision in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), the statute's distinction between regulated incumbents and would-be new market entrants cannot be treated as discriminatory because the two groups of entities are not similarly situated. As *Tracy* explained in rejecting a claim of discrimination made against an Ohio statute addressing natural gas, regulated incumbents are forced to carry the burdens of the States' regulatory mandates, and they may in exchange be given benefits to allow them to bear those burdens. *Id.* at 289. Would-be competitors, who do not carry the burdens, are not similarly situated and hence cannot complain of discrimination in being denied the benefits. In the same way, the existing, regulated transmission facility owners on which Minn. Stat. § 216B.246 places its burdens and grants its benefits are not similarly situated to would-be competitors like LSP, *who are not subject to the regulatory burden of being compelled to build.* The holding and logic of *Tracy* are controlling here, and they compel the same result.

Second, even if incumbents and non-incumbents could be deemed similarly situated, there still is no discrimination against interstate competition because § 216B.246 does not discriminate against out-of-state entities on its face, in purpose, or in effect. As the district court correctly recognized, § 216B.246 "draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-

20

state." ADD20-21. *All* existing providers bear the burden of possibly being required to build and receive the benefit of the right of first refusal, and *all* would-be competitors are spared the burdens and denied the benefits, regardless of where they are incorporated or headquartered. Minn. Stat. § 216B.246, subd. 2. LSP's arguments of discrimination rest on three false equivalencies: that utility-infrastructure regulations can be equated to flow-control ordinances, that limiting competition is the same as discriminating against interstate commerce, and that having operations in a State is the same as being incorporated or headquartered in the State. None of these arguments is correct, and there is no basis to LSP's appeal for *per se* invalidity.

Finally, in arguing that the burdens of Minnesota's statute outweigh its benefits, LSP does exactly what this Court said it cannot do: "ignore[] this nation's long history of public utility regulation." *S. Union*, 289 F.3d at 507. Both this Court and the Supreme Court have repeatedly affirmed the States' strong, legitimate interest in regulating utilities and dismissed claims challenging non-discriminatory regulations made in furtherance of that interest.

Ultimately, LSP is simply asking this Court to impose LSP's preferred open-market policy position on Minnesota as a constitutional mandate. But "[t]he battle between laissez fairists and regulators is as old as the hills," *Colon Health Ctrs.*, 813 F.3d at 158, and the dormant Commerce Clause does not enlist judges to take sides in that battle. Instead, it leaves to the people the choice of what approach to follow, acting

through their elected representatives. Here, LSP failed to convince the Minnesota

legislature to accept its policy views, failed to convince FERC to impose its views on

the states, and failed to convince the Seventh Circuit that FERC acted outside its

federal statutory authority. The district court therefore correctly dismissed LSP's

constitutional claims. This Court should affirm.

## ARGUMENT

### I. Minnesota's Even-Handed Regulation Of Critical, Physical Infrastructure Located Within Its Borders Does Not Violate The Dormant Commerce Clause.

The Commerce Clause of the U.S. Constitution authorizes Congress "[t]o

regulate Commerce . . . among the several states." Art. I, § 8, cl. 3. Although the face

of this provision contains only a grant of authority to Congress, the Supreme Court

has held that "in some instances it imposes limitations on the States absent

congressional action." *Wayfair*, 138 S. Ct. at 2089.[2] This "dormant" implication of the

affirmative grant of authority to Congress "prohibits state taxation or regulation that

discriminates against or unduly burdens interstate commerce and thereby impedes

free private trade in the national marketplace." *S. Union*, 289 F.3d at 507 (quoting

*Tracy*, 519 U.S. at 287). But it does not allow courts to "prohibit the States from

---

[2] This Court is bound to apply the dormant aspect of the Commerce Clause, but Xcel Energy and ITC Midwest preserve for Supreme Court review the argument that this aspect is unfounded in the text and history of the Constitution.

exercising their lawful sovereign powers in our federal system." *Wayfair*, 138 S. Ct. at 2096.

If a State law "regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). If, however, a "state law discriminates against interstate commerce—facially, in purpose or in effect—it will be invalidated unless the state can show, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006) (internal quotation marks omitted). This virtually *per se* rule of invalidity applies only "to provisions that patently discriminate against interstate trade," *S. Union*, 289 F.3d at 508.

For two, independently sufficient reasons, § 216B.248 does not discriminate against interstate trade and thus is subject only to the deferential *Pike* standard.

### A. Under the Supreme Court's decision in *Tracy*, Minnesota may choose to treat regulated incumbents differently from would-be competitors.

First, under the Supreme Court's decision in *Tracy*, LSP's claim of discrimination fails at the outset because would-be competitors are not similarly situated to regulated, incumbent transmission facility owners. Unlike the incumbents, would-be competitors are not already bearing the burdens of Minnesota's regulatory

compact, and hence they cannot complain about being excluded from the corresponding benefits. Because the "notion of discrimination assumes a comparison of substantially similar entities," there can be no claim of discrimination under the dormant Commerce Clause. *Tracy*, 519 U.S. at 298-99.

### 1. Would-be competitors are not similarly situated to regulated incumbents.

At issue in *Tracy* was an Ohio statute that imposed a 5 percent tax on sales of natural gas made by independent marketers and producers but exempted sales made by the regulated, domestic utilities. 519 U.S. at 281-82. General Motors, which bought its natural gas primarily from out-of-state suppliers, argued that "by granting the tax exemption solely to [the regulated utilities], which are in fact all located in Ohio," the State had discriminated against out-of-state entities and violated the dormant Commerce Clause. *Id.* at 285-86. The Supreme Court rejected that argument. Acknowledging that the regulated utilities and out-of-state suppliers "do compete and may compete further" for large industrial users, the Court nonetheless held that States were not required to "treat[] marketers and utilities as alike for dormant Commerce Clause purposes." *Id.* at 303. Rather, the importance of preserving States' ability to balance the regulatory benefits and burdens on the utilities that served the captive consumer market allowed the States to treat "marketers and [utilities] as dissimilar" even in the competitive market. *Id.* at 304. The Supreme Court therefore held that

Ohio's differential taxation of the sale of natural gas in the competitive market did not "discriminate" in a sense prohibited by the dormant Commerce Clause. *Id.* at 310.

