No. 18-2559

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

LSP Transmission Holdings, LLC,

*Plaintiff-Appellant*,

v.

Nancy Lange, Commissioner and Chair, Minnesota Public Utilities Commission; Dan Lipschultz, Commissioner, Minnesota Public Utilities Commission; Matt Schuerger, Commissioner, Minnesota Public Utilities Commission; John Tuma, Commissioner, Minnesota Public Utilities Commission; Katie Sieben, Commissioner, Minnesota Public Utilities Commission, and Mike Rothman, Commissioner, Minnesota Department of Commerce, each in his or her official capacity,

*Defendants-Appellees*,

and

Northern States Power Company d/b/a Xcel Energy and ITC Midwest, LLC,

*Intervenors-Appellees.*

On Appeal from the United States District Court for the District of Minnesota
Civil No. 0:17-cv-04490 (DWF/HB)

## BRIEF OF THE EDISON ELECTRIC INSTITUTE
## AS *AMICUS CURIAE* IN SUPPORT OF AFFIRMANCE AND INTERVENORS-APPELLEES

Samara Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
(214) 953-6825
Samara.Kline@bakerbotts.com

Scott A. Keller
Marcia Hook
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Scott.Keller@bakerbotts.com
Marcia.Hook@bakerbotts.com

Emily Fisher
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Ave., N.W.
Washington, DC 20004-2696
(202) 508-5000
EFisher@eei.org

*Counsel for Amicus Curiae*

# **TABLE OF CONTENTS**

**TABLE OF CONTENTS** ................................................................. i

**TABLE OF AUTHORITIES** ........................................................ ii

**INTEREST OF *AMICUS CURIAE*** .......................................... 1

**SUMMARY OF ARGUMENT** ................................................... 2

**ARGUMENT** ............................................................................. 5

   I.   LSP TRANSMISSION'S READING OF THE COMMERCE CLAUSE WOULD UPEND THE EXISTING UTILITY REGULATORY REGIME. ........ 5

   II.  THE FEDERAL POWER ACT RESERVES TO THE STATES THE RIGHT TO ENACT LAWS SUCH AS THE MINNESOTA STATUTE AT ISSUE HERE. ........................................................................... 11

   III.   THE DORMANT COMMERCE CLAUSE DOES NOT INVALIDATE THE MINNESOTA STATUTE, AS THE STATUTE IS NOT PROTECTIONIST EITHER IN INTENT OR EFFECT. ................................. 18

**CONCLUSION** ......................................................................... 24

**CERTIFICATE OF SERVICE** .................................................. 25

**CERTIFICATE OF COMPLIANCE WITH RULE 32 AND LOCAL RULE 28A** ........................................................................................ 26

Appellate Case: 18-2559   Page: 2   Date Filed: 01/14/2019 Entry ID: 4745793

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ark. La. Gas Co. v. Hall*,
    453 U.S. 571 (1981)........................................................................12

*Dep't of Revenue v. Davis*,
    553 U.S. 328 (2008)...................................................................18, 19

*Gen. Motors Corp. v. Tracy*,
    519 U.S. 278 (1997).............................................4, 6, 9, 10, 17, 18

*MISO Transmission Owners v. FERC*,
    819 F.3d 329 (7th Cir. 2016),
    *cert denied* 127 S. Ct. 1223 (2017).................................................16

*Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*,
    341 U.S. 329 (1951).........................................................................10

*Piedmont Envtl. Council v. FERC*,
    558 F.3d 304 (4th Cir. 2009) ...........................................................11

FEDERAL AGENCY RULES AND ADJUDICATIONS

*Midwest Indep. Transmission Sys. Operator, Inc.*,
    147 FERC ¶ 61,127 (2014).................................................................15

*Transmission Planning and Cost Allocation by Transmission Owning and
Operating Public Utilities*, Order No. 1000, FERC Stats. & Regs. ¶ 31,323
(2011), *aff'd S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41
(D.C. Cir. 2014) .........................................................................11, 15

*Transmission Planning and Cost Allocation by Transmission Owning
and Operating Public Utilities*, *order on reh'g*, Order No. 1000-A,
139 FERC ¶ 61,132 (2012)...........................................................11, 15

STATUTES

15 U.S.C. § 717...............................................................................3

15 U.S.C. § 717f(h)...........................................................................3

Appellate Case: 18-2559    Page: 3    Date Filed: 01/14/2019 Entry ID: 4745793

16 U.S.C. § 824(a) ...............................................................................................2, 12

16 U.S.C. § 824p ....................................................................................................... 3