The core logic of *Tracy* is that States that choose to take a regulated approach to the provision of a critical public good such as electricity or natural gas are not limited to a regulatory compact that imposes only burdens on the regulated entities. Rather, States may also grant benefits to offset the burdens, so as to ensure the continued financial health of the regulated entities. Furthermore, they may deny those benefits to unregulated competitors without being accused of discrimination because the competitors, not being subject to the burdens, have no valid claim to the benefits. Indeed, the "typical" regulated market involves a "blend of limitation and affirmative obligation" imposed by state regulations. *Id.* at 295. The regulated entities must comply with a "range of accounting, reporting, and disclosure rules." *Id.* at 296. The rates they may charge are "restricted." *Id.* And they must "serve all members of the public, without discrimination, throughout their fields of operations . . . . They [cannot] pick out good portions of a particular territory, serve only select customers under private contract, and refuse service . . . to . . . other users." *Id.* at 297 (quoting *Indus. Gas Co. v. Pub. Util. Comm'n of Ohio*, 21 N.E.2d 166, 168 (Ohio 1939)). In exchange, the regulated providers receive the right to provide the regulated good or service. *Id.* at 305-06.

Minnesota's regulation of transmission lines in § 216B.246 fits precisely within what *Tracy* described as the "typical blend of limitation and affirmative obligation." *Id.* at 295. The incumbent electric transmission owners are subject to extensive reporting and disclosure rules. *See, e.g.*, Minn. Stat. § 216B.2425. They may be compelled "to make adequate infrastructure investments and undertake sufficient preventative maintenance." *Id.* § 216B.79 (covering both utilities and "any transmission company that owns or operates electric transmission lines in Minnesota"). Finally, and critically, they can be compelled to "build the electric transmission line" that was approved by the regulators, even if they do not want to build it. *Id.* § 216B.246, subd. 3(b).

Minnesota is therefore entitled, just as Ohio was entitled in *Tracy*, to grant benefits to the regulated incumbents and deny them to would-be competitors without having those entities "be considered 'similarly situated' for purposes of a claim of facial discrimination under the Commerce Clause." *Tracy*, 519 U.S. at 310. In particular, Minnesota may grant a right of first refusal to build desirable new lines to offset the burden of being compelled to build undesirable lines. *See* Minn. Stat. § 216B.246, subd. 2. LSP, which cannot be compelled to build an undesirable line, has no constitutional right to cherry-pick the desirable lines.

Under *Tracy*, a variety of regulatory choices are entitled to deference, as shown by a recent Second Circuit decision rejecting a dormant Commerce Clause challenge to a Connecticut electricity regulation. Connecticut allowed its electric utilities to meet

renewable energy standards by purchasing renewable energy certificates (RECs), but only from utilities located within or adjacent to Connecticut's regional system (ISO-NE, analogous to MISO in this case). *Allco*, 861 F.3d at 92-93. A Georgia-owned utility whose RECs were excluded argued discrimination against interstate commerce. But in affirming the district court's grant of a motion to dismiss, the Second Circuit held that Connecticut had made a legitimate policy decision permitted by Congress and FERC. Specifically, it held that Connecticut customers had a separate interest in developing renewable energy sources in their region. *Id.* at 105. The court determined that it should give "controlling significance" to this policy decision. *Id.* at 106. As a result, the court rejected the claim of discrimination, citing *Tracy* and holding that "[i]t is they [Congress and FERC] that, in this setting, are best suited to decide which products ought to be treated similarly, and which should not." *Id.* at 107 (citing *Tracy*, 519 U.S. at 307).

### 2. LSP offers no valid basis for distinguishing *Tracy*.

LSP attempts to distinguish *Tracy*, but it identifies no valid basis for doing so. Indeed, if there is any difference between this case and *Tracy*, the arguments for sustaining Minnesota's regulation are *stronger* here.

In *Tracy*, Ohio's statute created a competitive market for the sale of natural gas to industrial users, then distorted that market by giving a tax advantage to the utilities on the article flowing in interstate commerce. Minnesota, in contrast, has not created

a market and then distorted it. Instead, it chose *not* to rely on the market but instead to follow the historical approach of ensuring safe, reliable, affordable electric service by selecting and regulating the providers. In addition, Minnesota's statute does not act directly on the article flowing in interstate commerce—the electricity—which is regulated exclusively by FERC. *See* 16 U.S.C. § 824(b)(1) (granting FERC the authority to regulate "the transmission of electric energy in interstate commerce"). Instead, the statute regulates solely the fixed, physical infrastructure that is located inside Minnesota. In short, Minnesota's statute affects interstate commerce much less directly than Ohio's did and in a much more neutral way.

LSP argues that Minnesota's statute discriminates more directly against interstate commerce than Ohio's did because, in *Tracy*, the companies at issue "were selling two distinct natural gas products in two distinct markets," whereas, in this case, LSP is trying to provide the same product (a new transmission line) in the same market as the regulated incumbents. (LSP Br. at 45.) But this is no distinction at all because it ignores half of the story in both cases. LSP ignores the fact that, in *Tracy*, the claim of discrimination arose out of the differential treatment of the regulated utilities and out-of-state marketers in a market where they were directly competing to sell the *same* product to the *same* customers—the market for large amounts of natural gas to industrial users like General Motors. Minnesota has created no such market here. Moreover, LSP ignores the fact that, in this case, the existing regulated owners

also provide other services where they are subject to Minnesota's regulatory burdens—the transmission companies like ITC Midwest own other transmission lines, and the utilities like Xcel Energy own both transmission lines and retail distribution facilities. In short, Minnesota's interests in providing regulatory benefits to offset the regulatory burdens placed on incumbents, and thus to protect those incumbents' continuing ability to provide critical services, are equally as strong as Ohio's interests were in *Tracy*.

Finally, LSP argues that the scope of § 216B.246 extends beyond utilities like Xcel Energy to cover transmission owners such at ITC Midwest. That is correct but irrelevant. Incumbent transmission owners such as ITC Midwest are subject to the burdens of Minnesota's regulatory compact, as described above, including the burden of being compelled to build a transmission line. To preserve those entities' ability to carry their burdens, Minnesota is entitled to grant them the corresponding benefit of the right to build new transmission lines that will connect to their existing facilities.[3]

### 3. All of the reasons given by *Tracy* for deferring to a State's policy choice on how to regulate utilities apply here.