ILL. COMP. STAT. ANN. 5/16-101 .......................................................................... 7

ILL. COMP. STAT. ANN. 5/16-103 .......................................................................... 7

MINN. STAT. ANN. § 216B.01 ...........................................................................12, 13

MINN. STAT. ANN. § 216B.03 ................................................................................ 21

MINN. STAT. ANN. § 216B.04 ................................................................................ 21

MINN. STAT. ANN. § 216B.16 ................................................................................ 23

MINN. STAT. ANN. § 216B.37 ................................................................................ 20

MINN. STAT. ANN. § 216B.40 ................................................................................ 21

MINN. STAT. ANN. § 216B.50 ................................................................................ 23

MINN. STAT. ANN. § 216B.79 ................................................................................ 21

MINN. STAT. ANN. § 216B.243 .............................................................................. 14

MINN. STAT. ANN. § 216B.246 ..........................................................................8, 22

MINN. STAT. ANN. § 216E.03 ............................................................................... 14

**OTHER AUTHORITIES**

FED. R. APP. P. 29(a) ................................................................................................ 1

FED. R. APP. P. 29(c)(5) ........................................................................................... 1

Appellate Case: 18-2559    Page: 4    Date Filed: 01/14/2019 Entry ID: 4745793

# INTEREST OF *AMICUS CURIAE*

This brief is filed by Edison Electric Institute ("EEI") as *amicus curiae*[1] in support of Intervenors-Appellees Northern States Power Company d/b/a Xcel Energy ("NSP") and ITC Midwest, LLC ("ITC Midwest"). EEI is the association that represents all U.S. investor-owned electric companies, international affiliates and industry associates worldwide. EEI members provide electricity for about 220 million Americans and operate in all 50 states and the District of Columbia. As a whole, the electric power industry supports more than seven million jobs in communities across the United States. EEI members own about 75% of transmission system facilities in the country, and they include both vertically integrated utilities and competitive transmission developers. EEI's members make considerable investments in needed and beneficial transmission infrastructure—investments the Federal Energy Regulatory Commission ("FERC") and Congress have recognized are critical to ensure a reliable, cost-effective, and modern bulk power system.

EEI's members are extensively regulated at both the federal and state levels. The existing regulatory structure in which EEI members operate has been carefully

---

[1] EEI confirms that all parties have consented to the filing of this brief. *See* FED. R. APP. P. 29(a). EEI confirms that no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund preparing or submitting the brief; and no person, other than EEI, its members or its counsel, contributed money intended to fund the preparation or submission of this brief. *See* FED. R. APP. P. 29(c)(5).

Appellate Case: 18-2559     Page: 5     Date Filed: 01/14/2019 Entry ID: 4745793

developed over more than one hundred years by Congress and state legislatures across the nation. Appellant LSP Transmission Holdings, LLC ("LSP Transmission") urges an unprecedentedly broad reading of the Commerce Clause that threatens to upend that structure and the process for making decisions within that structure.

## SUMMARY OF ARGUMENT

The power industry is highly regulated at both the federal and state levels. Over the past hundred years, Congress and state legislatures have carefully developed regulations governing this essential industry. In 1935, Congress enacted the Federal Power Act. 16 U.S.C. § 791 *et seq.* In this Act, Congress determined that the transmission and sale of power in interstate commerce should be regulated by the federal government, but it simultaneously reserved key aspects for state regulation. Consequently, the federal government, through FERC, regulates the transmission and sale of power in interstate commerce. *Id.* § 824(a). Such regulation, however, "extend[s] only to those matters which are not subject to regulation by the States." *Id.*

Among matters reserved to state regulation is the siting and construction of new transmission lines. With very limited exception, FERC has no authority over the siting and construction of new transmission lines. FERC's limited authority over transmission siting and construction contrasts starkly with the agency's sweeping

-2-

authority over siting and construction of new interstate *gas pipelines* under the Federal Power Act's sister statute, the Natural Gas Act. 15 U.S.C. § 717 *et seq.* Under the Natural Gas Act, FERC may authorize the construction of new interstate pipelines and grant pipeline developers the right to exercise eminent domain for the entire route of a pipeline. *Id.* § 717f(h). In contrast, for most interstate power transmission projects, FERC lacks such authority.[2]

States have exercised the authority reserved to them under the Federal Power Act by adopting various models to regulate the power industry within their borders. Currently, in more than twenty states, vertically integrated utilities serve captive customers within a franchised service territory designated by the state. In such systems, no other utility—whether it is another utility already operating in the state or a new market entrant—may compete with the incumbent utility within the state-designated franchised service territory. Even states that have chosen to move towards competitive procurement of power generation have retained franchised service territories for distribution service and, in some cases, transmission service as well. In turn, the state closely regulates everything the incumbent utility does. The

---

[2] FERC has the authority to site new transmission lines in National Interest Electric Transmission Corridors designated by the Department of Energy. *See* 16 U.S.C. § 824p. But, even this is a backstop authority that FERC may exercise in only limited circumstances, such as where a state fails to act within one year or imposes onerous conditions on a transmission project that would effectively destroy the economic viability or benefits of a project. *Id.* § 824p(b).