A central part of the Supreme Court's logic in *Tracy* was its view that federal courts must act "cautiously" in addressing dormant Commerce Clause challenges to

---

[3] In addition, as to the retail utility providers such as Xcel Energy—which, as the district court correctly recognized, represent the majority of incumbent entities covered by § 216B.246, ADD 18—there is not even an arguable distinction from *Tracy*.

state utility regulations because of the compelling reasons for deferring to States'
policy choices in that area. The Court listed three reasons for deference, and all of
them apply here. To be clear, Xcel Energy and ITC Midwest do not argue that Minn.
Stat. § 216B.246 is immune from dormant Commerce Clause analysis, nor did the
district court hold that it was. LSP misstates the district court's opinion in claiming
otherwise. (LSP Br. at 39.) Deference is different from immunity, and *Tracy*
unmistakably calls for deference.

      ***First***, *Tracy* held that deference is called for by the strength of the State interest.
519 U.S. at 304-06. Addressing natural gas in language that applies equally to
electricity, the Court found that "State regulation of natural gas sales to consumers
serves important interests in health and safety in fairly obvious ways," including
ensuring "dependable supply" and ability to pay. *Id.* at 306; *see also id.* at 291 n.8
(noting the "powerful state interest in regulating sales" of electricity to consumers).
Given the courts' "traditional recognition of the need to accommodate state health
and safety regulation in applying dormant Commerce Clause principles," the Court
deferred to "[t]he continuing importance of the States' interest in protecting the
captive [consumer] market from the effects of competition." *Id.* at 306. Indeed, the
Court noted that the States' legitimate interest was so strong that it could support
even regulation that resulted "in an outright prohibition of competition for even the

largest end users." *Id.* (citing *Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*, 341 U.S. 329, 336-37 (1951)).

The same logic applies to review of § 216B.246. Precisely the same health and safety reasons cited in *Tracy* led Minnesota to adopt its system of regulating electricity, *see* Minn. Stat. § 216B.01, and later to add § 216B.246 to that system. *See supra* at 11-12. The Supreme Court has "consistently recognized the legitimate state pursuit of such interests as compatible with the Commerce Clause, which was never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Tracy*, 519 U.S. at 306-07 (internal quotation marks omitted). This Court and other circuits have held the same. *See, e.g.*, *S. Union*, 289 F.3d at 509 (upholding statute that was "part of a complex regime for the regulation of public utilities"); *Allco*, 861 F.3d at 106 (upholding statute that "protect[ed] its citizens' health, safety, and reliable access to power"); *Balt. Gas & Elec. Co. v. Heintz*, 760 F.2d 1408, 1424 (4th Cir. 1985) (upholding statute that was "one subsection of an elaborate public service corporation law").

**Second**, the Court called for deference to State utility regulations because courts are "institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them." *Tracy*, 519 U.S. at 308. Because of this institutional weakness, the judiciary is "ill qualified to develop

Commerce Clause doctrine dependent on predictive judgments" about economic consequences. *Id.* at 309. As applied to Ohio's tax scheme, this logic led the Court to conclude that because eliminating the tax differential "*could* subject [utilities] to economic pressures that in turn could threaten" their ability to provide natural gas to the consumer market, this risk "counsels against taking the step of treating the bundled gas seller [the utility] like any other." *Id.* (emphasis added).

Again, the same logic applies to this Court's review of Minn. Stat. § 216B.246. This Court, just like the Supreme Court, is institutionally unsuited to make economic predictions and thus should not create Commerce Clause doctrine predicated on them. Moreover, denying existing regulated providers like Xcel Energy and ITC Midwest the ability to build and operate new, large projects *could* subject them to economic pressures that would threaten their ability to sustain Minnesota's regulatory demands on them. This Court should therefore defer to the judgment of Minnesota's legislature not to risk upending their existing, successful approach to regulating electricity. *See Allco*, 861 F.3d at 107 (recognizing that legislative bodies "are better-situated than the courts" to "determine the economic wisdom and the health and safety effects" of utility regulations).

*Finally*, the Supreme Court emphasized that deference by courts is appropriate because, "should intervention by the National Government be necessary, Congress has both the resources and the power" to act. *Tracy*, 519 U.S. at 304. Where Congress

has acted extensively in an area, the Court endorsed the "soundness" of Justice

Black's statement that, since the Constitution gives the regulatory power to Congress,

"until it acts I think we should enter the field with extreme caution." *Id.* at 310

(quoting *Nw. Airlines, Inc. v. Minnesota*, 322 U.S. 292, 302 (1944) (concurring opinion)).

Just so here. Congress has directly considered the balance between federal and state

authority in the FPA, and although it *could* override state authority over electric

transmission construction and operation if it wanted to, *see* U.S. Const. art. I, § 8, cl.3;

*United States v. Lopez*, 514 U.S. 549 (1995); *Gonzalez v. Raich*, 545 U.S. 1 (2005), as it has

done for natural gas, *see* 15 U.S.C. § 717f, it has instead expressly preserved state

authority. *S. Union*, 289 F.3d at 507.

Consistent with Congress's direction, FERC also has acknowledged States'

authority over the construction and ownership of transmission lines, including the

power to enact the type of statute that Minnesota enacted in § 216B.246. Indeed,

FERC specifically considered Minnesota's statute and, deferring ***to that statute***,

rejected LSP's challenge to the MISO tariff. In an analogous context, the Second

Circuit noted FERC's expertise in rejecting the plaintiff's request to have the federal

judiciary overrule Connecticut's geographic restriction on renewable energy credits,

explaining that "Congress and FERC are better-situated than the courts to supervise

and to determine the economic wisdom and the health and safety effects" of

Connecticut's regulation. *Allco*, 861 F.3d at 107; *cf. Elec. Power Supply Ass'n*, 136 S. Ct.

at 784 (noting, in rejecting a statutory challenge to a FERC regulation, that "[t]he Commission, not this or any other court, regulates electricity rates").