Appellate Case: 18-2559    Page: 7    Date Filed: 01/14/2019 Entry ID: 4745793

incumbent utility also bears certain obligations, including the requirement to construct new facilities if the state so directs. As the Supreme Court recognized in *Tracy*, this valid model arose in response to the states' experience with the "ruinous and short lived" results of experimenting with wholly free markets in this area, which led to duplicative utility systems and, after a period of "wasteful competition," the emergence of a single monopoly that charged customers monopoly prices. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 289-91 & nn.5-7 (1997).

LSP Transmission's interpretation of the Commerce Clause would undermine not only the careful balance Congress struck in the Federal Power Act, but also states' ability to design incumbent-utility regulatory regimes to fit the particular needs of their citizens as determined by state legislatures. LSP Transmission's challenge to the Minnesota statute rests upon the fundamental premise that any law granting any incumbent utility a preference violates the dormant Commerce Clause because it discriminates against those entities that do not yet have a presence in the state. Under LSP Transmission's view, "it makes no difference" that Minnesota's law disadvantages not just out-of-state entities, but also other incumbent utilities with a presence in the state. Brief of Plaintiff-Appellant at 27, *LSP Transmission Holdings, LLC v. Lange*, No. 18-2559 (8th Cir. Oct. 12, 2018) [hereinafter LSP Transmission Br.].

LSP Transmission's view of the dormant Commerce Clause is fundamentally out of step with this well-established area of state regulation. The Minnesota statute and other statutes that grant incumbent utilities certain rights are not designed as means of state protectionism against out-of-state entities. Rather, they reflect a state's determination—based on its extensive history and unique characteristics— that closely-regulated, state-sanctioned monopolies in the power industry are a better, more efficient way to ensure the provision of a service that is indispensable to daily life for its citizens. Such a determination is entirely within the discretion of states under the Federal Power Act and is not barred by the dormant Commerce Clause.

## ARGUMENT

### I. LSP TRANSMISSION'S READING OF THE COMMERCE CLAUSE WOULD UPEND THE EXISTING UTILITY REGULATORY REGIME.

LSP Transmission claims that the Court must invalidate the Minnesota statute, even though it applies equally to all entities, whether those entities are based inside or outside of Minnesota. *See* LSP Transmission Br. at 27 ("it makes no difference that Minnesota's law disadvantages not just out-of-state entities, but in-state incumbents as well."). This position has broad ramifications. Under this theory, *any* state law that benefits an incumbent utility would inherently "discriminate" against entities that do not yet have facilities in the state and violate the dormant Commerce

-5-

Clause. LSP Transmission's broad reading of the Commerce Clause is thus nothing short of a frontal assault on the existing utility regulatory regime utilized in states nationwide, as well as the choice of every state as to how to regulate the provision of power to its citizens.

For over one hundred years, states have granted companies in the power and gas industries exclusive designated service territories. As *Tracy* documented, this regime arose in response to the states' historic experiences with unfettered free market competition in the utility industry. Specifically, for a time, many states left regulation of the electric industry to municipal or local governments. *See Tracy*, 519 U.S. at 289 n.7. Those local entities handed out multiple franchises, resulting in duplicative utility systems. *See id.* As the Supreme Court noted, "[t]he results were 'ruinous and short lived.'" *Id.* Eventually, in both the power and gas industries, states concluded that it was "virtually an economic necessity" to "provide a single, local franchise with a business opportunity free of competition from any source, within or without the State, so long as the creation of exclusive franchises under state law could be balanced by regulation and the imposition of obligations to the consuming public upon the franchised retailers." *Id.* at 290. As of a few weeks ago, at least twenty-one states—including Minnesota—have elected such a model and grant utilities exclusive franchised service territories where retail customers are served by generation owned by a vertically integrated utility. S&P GLOBAL MARKET

Appellate Case: 18-2559    Page: 10    Date Filed: 01/14/2019 Entry ID: 4745793

INTELLIGENCE, RRA REGULATORY FOCUS: QUARTERLY REGULATORY EVALUATIONS – ENERGY 16-17 (Nov. 26, 2018).[3]  Another eight states have partially restructured their market, adopting a hybrid model where some competition for generation services is allowed for certain subsets of customers.  *Id.*

Even in those states where generation is fully subject to competition, the incumbent utility often is required by law to serve as provider of last resort if the competitive supplier fails to meet its contractual duty to provide power.  *E.g.*, 220 ILL. COMP. STAT. ANN.  5/16-103 (West 2015).[4]  The Department of Energy acknowledges the balance between benefits and obligations in states that allow competition for generation services, calling the descriptor "deregulated" for such states "a misnomer, as retail electricity providers and other parts of the industry remain highly regulated."  U.S. DEP'T OF ENERGY, TRANSFORMING THE NATION'S ELECTRICITY SYSTEM: THE SECOND INSTALLMENT OF THE QER app. at A-13.  And all three categories of states have retained franchised service territories for distribution services.