LSP argues that this Court should take the pro-competition policy reasons that FERC cited in Order No. 1000 and use them to create a constitutional rule doing what FERC refused to do as a regulatory matter: override States' long-held authority to regulate infrastructure located within their borders. This is precisely the wrong lesson to take from FERC's action. The correct lesson to take is that there is no need for the courts to intervene and upset the careful balance that Congress set and FERC has implemented between federal and state regulation. *See Tracy*, 519 U.S. at 309. As the United States explains in its amicus brief, FERC expressly stated that Order No. 1000 was not intended to limit, preempt, or otherwise affect state laws. (DOJ Br. 3.) To paraphrase *Allco*, since "neither FERC nor Congress has given any indication that [a state right-of-first-refusal] is unduly harmful to interstate commerce," this Court should refuse to reach that conclusion itself. *Allco*, 861 F.3d at 107.

*    *    *

In sum, *Tracy* controls the outcome of this case. The Court should therefore reject all of LSP's claims of discrimination.

## B. Section 216B.246 does not discriminate against out-of-state entities because its regulatory burdens and benefits apply even-handedly regardless of state of incorporation or principal place of business.

Even if incumbents and non-incumbents could be deemed similarly situated for purposes of dormant Commerce Clause analysis, there still is no discrimination against interstate commerce because § 216B.246 does not discriminate against out-of-state entities on its face, in purpose, or in effect. LSP carries the burden of proving discrimination, *see Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979), and it has failed to allege facts to meet that burden.

### 1. The statute is neutral on its face.

First, as the district court correctly recognized, § 216B.246 "draws a neutral distinction between existing electric transmission owners whose facilities will connect to a new line and all other entities, regardless of whether they are in-state or out-of-state." ADD20-21. *All* existing owners receive the benefit of the right-of-first refusal and bear the burden of possibly being required to build, and *all* would-be competitors are denied the benefits and spared the burdens, regardless of whether they are incorporated or headquartered within Minnesota or someplace else. Minn. Stat. § 216B.246, subd. 2. Many of the incumbent owners covered by § 216B.246 are out-of-state entities, including entities headquartered in Iowa, North Dakota, South Dakota, and Wisconsin. ADD7. Moreover, additional out-of-state companies are not frozen out of Minnesota but may become incumbents by buying existing transmission

facilities. *See* Minn. Stat. §§ 216B.16, subd. 7c(a) & 216B.50. In short, since "'[d]iscrimination' for purposes of the Commerce Clause means 'differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cnty.*, 115 F.3d 1372, 1384 (8th Cir. 1997) (internal quotation marks omitted), the statute is neutral on its face.

LSP offers three arguments for why § 216B.246 should be treated as being facially discriminatory, but none has merit.

### a. Section 216B.246 is not a "flow control" ordinance, nor can it reasonably be compared to such an ordinance.

First, LSP argues that § 216B.246 is "virtually indistinguishable from the countless 'flow control' laws that the Supreme Court and this Court have struck down for decades." (LSP Br. 26.) In making this argument, LSP overlooks one critical distinction: here, the thing being regulated does not flow. The electric transmission lines addressed by § 216B.246 will not move; they will be located quite permanently in Minnesota—and their location is not a matter of economic protectionism, it is a matter of physics. That makes this case utterly unlike the cases LSP cites.

In all the flow-control cases cited by LSP that struck down a regulation (LSP Br. 25-30; *see also* DOJ Br. 7-10), the regulation either prohibited or discriminated against articles moving in interstate commerce, or else unnecessarily required a facility to be used or owned in state as a prerequisite to being allowed to move an article in interstate commerce. Falling in the first category are *Fort Gratiot Sanitary Landfill, Inc. v.*

36

*Michigan Department of Natural Resources*, 504 U.S. 353, 358 (1992), where the statute prohibited landfills from accepting any waste generated outside their respective counties; and *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 272 (1984), where the statute taxed all liquor produced out of state but exempted certain liquors produced in state.

Falling in the second category are *Granholm v. Heald*, 544 U.S. 460, 474 (2005), where the statute required ownership of an in-state facility as a precondition for selling wine directly to customers in the state; *Dean Milk. Co. v. Madison*, 340 U.S. 349, 350 (1951), where the ordinance required milk to be processed at one of the city's approved plants before being sold in the city as pasteurized; and *Ben Oehrleins*, 115 F.3d at 1377, 1384-85, and *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 386 (1997), both of which addressed regulations requiring garbage to first be processed at a preferred facility in the state before it could be conveyed out of state.

Section 216B.246 is not a flow-control ordinance. It does not restrict or differentially tax the flow of electricity in interstate commerce—nor could it do so since regulation of "the transmission of electric energy in interstate commerce" belongs exclusively to FERC. 16 U.S.C. § 824(b)(1). Section 216B.246 also does not unnecessarily require a facility to be used or owned in Minnesota as a precondition for entering the market for a product flowing in interstate commerce. There is no precondition of owning a transmission facility to sell electricity onto the grid. Moreover, § 216B.246 addresses only transmission lines that the regional, MISO

planning process has itself concluded must be located in Minnesota because that is where they are needed to alleviate constraints on capacity.

Thus, this case does not involve even a whiff of the economic protectionism that dooms flow-control ordinances. Minnesota is not requiring reluctant out-of-state electricity generators to build transmission lines in Minnesota as a prerequisite to selling electric power in the State. It is simply regulating the construction and ownership of transmission lines that everyone agrees must be built in Minnesota. There is no discrimination against interstate commerce.

### b. Reducing competition is not the same thing as discriminating against interstate commerce.

Second, LSP repeatedly argues that, because § 216B.246 precludes out-of-state entities from competing, it is discriminatory. But § 216B.246 equally precludes in-state entities from competing, and *reducing competition* is not the same thing as *discriminating against interstate commerce*.