---

[3]  There are three distinct elements of retail electricity service: generation, transmission, and distribution.

[4]  The Illinois' Electric Service Customer Choice and Rate Relief Law of 1997, 220 ILL. COMP. STAT. ANN. 5/16-101, *et seq.*, restructured the electric generation markets, transitioning to competitive retail generation services and requiring electric utilities to continue to offer bundled services to customers in their service areas, to which customers are entitled to return after switching to a competitive supplier.

Appellate Case: 18-2559     Page: 11     Date Filed: 01/14/2019 Entry ID: 4745793

Rights of first refusal—and a corresponding *obligation* to build additional transmission lines—are important and integral components of this historical context. To the extent states afforded these kinds of rights to incumbent providers, they were coupled with corresponding obligations. For example, while incumbents receive the opportunity to build new transmission facilities that connect to their existing systems, the relevant state planning authority also can by law *require* those incumbents to construct new facilities. Like laws in many other states, the Minnesota statute reflects a matched set of rights and obligations. An incumbent transmission owner is given "the right to construct, own, and maintain an electric transmission line that has been approved" by the Midcontinent Independent System Operator, Inc. ("MISO")—if the transmission line will connect to the incumbent transmission owner's existing system. MINN. STAT. ANN. § 216B.246, subd. 2 (West 2012). In turn, the statute authorizes the Minnesota Public Utilities Commission to *require* an incumbent transmission owner to build the transmission line, even if it otherwise would decline to do so. *Id.* subd. 3(b).

The Minnesota statute thus precludes *any entity* (whether based in-state or out-of-state) from building new transmission lines that connect to an existing transmission owner's system, until the incumbent transmission owner is offered the chance to build that line. The Minnesota statute applies evenly to parties that have facilities in state and those that do not; neither may construct a new line connecting

-8-

to an existing system unless the owner of the existing system declines to undertake the new project. LSP Transmission emphasizes statutory definitions of "[i]ncumbent electric transmission owner" and "transmission company" that explicitly mention the ownership of facilities "in this state," *id.* subd. 1(c), but that language simply reflects the limits of Minnesota's regulatory jurisdiction. The language LSP Transmission highlights indicates that Minnesota lacks authority to regulate the siting and construction of transmission lines in other states.

The legal obligations imposed on incumbent utilities under Minnesota's regulatory structure also mean that LSP Transmission and other new market entrants are not similarly situated to incumbent transmission owners that already operate transmission lines in Minnesota. As the Supreme Court explained, "any notion of discrimination assumes a comparison of substantially similar entities." *Tracy*, 519 U.S. at 298 (footnote omitted). LSP Transmission attempts to cast *Tracy* as a case about "differential treatment of two distinct products in two distinct markets." LSP Transmission Br. 40. But this oversimplification misses much of *Tracy*'s rationale for upholding the challenged state law. Unlike incumbents, LSP Transmission and other competitive transmission builders cannot be compelled by law to construct transmission facilities. Instead, LSP Transmission may pick and choose which projects it will entertain, ignoring projects it deems insufficiently lucrative or desirable. In contrast, incumbent transmission owners do not have that option.

Appellate Case: 18-2559     Page: 13     Date Filed: 01/14/2019 Entry ID: 4745793

*Tracy* recognized that the ability of regulated utilities to meet corresponding legal obligations is intertwined with receiving regulatory benefits, including in some instances monopoly treatment, and that courts must exercise caution "before making a choice that could strain the capacity of the States to continue to demand" regulatory benefits for utility customers. *Tracy*, 519 U.S. at 307; *see also Panhandle E. Pipe Line Co. v. Mich. Pub. Serv. Comm'n*, 341 U.S. 329 (1951).

The district court therefore correctly applied *Tracy*'s reasoning in this case. The power and natural gas industries are subject to comprehensive, carefully crafted regulatory regimes that Congress and state legislatures have developed based on a wealth of experience. *See, e.g.*, LSP Transmission Br. Addendum at 18. *Tracy* directed that courts should proceed cautiously when considering a Commerce Clause challenge to a state public utility law. *Tracy*, 519 U.S. at 305-09; LSP Transmission Br. Addendum at 19. While Congress is well aware of state laws that grant incumbent utilities certain rights, "Congress has done nothing to limit its unbroken recognition of the state regulatory authority that has created and preserved the local monopolies." *Tracy*, 519 U.S. at 304-05.

LSP Transmission's reading of the Commerce Clause is particularly suspect because it has no limiting principle. LSP Transmission's position regarding the breadth of the dormant Commerce Clause would extend to the foundations underlying a regulatory regime that has existed for decades in states across the

-10-

nation. Those legislatures have decided that their regulatory structure requires corresponding obligations on, and benefits to, incumbent utility providers. There is no constitutional basis for supplanting this carefully structured utility regulatory regime or the will of state legislatures in this arena.