The Supreme Court recognized the difference in *Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission*, 341 U.S. 329, 336 (1951), where it found "no discrimination against interstate commerce" despite reviewing a Michigan certificate-of-need requirement that could result "in an outright prohibition of competition" in the sale of natural gas, as the Court later acknowledged in *Tracy*, 519 U.S. at 306. This Court likewise recognized the difference in *Southern Union*, where it found "no discrimination against interstate commerce," despite reviewing a Missouri statute that

38

reduced competition by requiring all utilities doing business in Missouri to receive prior state approval before buying stocks in other utilities. 289 F.3d at 508. Other courts addressing analogous limits on competition outside the utility context have recognized the same difference. *See Colon Health Ctrs.*, 813 F.3d at 155 (rejecting challenge to a Virginia statute denying new medical providers the right to compete absent obtaining a state certificate of need, declaring "we will not take the potentially limitless step of striking down every state regulatory program that has some alleged adverse effect on market competition"); *Heffner v. Murphy*, 745 F.3d 56, 74 (3d Cir. 2014) (rejecting challenge to law limiting general business corporation ownership of funeral homes to holders of 76 existing licenses, which could be held regardless of "state residency or citizenship").

Specifically as to Minnesota's restrictions on competition, LSP does not argue that Minnesota chose to regulate the electricity industry out of parochialism. Instead, as *Tracy* recognized, regulation was compelled by the "ruinous" consequences of the "short-lived" period of open-market competition. 519 U.S. at 289 n.7. Nor does LSP argue that Minnesota discriminated against out-of-state entities in selecting the companies that make up its existing, regulated transmissions owners—and any such argument would be untenable given the Iowa, North Dakota, South Dakota, and Wisconsin companies included in their ranks. ADD7. What LSP argues is that the choice to have the existing owners build any new transmission lines that will connect

39

to their facilities is unconstitutional discrimination because it limits competition to build those lines, even though the limitation applies equally to all companies, both in- and out-of-state. This extraordinary argument, which has no logical stopping point, would require courts to declare unconstitutional every local-monopoly utility that States have used for the last century and still use to distribute electricity to retail consumers. It has no basis either in the case law or in the purpose of the dormant Commerce Clause.

Again, § 216B.246 does not discriminate under the dormant Commerce Clause.

### c. Companies that merely own facilities in a State are not the same as companies that are incorporated or headquartered in a State.

Unable to show discrimination against out-of-state companies, LSP tries to define all of Minnesota's out-of-state incumbents out of existence, arguing that any company that owns a facility in Minnesota must be treated as a Minnesota company under the dormant Commerce Clause. (LSP Br. 28-33.) Under this definition— *presto!*—§ 216B.246 is perfectly discriminatory because all existing owners of transmission lines in Minnesota are defined to be Minnesota companies. But under this definition, a Texas corporation headquartered in Texas—or indeed a Chinese corporation headquartered in China—would also be considered a Minnesota company if it owned a transmission facility in Minnesota, and a Minnesota law benefitting that

company would be deemed to discriminate against interstate commerce. This is absurd.

Other courts, recognizing the absurdity of equating in-state operations with in-state ownership or principal place of business, have repeatedly rejected attempts by dormant Commerce Clause plaintiffs to base claims of facial discrimination on that argument. The case most closely on point is *Colon Health Centers of America, LLC v. Hazel*, where two out-of-state companies challenged a Virginia law prohibiting them from building new medical facilities without first obtaining a certificate of need. 813 F.3d at 154. They argued "the certificate requirement discriminate[d] in favor of incumbent health care providers at the expense of new, predominantly out-of-state firms." *Id.* The Fourth Circuit rejected that argument, holding that "incumbency is not the focus of the dormant Commerce Clause," and "incumbency bias" is not the same as discrimination against out-of-state interests. *Id.* To the contrary, "[o]ne can be . . . an incumbent recipient of some state contractual benefit without necessarily being an in-state resident." *Id.* Similarly, in *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388, 404 (3d Cir. 1987), the plaintiff challenged a ban on off-shore bulk transfer facilities that exempted two existing facilities, arguing that the exemption discriminated in favor of existing in-state interests. The Third Circuit rejected the plaintiff's attempt to define "in-state interests [as] those that . . . currently have operations in Delaware," calling it "circular." *Id.* at 404 n.23. The court found instead that the exemption "discriminates

41

between preexisting in-state interests and potential new in-state interests," which does not violate the dormant Commerce Clause. *Id.*

Here, just as in *Colon Health* and *Oberly*, § 216B.246 distinguishes between incumbents and potential new entrants, but it does not discriminate against out-of-state companies. LSP argues that *Colon Health* cannot be applied here because it was decided on summary judgment, whereas this case was decided on a motion to dismiss. But that distinction in procedural posture makes no difference because the facts *as alleged by LSP* show that Minnesota and non-Minnesota entities are treated the same. APP20 (Compl. ¶ 64). Specifically, as the district court found, the Wisconsin, South Dakota, Iowa, and North Dakota companies that own transmission facilities in Minnesota receive exactly the same benefits (and burdens) under § 216B.246 as their Minnesota counterparts. ADD7 & 21. The statute is neutral.

LSP argues that this Court's decision in *Ben Oehrleins*, 115 F.3d 1372, requires treating out-of-state companies with operations in Minnesota as if they were in-state companies for purposes of analyzing discrimination. (LSP Br. 29.) But that is incorrect. In *Ben Oehrleins*, the district court had been convinced by the plaintiff's argument that a monopoly on processing waste that stayed in state "discriminate[d] against interstate commerce by prohibiting out-of-state entities full access to the local market in waste processing." *Id.* at 1386. This Court disagreed, holding that because *all* potential competitors were precluded, a "Delaware corporation doing business in

Minnesota could not argue that it is discriminated against by Minnesota laws that apply equally to all businesses operating in the state." *Id.* at 1386-87; *see also IESI AR Corp.*, 433 F.3d at 605-06. In the same way here, LSP cannot argue that it is discriminated against by § 216B.246, which denies the right to build to *all* businesses other than those to whose facilities a new project will connect, regardless of their state of incorporation. "It would be a different matter, of course, if the state were to treat a company incorporated or principally located in another state differently from Minnesota companies on that basis." *Ben Oehrleins*, 115 F.3d at 1387 n.13. But § 216B.246 does no such thing. It is neutral.