## II. THE FEDERAL POWER ACT RESERVES TO THE STATES THE RIGHT TO ENACT LAWS SUCH AS THE MINNESOTA STATUTE AT ISSUE HERE.

The Federal Power Act reserves to states authority over the siting and construction of transmission facilities. *See, e.g.*, *Piedmont Envtl. Council v. FERC*, 558 F.3d 304, 310 (4th Cir. 2009). The challenged Minnesota statute falls well within this state siting and construction authority. EEI takes no position on whether states *should* enact right of first refusal laws such as this statute. But whether a state should enact such a law is a legitimate policy choice reserved to each state. FERC's elimination of the *federal* right of first refusal in Order No. 1000[5] does not dictate that states should be barred from adopting laws granting utilities a right of first refusal.

When enacting the Federal Power Act, Congress made clear that FERC's authority to regulate the interstate transmission and sale of power "extend[s] only to

---

[5] *Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, FERC Stats. & Regs. ¶ 31,323 (2011), *order on reh'g*, Order No. 1000-A, 139 FERC ¶ 61,132, *order on reh'g*, Order No. 1000-B, 141 FERC ¶ 61,044 (2012), *aff'd S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41 (D.C. Cir. 2014).

-11-

those matters which are not subject to regulation by the States."  16 U.S.C. § 824(a).

Siting and construction of new transmission lines is one arena reserved to the states.

With very limited exceptions, FERC has no authority over the siting and

construction of new transmission lines.  The absence of this authority is particularly

notable because it is one of the few ways that the Federal Power Act differs from the

Natural Gas Act, which grants FERC sweeping authority to site and construct new

interstate gas pipelines.  *See, e.g.*, *Ark. La. Gas Co. v. Hall*, 453 U.S. 571, 577 n.7

(1981).

The challenged Minnesota statute falls squarely within this siting and

construction authority reserved to the states.  The Minnesota statute is designed to

shape the structure of the transmission system within the state in accordance with

state goals.  The Minnesota Legislature has long been concerned with "unnecessary

duplication of facilities which increase the cost of service to the consumer and to

minimize disputes between public utilities which may result in inconvenience or

diminish efficiency in service to the consumers."  MINN. STAT. ANN. § 216B.01

(West 2018).  The Minnesota statute at issue in this case furthers that purpose by

promoting the development of a transmission system characterized by facilities that

are owned continuously between two points.  Without such a right of first refusal

(and the attendant obligation to build), the transmission system within Minnesota

could become a patchwork quilt with many different transmission owners owning

Appellate Case: 18-2559     Page: 16     Date Filed: 01/14/2019 Entry ID: 4745793

short interconnecting spans of lines. The Minnesota statute thus helps achieve a legitimate state goal by minimizing avoidable fragmentation of the transmission system and, in turn, the possibility of disputes between public utilities that might result in inconvenience or diminish efficiency in service to consumers.

The project at issue in the instant proceeding demonstrates how the statute helps minimize the opportunity for such disruptions. The Huntley-Wilmarth transmission line project will connect the existing transmission systems of NSP and ITC Midwest. Because of the Minnesota statute, this project will be jointly built by NSP and ITC Midwest, meaning there will be two transmission owners managing one interface (that is, the point where the two transmission systems interconnect). If there were no such statute and a third party were awarded the project, there instead would be three separate transmission owners that would have to coordinate two separate interfaces. Multiply this issue across the entire transmission system within the State of Minnesota, and one starts to understand how such an outcome could undermine the Minnesota Legislature's goal of "minimiz[ing] disputes between public utilities which may result in inconvenience or diminish efficiency in service to the consumers." *Id.*

The challenged statute represents the Minnesota Legislature's attempt to ensure safe, reliable electric service within its boundaries. LSP Transmission's suggestion that the State of Minnesota has no legitimate right to enact laws designed

-13-

to protect the reliability of the transmission system within the State because MISO-approved transmission projects are studied for reliability impacts and "are unrelated to the retail distribution of electricity provided by utilities and regulated by the Minnesota [Public Utilities Commission]" is wrong as a matter of both law and fact. LSP Transmission Br. 37. Under the Federal Power Act, no other entity bears authority to make these types of policy decisions regarding the transmission system within Minnesota or any other state. FERC cannot dictate what transmission lines should be built in Minnesota, where those lines should be built, or who should build those lines. MISO has functional control of the high-voltage facilities owned by utilities in Minnesota and may recommend new transmission facilities be constructed. However, any such projects must go through the state permitting process and, therefore, could be rejected in their entirety by the Minnesota Public Utilities Commission. *Id.* at 38 (citing MINN. STAT. ANN. §§ 216B.243 & 216E.03). And for good reason, as those transmission lines serve as the backbone to the retail distribution network that serves Minnesota's citizens.