In contrast to the cases cited above, the Eleventh Circuit case relied on by LSP expressly did "not address" whether the statute at issue was discriminatory. *Fla. Transp. Servs., Inc. v. Miami-Dade Cnty.*, 703 F.3d 1230, 1257 (11th Cir. 2012) (because the statute failed *Pike* balancing, the court did "not address" the discrimination challenge). At the other end of the spectrum, the statute at issue in *Walgreen Co. v. Rullan*, 405 F.3d 50, 56 (1st Cir. 2005), was held to be discriminatory in effect because its certificate-of-need requirements were applied unevenly to exclude out-of-state competitors. No such uneven application of Minnesota's right-of-first-refusal statute has been alleged by LSP.[4]

---

[4] To the extent *Walgreen* can be read more broadly to equate favoring incumbents with discrimination against interstate commerce, its reasoning is unsound. *See, e.g., Fla.*

(footnote continued)

Finally, LSP argues that in-state status depends on whether a company "has a meaningful in-state presence." (LSP Br. 28.) No court has adopted that test, and the one case LSP cites in fact *rejected* a dormant Commerce Clause challenge to an ordinance mandating use of a government-owned garbage-processing facility, holding that government-owned entities are not similarly situated to privately-owned entities, and citing *Tracy* for the proposition that "any notion of discrimination assumes a comparison of substantially similar entities." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007).

\*　　\*　　\*

In short, § 216B.246 is facially neutral in its treatment of in-state and out-of-state entities.

### 2. The statute does not discriminate in effect.

LSP next claims that the statute discriminates in effect because it allegedly disproportionately benefits Minnesota-based entities and disproportionately burdens out-of-state entities. (LSP Br. 33.) LSP counts the number of Minnesota-headquartered incumbents, compares that number against the lower number of out-

---

(footnote continued from previous page)

*Transp. Servs., Inc. v. Miami-Dade Cnty.*, 757 F. Supp. 2d 1260, 1275-76 (S.D. Fla. 2010) (finding *Walgreen*'s reasoning unpersuasive); *Doran v. Mass. Turnpike Auth.*, 256 F. Supp. 2d 48, 53 (D. Mass. 2003), *aff'd* 348 F.3d 315.

of-state headquartered incumbents, and declares that difference reveals a discriminatory effect. LSP has the law wrong.

The Supreme Court rejected a direct analogue to LSP's argument in *CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69 (1987). There, the plaintiff argued that an Indiana statute targeting hostile corporate takeovers discriminated against interstate commerce because "most hostile tender offers are launched by offerors outside Indiana." *Id.* at 88. The Supreme Court remarked that "this argument avails [plaintiff] little." *Id.* "Because nothing in the Indiana Act imposes a *greater* burden on out-of-state offerors than it does on similarly situated Indiana offerors," the Court held, "we *reject* the contention that the Act discriminates against interstate commerce." *Id.* (emphasis added). In the same way, nothing in § 216B.246 imposes any greater burden on out-of-state entities trying to enter the transmission-line market than it does on Minnesota entities—they are all excluded unless they own or buy the transmission facility in Minnesota to which the new transmission line will connect.

The Supreme Court also rebuffed a similar argument in *Commonwealth Edison Co. v. Montana*, where it upheld a Montana tax on coal extracted from in-state mines even though 90 percent of the coal was shipped to out-of-state users, rejecting the argument that a state action "must be considered discriminatory for purposes of the Commerce Clause if [its] burden is borne primarily by out-of-state consumers." 453 U.S. 609, 618 (1981).

LSP cites *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, but that case involved a "*facially discriminatory* tax scheme" promulgated by Maine whose burden fell "*by design* in a predictable disproportionate way on out-of-staters." 520 U.S. 564, 579-80 (1997) (emphasis added). This decision provides no support to LSP's argument because it distinguishes *Commonwealth Edison Co.* on the basis that "the Maine tax is facially discriminatory," whereas the Montana tax was not. *Id.* at 580 n.13. Section 216B.246 is like the facially neutral statute in *Commonwealth Edison*, not the facially discriminatory statute in *Camps Newfoundland*.

Finally, this Court's decision in *SDDS, Inc. v. South Dakota*, 47 F.3d 263 (8th Cir. 1995), does not support a finding of discriminatory effect here. That case involves a South Dakota referendum that rejected construction of a specific garbage facility that would receive 95 percent of its waste from out of state. *Id.* at 266. In addition to having an "openly declared" discriminatory purpose, the statute was "attempting to exclude out-of-state trash that has a 'negative' value, thus forcing other states to bear the cost of disposing of the trash when the market would otherwise dispose of the trash in South Dakota." *Id.* at 271. This court noted that the fact that some of the waste would also come from South Dakota "does not eliminate the discriminatory effect." *Id.* at 271 n. 12. Here, there is no such discriminatory effect. Rather, the statute is an even-handed regulation regarding the construction and ownership of new transmission facilities that fall within Minnesota's scope of regulatory authority.

### 3. The statute does not have a discriminatory purpose.

LSP finally argues that the Court should find that the statute has a discriminatory purpose. (LSP Br. 35.) The Minnesota legislature, however, expressly stated that its purpose in regulating electricity is to provide consumers "in this state with adequate and reliable services at reasonable rates." Minn. Stat. § 216B.01. In *Southern Wine & Spirits v. Alcohol & Tobacco Control*, this Court relied on a similar, formal statement in rejecting a claim of discriminatory purpose. 731 F.3d 799, 808-09 (8th Cir. 2013). Nothing that LSP cites can overcome the Minnesota legislature's express finding, passed by its members.

To the extent the Court looks to legislative history, that history reveals that in enacting § 216B.246, the Minnesota legislature carefully considered alternative approaches but decided to retain its longstanding, successful regulatory approach for selecting the owners and operators of transmission lines. When the bill that would become § 216B.246 was under consideration, the legislature heard from both Plaintiff-Appellant LSP, which advocated an open-market approach to selecting the builders and operators of new transmission lines, APP17 (Compl. ¶¶ 54-55), APP39-40, and from Intervenor-Appellee Xcel Energy and others who advocated retaining the existing system of geographic franchises, APP17 (Compl. ¶ 53), APP34-37. The legislature ultimately concluded that its existing system better served Minnesota.

In a Minnesota State Senate Committee hearing on the bill, Senator David Brown—an author of the bill—said, "Our regulatory system has served Minnesota well, and our system is reliable and our rates are fairly competitive." APP34. Senator Brown cautioned that:

> If we choose not to pass this legislation, we are moving into the world of unknown, versus we have a very known process right now, members. And I think it's best to stick with that process . . . .