LSP Transmission repeatedly attempts to conflate the *federal* right of first refusal eliminated in FERC Order No. 1000 with a state-law right of first refusal like the Minnesota statute at issue here—making it seem as if Order No. 1000 and the related federal-court precedent also mandate the elimination of such state-level rights. *See, e.g.*, LSP Transmission Br. app. at 7 (Compl. ¶ 22). Nothing in Order

-14-

No. 1000 or the related precedent requires the elimination of state rights of first refusal. Before Order No. 1000, some Regional Transmission Operators and Independent System Operators, including MISO, had provisions in their tariffs that granted incumbent transmission owners a right of first refusal with respect to new transmission facilities that connected to their systems. Those "federal" rights of first refusal existed alongside rights of first refusal created by state law. In Order No. 1000, FERC required these operators to eliminate federal rights of first refusal from their tariffs. However, in Order No. 1000, FERC expressly provided that its action "addresse[d] only rights of first refusal that are created by provisions in [FERC]-jurisdictional tariffs or agreements." Order No. 1000 ¶ 253 n.231. Thus, a right of first refusal:

> based on a state or local law or regulation *would still exist under state or local law* even if removed from [FERC]-jurisdictional tariff or agreement, and nothing in Order No. 1000 changes that law or regulation, for Order No. 1000 is clear that nothing therein is "intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities.

Order No. 1000-A at ¶ 381 (emphasis added).

FERC explained that its "decision to focus on federal (not state) right of first refusal provisions in [FERC]-jurisdictional tariffs was an exercise of remedial discretion designed to ensure that its . . . reforms [did] not result in the regulation of matters reserved to the states." *Midwest Indep. Transmission Sys. Operator, Inc.*, 147 FERC ¶ 61,127, at ¶ 156 (2014). When LSP Transmission challenged FERC's

decision to allow MISO to reference such state rights of first refusal in its tariff, the Seventh Circuit upheld FERC's decision. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 336 (7th Cir. 2016), *cert denied* 127 S. Ct. 1223 (2017). The Seventh Circuit noted that FERC's decision was based on the "proper goal" of seeking "'to avoid intrusion on the traditional role of the States' in regulating the siting and construction of transmission facilities." *Id.* LSP Transmission hypothesizes that "if every state were to adopt a [right of first refusal] statute, the cumulative effect of such statutes would nullify Order No. 1000's abolition of federal [rights of first refusal] and eliminate competition in the market." LSP Transmission Br. 53. However, fewer than ten states actually have implemented such statutes, and the ability of states to make their own policy decisions regarding siting and construction of new transmission lines is part of the balance that Congress struck when it enacted the Federal Power Act.

The Minnesota statute falls squarely within Minnesota's authority as a state to regulate the construction and siting of transmission lines within its boundaries. The Minnesota Legislature has determined that a law that minimizes the number of utilities that own the transmission system will best ensure that its citizens receive safe, reliable, and affordable electricity. LSP Transmission urges this Court to use the dormant Commerce Clause to strike down this Legislature's decision. Citing only general economic principles and FERC's determinations regarding the market

-16-

effects of a nationwide *federal* right of first refusal, LSP Transmission theorizes that "[i]n practice, elimination of [rights of first refusal] increases competition, lowers costs, and benefits consumers." LSP Transmission Br. 47. As the Supreme Court recognized in *Tracy*, however, federal courts are "institutionally unsuited to gather the facts upon which economic predictions can be made, and professionally untrained to make them." *Tracy*, 519 U.S. at 308. Courts are "consequently ill qualified to develop Commerce Clause doctrine dependent on any such predictive judgments, and it behooves [them] to be as reticent about projecting the effect of applying the Commerce Clause" in any given case. *Id.* at 309. Accordingly, courts customarily "declin[e] to engage in elaborate analysis of real-world economic effects." *Id.* LSP Transmission's claim that entirely unregulated markets will best serve consumers nationwide may have surface appeal, but the appropriate forum for that debate is a legislative body. For more than one hundred years, states have been free to draw their own conclusions to ensure the safe, reliable, and comprehensive service that individual and corporate electricity consumers deserve.

That is why Congress vested the states with authority to choose how to provide essential electricity services to their citizens. The states are best suited to make those policy determinations, to represent and respond to their citizens' particular needs, and to identify the state-specific factors relevant to meeting those needs. Congress is well aware that many states, like Minnesota, have enacted

Appellate Case: 18-2559    Page: 21    Date Filed: 01/14/2019 Entry ID: 4745793

regulatory monopolies with corresponding benefits and obligations, and Congress has the "power and institutional competence to decide upon and effectuate any desirable changes in the scheme that has evolved." *Id.* Federal courts should not use an amorphous dormant Commerce Clause theory to invalidate regulatory models that have existed for decades nationwide. Any plea for expansion of federal power in that regard must be directed to Congress.