APP48. Similarly, in a January 24, 2012 report required by Minn. Stat. § 216C.054, the Commissioner of Commerce expressed concern that, if incumbents were not given the right of first refusal, it would "discourage utilities from sharing information since another entity could step in and build lines a utility would like to build," whereas granting such a right would encourage utilities to "build more transmission." SAPP13.

After § 216B.246 was enacted, the 2013 annual report required by § 216C.054 reiterated the state's view that the "statute works in conjunction with Minnesota's existing statutes to ensure that Minnesota utilities provide reliable service, at reasonable costs, in consideration of Minnesota's policy objectives." SAPP31.

In contrast to this legislative history, LSP cites "hearing testimony" that supposedly "brim[s] with protectionist rhetoric." (LSP Br. 36.) The statement it cites, however, is from "supporters" of the bill, not legislators, and it therefore sheds no light on a Minnesota statute's purpose. *See State v. Smith*, 899 N.W.2d 120, 130-131 (Minn. 2017) ("statements by a non-legislator" are "usually given no weight"). Even if

the statement had been made by a legislator, this Court has rejected attempts to rely on "a single legislator's views" to show protectionist intent. *S. Wine & Spirits*, 731 F.3d at 809. Finally, the quoted statements do not show "protectionist" intent in any event, but rather an intent to benefit Minnesota citizens, because returns will "flow back to our members as rate payers, as a benefit to them." (LSP Br. 36; APP37.)

Section 216B.246 is neutral on its face, in effect, and in purpose. It cannot be struck down as discriminating against interstate commerce.

## II. Minnesota's Statute Does Not Place Clearly Excessive Burdens On Interstate Commerce

Since Minnesota's statute does not discriminate against interstate commerce, it must be upheld "'unless the burden imposed on [interstate] commerce is ***clearly excessive*** in relation to the putative local benefits.'" *S. Union*, 289 F.3d at 507 (emphasis added) (quoting *Pike*, 397 U.S. at 142). The district court appropriately dismissed the Complaint under this deferential standard.

The Supreme Court has "rarely invoked *Pike* balancing to invalidate state regulation under the Commerce Clause," and plaintiffs who challenge "part of a complex regime for the regulation of public utilities" bear a "substantial burden" in stating a claim under *Pike*. *S. Union*, 289 F.3d at 509. Courts therefore routinely grant motions to dismiss claims made under the *Pike* test once they have found an absence of discrimination. *See, e.g., Grand River Enters. Six Nations, Ltd. v. Beebe*, 574 F.3d 929,

941-43 (8th Cir. 2009) (affirming dismissal of discrimination and *Pike* claims); *Allco*, 861 F.3d at 103-08 (same); *Doran*, 348 F.3d at 318-323 (same).

As the Supreme Court noted in *Tracy*, only a "small number" of cases have invalidated genuinely non-discriminatory statutes under *Pike* balancing, and they have done so only when "such laws undermined a compelling need for national uniformity in regulation." 519 U.S. at 298 n.12. Here, Congress and FERC have both indicated beyond any second-guessing by the judiciary that there is no such compelling need for national uniformity. When Congress enacted the FPA, it specifically preserved State authority over facilities used for the "transmission of electric energy in intrastate commerce." 16 U.S.C. § 824(b)(1). As this Court thus recognized in *Southern Union*, "[a] major purpose" of the FPA "was to preserve and protect state and local regulation" on matters of local interest, such as the ownership and operation of physical transmission infrastructure. 289 F.3d at 507. Likewise, when FERC addressed the issue of States using right-of-first-refusal laws to select the owners and operators of new electric transmission lines, it specifically declared that it would defer to the individual States' choices, striking "an important balance" between promoting competition and avoiding federal intrusion into the "regulation of matters reserved to the states." 150 FERC at 61177, ¶ 27, 2015 WL 285969, at *8.

Not only has Congress fatally undermined any alleged need for national uniformity, but it has also validated the legitimacy of the local State interest, finding

that "the business of transmitting and selling electric energy for ultimate distribution to the public is affected with a public interest." 18 U.S.C. § 824(a). The Supreme Court likewise has recognized the strength of the State interest. Writing about natural gas in language that applies equally to electricity, the Court found that "State regulation of natural gas sales to consumers serves important interests in health and safety in fairly obvious ways," including ensuring "dependable supply" and ability to pay. *Tracy*, 519 U.S. at 306. This Court likewise has found that "regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States." *S. Union*, 289 F.3d at 508.

None of the cases that LSP cites in its balancing analysis address any state interest comparable to the interest in regulating utilities. *See Pike*, 397 U.S. at 144 (regulations for shipping of fruits and vegetables); *Cotto Waxo Co. v. Williams*, 46 F.3d 790, 794 (8th Cir. 1995) (state ban of all sale of petroleum-sweeping compounds based on environmental considerations, where there was no evidence of state benefit); *Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280, 281-82 (8th Cir. 1993) (state regulations on consumer credit lenders, with no evidence that state's citizens were subject to such rates). Indeed, LSP concedes that Minnesota's valid interests allow it to select the builders and operators of transmission lines using criteria that the State sets (LSP Br. 43-44), and further that the State may "impos[e] additional permitting obligations on non-incumbents," (LSP Br. 58). But it offers no explanation why the

same interests that allow States to draw these distinctions do not also allow them to take a fully regulated approach.

Ultimately, LSP is asking this Court to take a policy step that FERC declined to take, citing the very same policy arguments that FERC found insufficient. LSP points to allocation of the costs of certain transmission lines across the MISO region as a reason to override Minnesota's policy (LSP Br. 53), but FERC did not find the fact of regional cost sharing sufficient to override State rights of first refusal—indeed, it even left some *federal* rights of first refusal in place. *See* Order No. 1000, 136 FERC at ¶¶ 318-319, 2011 WL 2956837 at *102. Likewise, although LSP cites the alleged cost savings that could accompany competition (LSP Br. 53), FERC considered that policy as well, yet still deferred to the States. Not only that, but FERC rejected LSP's challenge to the MISO tariff implementing the very Minnesota statute at issue here, noting that its Order No. 1000 had "struck an important balance" between promoting competition and allowing continued "regulation of matters reserved to the states." 150 FERC at 61177, ¶ 27, 2015 WL 285969, at *8. The Seventh Circuit then affirmed FERC's decision as consistent with Congress's intent, reasoning that FERC had acted appropriately "to avoid intrusion on the traditional roles of the States in regulating the siting and construction of transmission facilities." *MISO Transmission Owners*, 819 F.3d at 336.