## III. THE DORMANT COMMERCE CLAUSE DOES NOT INVALIDATE THE MINNESOTA STATUTE, AS THE STATUTE IS NOT PROTECTIONIST EITHER IN INTENT OR EFFECT.

The dormant Commerce Clause doctrine "is driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competition." *Dep't of Revenue v. Davis*, 553 U.S. 328, 337–38 (2008) (internal quotation marks omitted). The challenged statute is not designed to protect in-state economic interests from out-of-state competition. Like many other aspects of state regulatory regimes for utilities that are built around franchised service territories, this one protects an incumbent utility from competition by anyone, whether in-state or out-of-state (however that term is defined). That kind of law in a utility context does not represent the local economic protectionism that the dormant Commerce Clause bars.

LSP Transmission portrays the Minnesota statute as an attempt to "secure[] lucrative business opportunities—the construction of MISO-approved transmission

-18-

lines—for favored local operators, thus preventing out-of-state entities for competing for such projects." LSP Transmission Br. 27. But, as discussed above, the law is actually agnostic as to whether the entity building the transmission lines is an in-state or out-of-state entity (however that term is defined). If a new transmission project will interconnect with an incumbent electric utility's system, nobody else may build such project unless the existing transmission owner declines the project. This is true whether the other entity seeking to build is another utility located somewhere in the state or a new market entrant. The statute is therefore not designed to "benefit in-state economic interests by burdening out-of-state competitors." *Davis*, 553 U.S. at 337–38. Instead, the statute intends to limit development by anyone when it comes to transmission facilities that will connect to an existing system.

The statements that LSP Transmission cites as "brimming with protectionist rhetoric" are taken out of context. LSP Transmission Br. 36 (citation omitted). NSP and the other utilities in Minnesota have turned control of their transmission facilities over to MISO. That means that any new transmission line on their system that exceeds certain voltage level must be studied and approved by MISO and included in the MISO transmission expansion plan (that is, "approved for construction in a federally registered planning authority transmission plan"). The overwhelming majority of those projects are not eligible for competitive bidding under the MISO

Appellate Case: 18-2559    Page: 23    Date Filed: 01/14/2019 Entry ID: 4745793

tariff because they fall into categories of projects that MISO has determined should not be subject to a time-consuming bidding process,[6] regardless of the existence of a state right of first refusal law. *See, e.g.*, MISO Tariff Attachment FF § VIII.A.2 ("A Transmission Owner shall have the right to develop, own, and operate any upgrade to a transmission facility owned by the Transmission Owner . . ."); *id.* § III.A.2.n ("Only a Transmission Owner shall be authorized to construct and/or own transmission facilities associated with a Baseline Reliability Project.").

Because Minnesota adheres to the franchised utility model, the state naturally sought to ensure that when FERC eliminated *federal* rights of first refusal, the state's regulatory structure was not negatively impacted. As the state's district court brief explained, in Minnesota "electric service is provided by monopolies" that are assigned franchised service territories "in order to encourage the development of coordinated statewide electric service at retail, to eliminate or avoid unnecessary duplication of electric utility facilities, and to promote economical, efficient, and adequate electric service to the public." Minn. Memorandum in Support of Motion to Dismiss at 2 *LSP Transmission Holdings, LLC v. Lange*, 329 F. Supp. 3d 695 (D. Minn. 2018) (No. 17-4490) (citing MINN. STAT. ANN. § 216B.37 (West 2018)). Within those franchised service territories, each electric utility has "the exclusive

---

[6] For example, the MISO Tariff provides MISO 165 days simply to evaluate the proposals submitted in response to a competitive solicitation. MISO Tariff Attachment FF § VIII.E.2.

Appellate Case: 18-2559    Page: 24    Date Filed: 01/14/2019 Entry ID: 4745793

right to provide electric service at retail to each and every present and future customer in its assigned service area and no [other] electric utility shall render or extend service at retail." MINN. STAT. ANN. § 216B.40 (West 2018). The Minnesota Public Utilities Commission in turn sets "just and reasonable" retail rates for those utilities and ensures that each provides "safe, adequate, efficient, and reasonable service," and "make[s] adequate infrastructure investments." MINN. STAT. ANN. §§ 216B.03–.04, & .79 (West 2018).

When there was a federal right of first refusal, there was no misalignment between Minnesota state law and the MISO Tariff. In that situation, Minnesota could rest assured that if a project were selected by MISO, it would be built by the utility with which the project would connect, just as would be the case for lower-voltage facilities that are not under MISO's control. But once FERC eliminated the federal right of first refusal, that alignment vanished. Minnesota's Legislature had concerns that the elimination of the right of first refusal could result in the construction of unnecessary transmission facilities, higher cost transmission lines due to FERC transmission rate incentives, and Minnesota ratepayers paying for transmission facilities that brought little benefit to them. *See* LSP Transmission Br. app. at 48 ("If we choose not to pass this legislation, we are moving into the world of unknown, versus we have a very known process right now, members. And I think it's best to stick with that process because FERC's process is unknown.").