To be clear, the undersigned parties do not agree with the economic case LSP sets out in its briefing. But this Court is not the entity charged with deciding the issue, and the dormant Commerce Clause is not a vehicle through which LSP can impose its policy preferences on Minnesota or any other state. The choice whether and how much to regulate belongs to Minnesota, as the Fourth Circuit recently explained:

> At the heart of appellants' argument is the basic economic maxim that barriers to entry like [certificate of need] programs may reduce competition and thereby allow entrenched incumbents to exert market power and charge inefficiently high prices. Like Virginia's legitimate state interest arguments, we do not find appellants' countervailing argument to be unreasonable. The points noted above, however, might be more persuasively made before the Virginia General Assembly, not a panel of unelected federal judges. The battle between laissez fairists and regulators is as old as the hills. The fighting, however, is more often over economics and politics than over law. Legislators, not jurists, are best able to compare competing economic theories and sets of data and then weigh the result against their own political valuations the public interests at stake.

*Colon Health Ctrs.*, 813 F.3d at 158.

Moreover, if any federal action is required, it should be taken by Congress, which "has the capacity to investigate and analyze facts beyond anything the Judiciary could match, joined with the authority of the commerce power to run economic risks that the Judiciary should confront only when the constitutional or statutory mandate for judicial choice is clear." *Tracy*, 519 U.S. at 309. This is particularly true in the area of electricity regulation, where, as the Second Circuit has recognized, "it is FERC itself that has instituted a sort of regionalization of the national electricity market."

*Allco*, 861 F.3d at 107. To paraphrase *Allco* to apply to this case, since "neither FERC nor Congress has given any indication that [a state right-of-first-refusal] is unduly harmful to interstate commerce," this Court should refuse to intervene under the dormant Commerce Clause. *Id.* The Court should therefore reject LSP's challenge to the statute and affirm the district court.

III. **The Amicus Brief Of The United States Does Not Identify Any Valid Basis For Remand.**

The amicus brief of the U.S. Department of Justice Antitrust Division "takes no position" on the ultimate question of whether Minn. Stat. § 216B.246 is constitutional. (DOJ Br. 1.) This is a material change from the position the Antitrust Division took in the district court, where its untimely Statement of Interest argued that the statute was unconstitutional. District Ct. Dkt. 70 at 10; *see also* ADD10-11. Now, the Antitrust Division concedes that dormant Commerce Clause challenges are in some cases "capable of resolution at the motion-to-dismiss stage," (DOJ Br. 14), and contends only that the district court made three analytical errors that are cause for a remand, (DOJ Br. 5). There is no reason to remand. This case is on *de novo* review from an order granting a motion to dismiss. To the extent any errors of analysis exist, this Court can correct them in its own opinion. Moreover, the Antitrust Division identifies no actual error.

First, like LSP, the Antitrust Division argues that § 216B.246 is analogous to flow-control regulations and should be assessed under the flow-control cases. (DOJ

Br. 7-10.) But as demonstrated above, § 216B.246 is not a flow-control statute, nor can it be reasonably compared to one. *See supra* at 36-38. The district court committed no analytical error in applying more apposite cases instead.

Second, the Antitrust Division argues that the Supreme Court's decision in *Tracy* "cannot fairly be read to create a broad dormant Commerce Clause exception for public utilities." (DOJ Br. 12.) But the district court did not hold that it did. To suggest otherwise, the Antitrust Division quotes a parenthetical from a footnote in the district court's opinion (DOJ Br. 10), while ignoring the footnote's text (ADD16-17 n.7), along with the body of the district court's extended discussion of *Tracy* (ADD14-20), which "analyze[s] an individual law by reference to the broader regulatory context in which it appears," precisely as the Antitrust Division says should be done, (DOJ Br. 14). There was no analytical error in the district court's approach.

Finally, the Antitrust Division contends that the district court "mistaken[ly]" found that the federal government "expressly approved the use of state right-of-first-refusal laws," (DOJ Br. 15), which, if true, would exempt those laws from dormant Commerce Clause analysis, (DOJ Br. 15 n.3). This appears to be a matter of semantics, because the district did not hold § 216B.246 to be immune from review. Rather, and entirely correctly, the district court noted that, under *Tracy*, FERC's express and repeated decision not to intervene in a matter of traditional state control

was a compelling reason for the judiciary not to intervene. (ADD19.) Again, the

district court committed no analytical error.

## <u>CONCLUSION</u>

This Court should affirm the judgment of the district court.

Respectfully submitted,

/s/ Aaron D. Van Oort
Aaron D. Van Oort (#0315539)
Nathaniel J. Zylstra (#0314328)
Lauren W. Linderman (#0398466)
David Archer (#0399150)
FAEGRE BAKER DANIELS LLP
90 South Seventh Street, Suite 2200
Minneapolis, MN 55402-3901
(612) 766-7000
aaron.vanoort@FaegreBD.com
nathaniel.zylstra@FaegreBD.com
lauren.linderman@FaegreBD.com
david.archer@FaegreBD.com

Max J. Minzner
Matthew E. Price
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, D.C. 20001
(202) 639-6000
mminzner@jenner.com
mprice@jenner.com

*Attorneys for Intervenor-Defendant-Appellee*
*Northern States Power Company d/b/a Xcel Energy*

Richard D. Snyder (#0191292)
Lisa M. Agrimonti (#0272474)
Leah C. Janus (#0337365)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
rsnyder@fredlaw.com
lagrimonti@fredlaw.com
ljanus@fredlaw.com

*Attorneys for Intervenor-Appellee*
ITC Midwest LLC

## CERTIFICATE OF COMPLIANCE AND VIRUS SCANNING

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the brief contains 12,857 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, in 14-point Garamond.

Pursuant to Local Rule 28A(h)(2), I certify that the Brief and the Addendum have been scanned for viruses and are virus-free.

Respectfully submitted,

 /s/ Aaron D. Van Oort

## CERTIFICATE OF SERVICE

I hereby certify that on January 4, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Aaron D. Van Oort