-21-

Against that backdrop of the withdrawn federal right of first refusal, it becomes clear that the Minnesota legislators' statements reflect their legitimate concerns about losing the ability to ensure that transmission lines are built only if they are needed and the transmission system in Minnesota remains reliable. The structure of the Minnesota statute further reflects that concern. If the incumbent transmission owner declines to construct a project identified by MISO, it must "fully explain the basis for that decision." MINN. STAT. ANN. § 216B.246, subd. 3(b) (West 2018). The Minnesota Public Utilities Commission will then decide whether to direct the incumbent transmission owner or another entity to construct the project, "taking into consideration issues such as cost, efficiency, reliability, and other factors identified in this chapter." *Id.* In other words, if the incumbent transmission owner declines to construct the project, the statute provides the Minnesota Public Utilities Commission the opportunity to determine whether it is necessary for the facility to be constructed at all. Thus, contrary to LSP Transmission's assertions, the statute does help preserve "local control" over the approval of transmission projects. LSP Transmission Br. 37.

LSP Transmission also is incorrect when it asserts that the law "wall[s] off the state from new market participants." LSP Transmission Br. app. at 27 (Compl. ¶ 91). The Minnesota statute would allow LSP Transmission to build a MISO-approved project that does not connect to an existing incumbent utility's system (for example,

a MISO-approved project that passes through Minnesota). And, as Intervenors-Appellees note in their response brief, out-of-state companies also may become incumbents by buying existing transmission facilities, as ITC Midwest did to enter the Minnesota market. *See* Response of Intervenors-Defendants-Appellees Northern States Power Company D/B/A Xcel Energy and ITC Midwest LLC, at 12 *LSP Transmission Holdings, LLC v. Lange*, No. 18-2559 (8th Cir. Jan. 4, 2019) (citing MINN. STAT. ANN. §§ 216B.16, subd. 7c(a) & 216B.50). The statute is simply designed to ensure that *nobody* (whether in-state or out-of-state) may build transmission lines that connect to an existing transmission owner's system without that incumbent transmission owner having the opportunity to build it first.

The challenged Minnesota statute does not fall into the category of laws designed to protect local economic interests against out-of-state competition. The Minnesota law is neutral both in its purpose and effect. It applies evenly to both in-state and out-of-state entities. It does not preclude LSP Transmission or other new market entrants from becoming incumbent utilities in the state. Nor does it preclude LSP Transmission or other new market entrants from competing for MISO-approved transmission lines in Minnesota, so long as those lines do not connect to the system of an existing transmission owner. In sum, this is not economic protectionism designed just to favor in-state businesses, so the dormant Commerce Clause does not bar this valid Minnesota statute.

Appellate Case: 18-2559    Page: 27    Date Filed: 01/14/2019 Entry ID: 4745793

## **CONCLUSION**

The district court's judgment should be affirmed.

Respectfully submitted,

 /s/  Samara Kline
Samara Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue
Suite 900
Dallas, TX 75201-2980
(214) 953-6825
Samara.Kline@bakerbotts.com

Scott A. Keller[7]
Marcia Hook
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Scott.Keller@bakerbotts.com
Marcia.Hook@bakerbotts.com

Emily Fisher
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Ave., N.W.
Washington, DC 20004-2696
(202) 508-5000

*Counsel for Amicus Curiae*

---

[7] Admitted only in Texas.  Not admitted in the District of Columbia. Practicing under the supervision of principals of the firm who are members of the District of Columbia bar.

Appellate Case: 18-2559     Page: 28     Date Filed: 01/14/2019 Entry ID: 4745793

## <u>CERTIFICATE OF SERVICE</u>

This will certify that a true and correct copy of the above document was served on this the 11th day of January, 2019, via the Court's CM/ECF system on all counsel of record.

Dated: January 11, 2019

/s/ Marcia Hook

Marcia Hook
*Counsel for Amicus Curiae*

Appellate Case: 18-2559    Page: 29    Date Filed: 01/14/2019 Entry ID: 4745793

## CERTIFICATE OF COMPLIANCE WITH RULE 32 AND LOCAL RULE 28A

The undersigned counsel of record hereby certifies, pursuant to Fed. R. App. P. 32(g)(1), that:

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,489 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f);

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using the Microsoft Office Word 2016 word processing software in 14-point Times New Roman type style; and

3. This brief complies with 8th Cir. R. 28A(h)(2) because it has been scanned for viruses and is virus-free.

Dated: January 11, 2019

 /s/  Marcia Hook
Marcia Hook
*Counsel for Amicus Curiae*

Appellate Case: 18-2559     Page: 30     Date Filed: 01/14/2019 Entry ID: 4745793