# In the
# United States Court of Appeals
# For the Eighth Circuit

LSP Transmission Holdings, LLC,

*Plaintiff-Appellant*,

v.

Nancy Lange, Commissioner and Chair, Minnesota Public Utilities Commission;
Dan Lipschultz, Commissioner, Minnesota Public Utilities Commission;
Matt Schuerger, Commissioner, Minnesota Public Utilities Commission;
John Tuma, Commissioner, Minnesota Public Utilities Commission;
Katie Sieben, Commissioner, Minnesota Public Utilities Commission, and
Mike Rothman, Commissioner, Minnesota Department of Commerce,
each in his or her official capacity,

*Defendants-Appellees,*

*and*

Northern States Power Company d/b/a Xcel Energy, and ITC Midwest, LLC,

*Intervenors-Appellees.*

*On Appeal from the United States District Court for the District of Minnesota
Civil No. 0:17-cv-04490 (DWF/HB)*

## REPLY BRIEF OF PLAINTIFF-APPELLANT

Charles N. Nauen (#121216)
David J. Zoll (#0330681)
Rachel A. Kitze Collins (#0396555)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
(612) 339-6900
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

Paul D. Clement
Erin E. Murphy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
(202) 879-5000
paul.clement@kirkland.com
erin.murphy@kirkland.com

*Attorneys for Appellant
LSP Transmission Holdings, LLC*

Jason Marisam (#0398187)
Assistant Attorney General
OFFICE OF THE
MINNESOTA ATTORNEY GENERAL
445 Minnesota Street, Suite 1100
St. Paul, MN  55101-2128
(651) 757-1275
jason.marisam@ag.state.mn.us

*Attorney for Defendants-Appellees*

Aaron D. Van Oort (#0315539)
Nathaniel J. Zylstra (#0314328)
FAEGRE BAKER DANIELS LLP
2200 Wells Fargo Center
Minneapolis, MN 55402-3901
(612) 766-8726
aaron.vanoort@FaegreBD.com
nathaniel.zylstra@FaegreBD.com

*Attorneys for Intervenor-Appellee Northern States
Power Company d/b/a Xcel Energy*

Richard D. Snyder (#0191292)
Lisa M. Agrimonti (#0272474)
Leah C. Janus (#0337365)
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000
rsnyder@fredlaw.com
lagrimonti@fredlaw.com
ljanus@fredlaw.com

*Attorneys for Intervenor-Appellee*
*ITC Midwest LLC*


Mark R. Schuling, Consumer Advocate
Jennifer C. Easler, Attorney
John S. Long, Attorney
Jeffrey J. Cook, Attorney
IOWA DEPARTMENT OF JUSTICE
OFFICE OF CONSUMER ADVOCATE
1375 East Court Avenue
Des Moines, IA 50319-0063
(515) 725-7200
IowaOCA@oca.iowa.gov

*Iowa Department of Justice,*
*Office of Consumer Advocate as Amicus Curiae*


Mark B. Bring
Associate General Counsel
OTTER TAIL POWER COMPANY
215 S. Cascade Street
Fergus Falls, MN 56537
mbring@otpco.com

*Attorney for Otter Tail Power Company as*
*Amicus Curiae*


B. Andrew Brown (MN #0205357)
DORSEY & WHITNEY LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
(612) 340-5612
Brown.Andrew@dorsey.com

*Attorney for Southern Minnesota Municipal*
*Power Agency as Amicus Curiae*

Robert Potter, Attorney
Daniel E. Haar, Attorney
Matthew C. Mandelberg, Attorney
Makan Delrahim, Assistant Attorney General
Andrew C. Finch, Principal Deputy Assistant
 Attorney General
Michael F. Murray, Deputy Assistant
 Attorney General
Kristen C. Limarzi, Attorney
Robert B. Nicholson, Attorney
Adam D. Chandler, Attorney
U.S. DEPARTMENT OF JUSTICE
ANTITRUST DIVISION
950 Pennsylvania Ave., NW, Room 3224
Washington, DC 20530-0001
(202) 353-6638
adam.chandler@usdoj.gov

*United States of America as Amicus Curiae*


David R. Moeller (MN #0287295)
MINNESOTA POWER/ALLETE
30 West Superior Street
Duluth, MN 55802-2093
(218) 723-3963
dmoeller@allete.com

*Attorney for Minnesota Power/ALLETE as*
*Amicus Curiae*

Harvey L. Reiter (DC #232942)
STINSON LEONARD STREET LLP
1775 Pennsylvania Avenue NW
Suite 800
Washington, DC 20006
(202) 785-9100
harvey.reiter@stinson.com

Brian M. Meloy (MN #0287209)
Thomas C. Burman (MN #0396406)
STINSON LEONARD STREET LLP
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
(612) 335-1500
brian.meloy@stinson.com
thomas.burman@stinson.com

*Attorneys for Great River Energy as Amicus*
*Curiae*

Samara Kline
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 900
Dallas, TX 75201-2980
(214) 953-6825
Samara.Kline@bakerbotts.com

Scott A. Keller
Marcia Hook
BAKER BOTTS L.L.P.
1299 Pennsylvania Avenue, NW
Washington, DC 20004
Scott.Keller@bakerbotts.com
Marcia.Hook@bakerbotts.com

Emily Fisher
EDISON ELECTRIC INSTITUTE
701 Pennsylvania Ave., N.W.
Washington, DC 20004-2696
(202) 508-5000
EFisher@eei.org

*Attorneys for Edison Electric Institute
as Amicus Curiae*

# TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................... i

TABLE OF AUTHORITIES .................................................................. ii

INTRODUCTION ................................................................................1

ARGUMENT .......................................................................................4

I.  THE ROFR DISCRIMINATES ON ITS FACE,
    IN ITS EFFECTS, AND IN ITS PURPOSE. .........................................4

    A.  The ROFR is Discriminatory on Its Face. ...............................4

    B.  The Statute's Preference for Incumbents
        Discriminates Against Interstate Commerce. ........................8

    C.  The ROFR Discriminates in Its Effects and Purpose. ...........10

II. *TRACY* DOES NOT IMMUNIZE MINNESOTA'S
    ROFR LAW FROM COMMERCE CLAUSE SCRUTINY. ...............12

    A.  *Tracy* Does Not Immunize Every Law Involving
        Public Utilities from Commerce Clause Scrutiny. ..............13

    B.  Appellees' Efforts to Deny Its Discrimination Against
        Interstate Commerce Are Unavailing. ...............................18

    C.  The State's Efforts to Justify the ROFR as a Historical
        or Policy Matter Are Unfounded. ......................................22

III. THE STATUTE FAILS THE *PIKE* BALANCING TEST. ..................26

CONCLUSION ...................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ark. Elec. Co-op Corp. v. Ark. Pub. Service Comm'n,*
461 U.S. 375 (1983)..........................................................................................26

*Baldwin v. G.A.F. Seelig, Inc.,*
294 U.S. 511 (1935)..........................................................................................12

*Ben Oehrleins & Sons & Daughter, Inc. v. Henn. Cty.,*
115 F.3d 1372 (8th Cir. 1997) ...................................................................*passim*

*C & A Carbone, Inc. v. Town of Clarkstown, N.Y.,*
511 U.S. 383 (1994)......................................................................................6, 7

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine,*
520 U.S. 564 (1997)..........................................................................................10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)..........................................................................................16

*Colon Health Ctrs. of Am., LLC v. Hazel,*
813 F.3d 145 (4th Cir. 2016) ..............................................................9, 10, 11

*Commonwealth Edison Co. v. Montana,*
453 U.S. 609 (1981)..........................................................................................10

*CTS Corp. v. Dynamics Corp. of Am.,*
481 U.S. 69 (1987)............................................................................................10

*Dean Milk Co. v. Madison,*
340 U.S. 349 (1951)............................................................................................7

*Department of Revenue of Ky. v. Davis,*
553 U.S. 328 (2008)..........................................................................................23

*Family Winemakers of Cal. v. Jenkins,*
592 F.3d 1 (1st Cir. 2010)................................................................................10

*General Motors Corp. v. Tracy,*
519 U.S. 278 (1997)....................................................................................*passim*

ii

*IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*,
  433 F.3d 600 (8th Cir. 2006) ...............................................................18

*Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*,
  772 F.2d 404 (8th Cir. 1985). ........................................................24, 27

*Midwest ISO Transmission Owners v. F.E.R.C.*,
  373 F.3d 1361 (D.C. Cir. 2004) .....................................................5, 14

*New England Power Co. v. New Hampshire*,
  455 U.S. 331 (1982) .........................................................................17

*Norfolk Southern Corp. v. Oberly*,
  822 F.2d 388 (3d Cir. 1987) .............................................................10

*North Dakota v. Heydinger*,
  825 F.3d 912 (8th Cir. 2016) ...............................................23, 24, 27

*S.C. Serv. Auth. v. F.E.R.C.*,
  762 F.3d 41 (D.C. Cir. 2014) ...........................................................23

*SDDS, Inc. v. State of S.D.*,
  47 F.3d 263 (8th Cir. 1995) .............................................................10

*Southern Union Co. v. Missouri Public Service Commission*,
  289 F.3d 503 (8th Cir. 2002) ...........................................................26

*State v. Smith*,
  899 N.W.2d 120 (Minn. 2017) .........................................................12

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992) ....................................................................17, 24

**Statutes**

16 U.S.C. § 824 ........................................................................8, 24

16 U.S.C. § 824p(b) ...........................................................................23

Minn. Stat. § 216B.243, Subd. 5 .......................................................21

Minn. Stat. § 216B.246, Subd. 1(c) ...........................................1, 4, 15

Minn. Stat. § 216B.246, Subd. 2 ................................................1, 5, 14

Minn. Stat. § 216B.246, Subd. 3(b) ............................................................19

## INTRODUCTION

Minnesota's Right of First Refusal ("ROFR") statute discriminates against interstate commerce on its face, in its effects, and in its purpose. The law grants "incumbent electric transmission owners" a right of first refusal to build and operate transmission lines, which connect to their facilities and have "been approved for construction in a federally registered planning authority transmission plan." Minn. Stat. § 216B.246, Subd. 2. The law defines these "incumbents" to include *only* entities that already own transmission facilities in Minnesota. *Id.* at Subd. 1(c). Both on its face and in its effects, the law grants a special benefit to in-state entities at the expense of would-be out-of-state competitors for the right to build and operate the instrumentalities of interstate commerce to which the law applies.

The State does not meaningfully deny that overt discrimination. Instead, the State contends that the Supreme Court's decision in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997) ("*Tracy*"), immunizes the ROFR statute from Commerce Clause scrutiny. The State is mistaken. *Tracy* involved a state law that granted a tax preference *only* to public utilities' sales of natural gas to retail customers. In other words, the law exclusively regulated public utilities, and did so in an area exclusively reserved to the states. The ROFR law, by contrast, applies *only* to transmission lines that are part of a *federally* regulated *interstate* transmission grid. Underscoring their role in the *interstate* grid, these projects are not even funded by

1

Minnesota alone, but are paid for by customers across multiple states, as Iowa explains in its amicus brief. Shielding these projects from competition directly impacts not just residents of Minnesota, but residents of other states that help fund them.

Moreover, the ROFR law grants a preference not just to public utilities that sell electricity at retail, but to *all* "incumbent" transmission owners in Minnesota, whether they are vertically integrated public utilities like Intervenor Xcel or independent transmission companies like Intervenor ITC Midwest. This case is thus at the near-opposite end of the local-to-interstate spectrum as *Tracy*. To read *Tracy* as immunizing from Commerce Clause scrutiny a law that grants in-state companies an exclusive preference to construct and operate federally approved transmission lines that are part of an interstate grid funded by multiple states would be a radical expansion of that decision.

The State's plea for blind deference to its views is therefore misplaced. Whatever deference *Tracy* may afford states when they are regulating the distribution of electricity at retail—a matter federal law expressly leaves to the states—who may compete for and own federally approved interstate transmission lines is quite a different matter. Indeed, the State itself implicitly recognizes as much when it concedes that Congress or FERC could preempt its ROFR law at any time. That is a concession that the State is regulating interstate commerce and engaging in

in-state favoritism in such regulation. This is precisely what the Commerce Clause forbids. In all events, the State's insistence that its retail distribution market cannot survive without the ROFR law is considerably undermined by FERC's rejection of all the same policy arguments when it eliminated the federal ROFR.

The State's efforts to demonstrate that LSP is not similarly situated to the "incumbents" to whom the ROFR law grants a preference fall equally flat. The State attempts to manufacture a distinction between LSP and incumbents by asserting that, in exchange for the "benefit" of the right to build transmission lines, incumbents must accept the "burden" that the Minnesota PUC may order them to construct a transmission line even if they decline to exercise their ROFR. But that argument is entirely circular, as that burden is owing to nothing more than their status as incumbents under the ROFR law. If LSP owned transmission lines in Minnesota, it too could be ordered to construct a new line that connected to its facilities. The State cannot justify its discrimination by pointing to consequences of that same discrimination. Nor can it launder constitutionally forbidden discrimination in favor of in-state incumbents by simultaneously making demands of those incumbents. In reality, there is only one thing that distinguishes LSP from incumbents: The incumbents have a physical presence in Minnesota, and LSP does not. That is precisely the kind of distinction that the Commerce Clause renders virtually per se unlawful. The District Court's decision must be reversed.

## ARGUMENT

## I.  THE ROFR DISCRIMINATES ON ITS FACE, IN ITS EFFECTS, AND IN ITS PURPOSE.

As explained in LSP's opening brief, the ROFR law discriminates against interstate commerce on its face, in its effects, and in its purpose. *See* LSP Br. 23-39. The State does not meaningfully dispute those arguments. Instead, the State argues that it does not have to satisfy ordinary Commerce Clause scrutiny because *Tracy* purportedly immunizes from Commerce Clause attack all state laws involving "traditional regulated utility services—*i.e.,* energy generation, transmission, and distribution." State Br. 22. The State is wrong, *see infra* Part II, and its felt need to put all of its eggs in the *Tracy* basket underscores that its law could not survive traditional Commerce Clause scrutiny. Intervenors' attempts to demonstrate otherwise fall far short.

### A.  The ROFR is Discriminatory on Its Face.

The ROFR statute discriminates against interstate commerce on its face by granting an absolute preference to entities with a physical presence in Minnesota in the market for constructing and owning federally approved transmission lines. The law gives a right of first refusal only to "incumbent electric transmission owners." Minn. Stat. § 216B.246, Subd. 1(c). And the law defines an "incumbent electric transmission owner" as an entity that "owns, operates, and maintains an electric transmission line in this state." *Id.* By its plain terms, then, the statute grants a

"preference to … local interest[s] at the expense of all others." *Ben Oehrleins &*
*Sons & Daughter, Inc. v. Henn. Cty.*, 115 F.3d 1372, 1385 (8th Cir. 1997)
("*Oehrleins*").

Intervenors try to distinguish *Oehrleins* and the line of cases invalidating flow
control laws giving local entities the exclusive right to process and dispose of waste
by arguing that those laws involved the flow of goods in interstate commerce,
whereas this case involves transmission facilities physically located in Minnesota.
That is doubly wrong.  First, long before the ROFR law, Minnesota decided to
connect itself to the interstate electricity market and to allow transmission owners in
Minnesota to turn operational control of their transmission facilities over to MISO,
a federally regulated entity that plans and operates those facilities as part of an
interstate electricity transmission grid.  *Midwest ISO Transmission Owners v.*
*F.E.R.C.*, 373 F.3d 1361, 1364-65 (D.C. Cir. 2004).  The ROFR law applies *only* to
transmission lines that are part of that interstate grid, as it applies *only* to lines
"approved for construction in a federally registered planning authority transmission
plan," Minn. Stat. § 216B.246, Subd. 2—*i.e.*, approved by MISO.  Those lines are
classic instrumentalities of interstate commerce:  They are the lines through which
the interstate good of electricity is transmitted all throughout MISO's multi-state
grid.  Indeed, they are paid for by customers in *multiple* states, not just by Minnesota.
*See* Iowa Br. 2-5.  States have no more power to discriminate against

instrumentalities of interstate commerce than to discriminate against the goods that flow through them.

Second, the interstate commerce discriminated against in the flow control cases was not "the solid waste itself," but "rather the service of processing and disposing of it." *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 391 (1994) ("*Carbone*"). As the Supreme Court explained, "the essential vice in laws of this sort" is not that they disrupt the flow of waste, but "that they bar the import of the processing service" by would-be out-of-state servicers. *Id.* at 392. That is exactly the vice of the ROFR statute: It bars out-of-state entities from providing the service of constructing and owning the transmission lines through which electricity flows in interstate commerce, instead preserving that benefit to local transmission owners. "Hoard[ing]" instrumentalities of interstate commerce "for the benefit of local businesses" who want to build and operate them is, if anything, worse than hoarding waste for the benefit of local interests that want to process and dispose of it. *Id.*

Intervenors next argue that the ROFR "reduc[es] competition" rather than "discriminating against" interstate commerce because it "equally precludes in-state entities from competing" with incumbents by giving the ROFR to the entity or entities that connect to the new line. Xcel Br. 38. But both the Supreme Court and this Court have rejected that argument, explaining that a law that "erect[s] an

economic barrier protecting a major local industry against competition from without the State," *Dean Milk Co. v. Madison*, 340 U.S. 349, 354 (1951), is "no less discriminatory because in-state or in-town [would-be competitors] are also covered by the prohibition," *Carbone*, 511 U.S. at 391; *see also Oehrleins*, 115 F.3d at 1384. The certificate-of-need cases on which Intervenors rely do not suggest otherwise. *See* Xcel Br. 38-39. Those cases involved facially *neutral* laws, and concluded only that such laws do not necessarily discriminate against interstate commerce just because they reduce competition. That hardly supports the assertion that facially *discriminatory* laws may escape invalidation if they only "reduce" competition.

Finally, Intervenors argue that the principles set forth in *Carbone* and other cases have "no logical stopping point," and "would require courts to declare unconstitutional every local-monopoly utility" that "distribute[s] electricity to retail consumers." Xcel Br. 40. That ignores the fundamental difference between local utilities and instrumentalities of interstate commerce. Local monopolies providing local services to local residents have co-existed harmoniously with *Dean Milk*, *Carbone*, and other Commerce Clause cases for decades. A state law that gives in-state entities a preference to build transmission lines that are part of a federally regulated and multi-state funded *interstate* grid is fundamentally different from state regulation of local utilities supplying electricity to captive retail customers; not least because the Federal Power Act expressly reserves to the states the ability to regulate

the retail distribution of electricity, while giving the federal government primary authority to regulate interstate transmission.  16 U.S.C. § 824(a)-(b).

**B.**    **The Statute's Preference for Incumbents Discriminates Against Interstate Commerce.**

Intervenors next embrace the District Court's formalistic view that the ROFR law is not facially discriminatory because some of the protected incumbents are headquartered outside Minnesota.  But Intervenors have no response to LSP's point that a law that limited commercial opportunities to companies that already employ Minnesota workers or pay Minnesota taxes would be an obvious Commerce Clause violation, even if some of the favored "incumbents" were headquartered elsewhere.  The result is no different simply because the law's preference is predicated on the ownership of physical assets in Minnesota.

Intervenors likewise have no meaningful response to this Court's decision in *Oehrleins* or the decisions from the Eleventh and First Circuits rejecting their formalistic approach.  In *Oehrleins*, this Court squarely rejected the proposition that "an out-of-state concern that permanently locates an operation within the state is still an 'out-of-state' entity" for Commerce Clause purposes.   115 F.3d at 1376.  Intervenors do not even acknowledge that holding, let alone try to distinguish it.  Instead, they simply note that *Oehrleins* went on to reject the proposition that the Commerce Clause gives out-of-state entities the right to complain about state laws that grant preferences to local interests in wholly *intrastate* markets.  Xcel Br. 43.

8

But *this* case does not involve wholly intrastate commerce. Rather, it involves *only* lines that are part of an *interstate* transmission grid. A law that grants in-state interests an exclusive right to build the electricity equivalent of interstate highways cannot escape Commerce Clause scrutiny just because some of those in-state interests are headquartered out-of-state. Indeed, the favored operator in *Oehrleins* was itself owned by an "out-of-state" company, 115 F.3d at 1377, yet that did not save the part of the ordinance that favored that operator in the *interstate* waste market.

Like the District Court, Intervenors suggest that *Colon Health* compels their cramped definition of an in-state entity. Setting aside the fact that this out-of-circuit decision cannot trump *Oehrleins*, *Colon Health* dealt with an entirely different type of law—a certificate of need law that did not give special treatment to "incumbents" with a pre-existing connection in the state. *Colon Health Ctrs. of Am., LLC v. Hazel*, 813 F.3d 145, 149, 152 (4th Cir. 2016). Under those circumstances, the Fourth Circuit found that it was "reasonable" at the summary judgment stage for one of the party's *experts* to define an "in-state" entity more narrowly for purposes of determining whether the law had the effect of discriminating against interstate

commerce. *Id.* at 153-54. *Colon Health* is thus distinguishable in both its factual and its procedural posture.[1]

## C. The ROFR Discriminates in Its Effects and Purpose.

Even if some of the entities that benefit from the ROFR law do not qualify as "in-state," the law would still be virtually per se invalid because it is discriminatory "in its effect[s]." *Oehrleins*, 115 F.3d at 1383. The vast majority of entities to which the law diverts business are "in-state" companies even under Intervenors' narrow conception of the phrase, as they both operate in and are headquartered in Minnesota. Just as in *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Maine*, 520 U.S. 564, 581 (1997), the benefits of the ROFR statute fall primarily to those in-state companies, while out-of-state companies bear the majority of the burdens. *See also SDDS, Inc. v. State of S.D.*, 47 F.3d 263, 271 n.12 (8th Cir. 1995); *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1, 10-11 (1st Cir. 2010) (finding a law that principally benefits in-state market discriminatory even though it also benefitted some out-of-state companies).

The cases on which Intervenors rely do not suggest otherwise. Xcel Br. 45 (citing *CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69 (1987); *Commonwealth*

---

[1] Intervenors also rely on *Norfolk Southern Corp. v. Oberly*, 822 F.2d 388 (3d Cir. 1987). But that case involved a grandfather clause used to "avoid[] hardship to those who have invested in reliance upon the prior law," *id.* at 404, by protecting them from the operation of a new one. It did not involve an effort to *divert new* business to existing businesses.

*Edison Co. v. Montana*, 453 U.S. 609 (1981)).  Those cases dealt with laws that created *burdens* that applied to *all* in-state and out-of-state entities alike, not laws that created special *benefits* only for in-state entities.  A facially neutral law that imposes on everyone a burden that falls disproportionately on out-of-state actors is obviously quite different from a law that grants a "preference" to a select few entities that disproportionately benefits "local interest[s] at the expense of all others." *Oehrleins*, 115 F.3d at 1385.

Moreover, as *Colon Health* itself demonstrates, even a law that imposes only burdens is constitutionally suspect if those burdens disproportionately exclude out-of-state interests from in-state markets.  While the certificate of need requirement in *Colon Health* was facially neutral, the Fourth Circuit nonetheless analyzed whether it had the effect of "erect[ing] a special barrier to market entry by non-domestic entities."  813 F.3d at 153.  The court found as a factual matter that it did not, *id.*, but its analysis plainly rested on the well-settled rule that facial neutrality will not save a law that, like the ROFR law, operates to preference in-state interests over out-of-state interests.

Finally, the ROFR law discriminates in its purpose, as evidenced by the protectionist statements demonstrating that the legislature's primary concern was to protect local interests.  *See, e.g.*, APP37 (explaining that statute will ensure that returns on transmission projects "flow back to our members as rate payers, as a

benefit to them"); APP42 ("why should we not protect our guys that are responsible for the whole package?"). Intervenors protest that some of these statements came from the law's "supporters" rather than legislators, but statements by supporters may be taken into account when the evidence shows that they "reflect the legislators' views." *State v. Smith*, 899 N.W.2d 120, 130-31 (Minn. 2017).

Intervenors also protest that these statements evince an intent to benefit not just Minnesota transmission companies, but Minnesota residents, but they do not explain why that makes any legal difference. After all, most protectionists like to think they are protecting in-state customers, but the Commerce Clause reflects a different view. *See Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523 (1935) (noting that to allow health and safety concerns to justify discriminatory laws "would be to eat up the rule under the guise of an exception."). In all events, if there is room for debate about the legislature's purpose, that is an inherently factual question that is inappropriate for resolution on a motion to dismiss. LSP has more than sufficiently pleaded that the ROFR statute has a discriminatory purpose. Particularly when combined with the law's evident discriminatory effect, that at the very least entitles LSP to proceed with discovery.

## II. *TRACY* DOES NOT IMMUNIZE MINNESOTA'S ROFR LAW FROM COMMERCE CLAUSE SCRUTINY.

The State principally argues that there is no need to analyze whether the ROFR law is discriminatory because the Supreme Court's decision in *Tracy*

"forecloses" any Commerce Clause challenge to the ROFR law. The State is mistaken. As the United States aptly put it, *Tracy* does not create any "general exception to the dormant Commerce Clause for state laws benefiting public utilities." U.S. Br. 10.

### A. *Tracy* Does Not Immunize Every Law Involving Public Utilities from Commerce Clause Scrutiny.

The State advances the sweeping proposition that *Tracy* immunizes from Commerce Clause scrutiny state laws that grant "local utilities" any kind of preference that relate to "traditional regulated utility services—*i.e.,* energy generation, transmission, and distribution." State Br. 22. That is a radical and untenable expansion of *Tracy*'s narrow holding.

*Tracy* involved a law that benefitted a particular kind of public utility engaged in a particular function—namely, a "local distribution company" "engaged in the business of supplying natural gas." *Tracy*, 519 U.S. at 282 (quotations omitted). The tax preference the Court approved in *Tracy* applied *only* to those public utilities and applied *only* to their retail sales of natural gas, a quintessential issue of state, not federal, regulation.[2]

---

[2] The State maintains that the LDCs in *Tracy* were supplying two distinct products—a "bundled" gas product for captive customers and a non-bundled product for others. State Br. 22-23. That is incorrect. While the LDCs were serving what the Court deemed to be two distinct retail *markets*—captive customers and bulk buyers—they were supplying only one product: a bundled product with state-mandated rights and benefits. *See Tracy*, 519 U.S. at 297.

That alone dooms Appellees' argument that *Tracy* already answered the question presented here, as this case involves neither the retail provision of electricity nor a preference confined to public utilities engaged in that quintessentially local activity. Instead, this case involves almost the opposite end of the local-to-interstate spectrum: the construction of channels of interstate commerce, specifically, high-voltage transmission lines that are "approved for construction in a federally registered planning authority transmission plan" and are part of an *interstate* grid overseen by FERC. Minn. Stat. § 216B.246, Subd. 2. Accordingly, *all* of the transmission lines to which the ROFR law applies—including those owned by vertically integrated public utilities—are subject to *MISO*'s operational control, not Minnesota's. *Midwest ISO Transmission Owners*, 373 F.3d at 1365. Indeed, those lines are not even paid for by Minnesota alone, but rather are paid for by citizens of multiple states through a cost allocation formula established by MISO and approved by FERC. *See* Iowa Br. 2-3 (explaining that Iowa customers will pay for about half of the Huntley-Wilmarth project); APP14-15 at ¶¶41-44. This law is thus manifestly not an effort to regulate local monopoly retail markets; to the contrary, it is an effort to let Minnesota decide the circumstances under which residents of *other* states can benefit from competition for transmission lines that they are helping to fund.

Appellees' analogy to *Tracy* stumbles out of the blocks, as this is not a case about a state law that incidentally affects interstate commerce in the process of directly regulating public utilities in the captive retail market. It is a case about a state law that directly regulates interstate commerce in a way that the State claims is incidentally beneficial to its retail markets. Whatever deference states may get when regulating the local distribution of gas or electricity to captive retail customers, *Tracy* plainly does not shield from Commerce Clause scrutiny discriminatory state laws that directly regulate interstate commerce simply because the State claims that they have some relationship to its retail markets.

The State's attempt to liken the ROFR law to the retail tax preference for public utilities in *Tracy* is particularly misplaced because the ROFR law gives a right of first refusal not just to public utilities serving captive retail customers, but to *any* "incumbent electric transmission owner," be it a vertically integrated public utility like Intervenor Xcel and Amicus Minnesota Power and Otter Tail Power Company, an independent transmission company like Intervenor ITC Midwest, a cooperative like Amicus Great River Energy, or a municipal corporation like Amicus Southern Minnesota Municipal Power Agency. *See* Minn. Stat. § 216B.246, Subd. 1(c); APP20-21 at ¶64. The preference that the ROFR law creates thus is not confined to public utilities that supply electricity at retail. *Tracy* provides no support for the notion that courts must blindly defer to a state's view that granting preferences to *all*

15

in-state participants in some other *interstate* market—without regard to whether they are public utilities that sell electricity to captive retail customers—is somehow essential to its efforts to regulate the retail distribution of electricity by public utilities.

Indeed, the State makes no effort to identify anything in *Tracy* that would allow it to grant a preference to an independent transmission company like ITC Midwest that plays no role in the retail electricity distribution market. Instead, the State effectively asks this Court to ignore that inconvenient aspect of its law, declaring that "the *primary* effect and purpose of the law is to benefit energy utilities performing a core utility function." State Br. 24 (emphasis added). But the fact that neither the ROFR law nor the construction and operation of interstate transmission facilities in Minnesota is confined to "utilities" belies the State's contention that it is regulating "a core utility function." Likewise, the fact that the ROFR law is "overinclusive … in relation to the state interests [it] purportedly serve[s]" is all the more reason to question the State's claim that the law is just about protecting public utilities. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 579 (1993).

The State nonetheless insists that "[t]he mere *possibility* that eliminating the [ROFR] law could impede electricity distribution" compels this Court to uphold it, because *Tracy* declares courts wholly lacking in competence "to assess how

eliminating a utilities law might affect consumers dependent on utilities for energy distribution." State Br. 27-28 (emphasis added). Again, that proposition finds no support in *Tracy*—as evidenced by the fact that *Tracy* did not purport to overrule cases in which the Supreme Court has struck down discriminatory state energy laws under the Commerce Clause notwithstanding efforts to justify them as critical to local energy markets. *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437 (1992); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982).

The State's plea for blanket deference is particularly misplaced given its concession that the federal government could preempt state ROFR laws. *See* State Br. 21, 31; Xcel Br. 33. *Tracy* certainly does not provide any support for the topsy-turvy notion that courts must blindly defer to a state's views on a question on which the state concedes it does not even have ultimate jurisdiction. Moreover, the State's policy arguments in support of its law are considerably undercut by the fact that FERC, the regulator that *does* have jurisdiction over the operation of interstate transmission lines, considered and rejected the same "reliability" arguments that Appellees press now when it eliminated the federal ROFR. The fact that FERC did not share Minnesota's view is a sufficient reason to reject the State's claim that it is entitled to unbridled deference.

Instead, if the ROFR law patently discriminates against interstate commerce (which it does), then just as with any other discriminatory law, it is the State's burden

to prove that it has *no other way* to achieve its ends. *See IESI AR Corp. v. Nw. Ark. Reg'l Solid Waste Mgmt. Dist.*, 433 F.3d 600, 604 (8th Cir. 2006). The State does not and cannot meet that burden, for who will own and operate interstate transmission lines has not been shown to have any actual or potential impact on a public utility's ability to provide electricity to captive retail customers. Accordingly, to the extent there is even any question here of which market "controls," State Br. 23, it is plainly the market that the State is actually regulating: the market for federally approved interstate transmission lines, not the wholly separate captive retail market in which the "incumbents" who benefit from the ROFR law do not even necessarily participate.

**B.** **Appellees' Efforts to Deny Its Discrimination Against Interstate Commerce Are Unavailing.**

Appellees alternatively argue that even if the ROFR law cannot be justified under some non-existent "public utility" exception to the Commerce Clause, the law does not actually discriminate against interstate commerce because LSP is not similarly situated to incumbents, and because incumbents are not really getting that much of a benefit anyway. These arguments fall flat.

Appellees first makes a strained attempt to analogize incumbents to public utilities that are obligated to provide electricity to all retail customers in their service areas, emphasizing that the ROFR law gives the Minnesota PUC the power to require an incumbent to build a regional transmission line even if it would rather not do so,

*see* Minn. Stat. § 216B.246, Subd. 3(b) and that "[n]on-incumbent entities do not face such a possibility," State Br. 18. That argument is entirely circular. Incumbents bear this "burden" only because they are incumbents—that is, because they presently own transmission lines in Minnesota. Were LSP to build a transmission line in Minnesota, it would be subject to exactly the same "burden." The State cannot justify its discrimination by pointing to a distinction that exists only because of that discrimination. Nor can the State shield its pro-incumbent favoritism from Commerce Clause scrutiny by imposing some demands on the incumbents in conjunction with the benefits. Intervenors' invocation of various other state regulatory requirements with which incumbents must comply fail for the same reason. *See* Xcel Br. 26. LSP would have to comply with all those same requirements were it awarded a transmission project; it has not yet done so only because the ROFR law precludes it from competing.

LSP is not trying to "cherry-pick" anything, Xcel Br. 26, let alone to create some sort of de-regulated open-market free for all, with unneeded transmission lines crisscrossing the state at the whim of anyone who wants to build them. *See, e.g.*, EEI Br. 4-6. LSP seeks only the right to compete for the lines to which the ROFR law applies—*i.e.*, regional transmission lines that have already been *approved* by MISO, and that will not be built unless the PUC grants a Certificate of Need and Route Permit. Eliminating the ROFR law would not entitle LSP or anyone else to

build unneeded lines that neither MISO nor the State has approved; it would simply allow LSP to compete subject to the same requirements as incumbents.

Moreover, Appellees' suggestion that the PUC's ability to order an incumbent to build a transmission line is part of some longstanding state-law "regulatory compact" is misleading at best. In fact, that obligation is part of the original contractual compact between MISO and its transmission-owning members, and it would exist with or without Minnesota's ROFR law. Notably, when FERC eliminated the federal ROFR, MISO's members made the same argument that Appellees makes here, insisting that they were entitled to a right of first refusal in exchange for their agreement to take on regional projects if MISO does not find any of the competitive bids acceptable. *See* APP72-74 at ¶248. FERC rejected that argument, finding its "chang[ing of] the package of benefits and burdens currently in place" for transmission owners "necessary to correct practices that may be leading to rates for jurisdictional transmission service that are unjust and unreasonable." APP86 at ¶261. Appellees' contention that the ROFR law is an essential protection for incumbents is thus squarely at odds with FERC's judgment in eliminating it.

Shifting gears, the State suggests that the ROFR law does not really discriminate against LSP because if an incumbent public utility declines to build a MISO-approved line, LSP would be able to compete alongside incumbent independent companies for the right to do so. State Br. 24. But the fact that LSP

could compete if an incumbent declines to *exercise* its right of first refusal does nothing to mitigate the exclusion that the existence of that right enables. *See Oehrleins*, 115 F.3d at 1384-85 (finding the possibility that an operator could receive an exclusion from the law did not "alter the initial immediate purpose and effect" of the law, "which was to grant an absolute preference to a particular local interest at the expense of all others."). The State alternatively suggests that the "incumbency advantage granted to transmission companies" is not that meaningful because even incumbents cannot build a line unless they can obtain the necessary state certificates and permits. State Br. 25. But the suggestion that these state processes put competitive pressure on incumbents is misleading given that MISO has already signed off on the line and the ROFR has eliminated the possibility of competing bids.[3] At any rate, the relevant question under the Commerce Clause is *whether* the law discriminates against interstate commerce. *How much* that discrimination benefits in-state entities at the expense of out-of-state entities is beside the point.

The State protests that "[t]he dormant Commerce Clause does not require Minnesota to ignore the proven efficiency and reliability of an incumbent transmission company[.]" State Br. 26. No one is suggesting that it does. Of course

---

[3] To the extent the State suggests that another entity could be awarded the project through the State's Certificate of Need process, it is simply wrong. Even if another party demonstrates that a better alternative exists, the PUC's only option is to *deny* the Certificate of Need. Minn. Stat. § 216B.243, Subd. 5.

past performance may be taken into account when deciding to whom to award a contract.  *See* Dkt. 61-1 at 633-34.  But the ROFR law goes far beyond taking past performance into account and wholly precludes similarly situated out-of-state transmission companies from even trying to demonstrate that they are just as efficient and reliable.  That is precisely the kind of "preference to … local interest[s] at the expense of all others" that is virtually per se invalid under the Commerce Clause.  *Oehrleins*, 115 F.3d at 1385.  At a minimum, the discrimination against interstate commerce is sufficiently evident to necessitate a remand for a far more "nuanced analysis" of the issue than the District Court conducted.  U.S. Br. 14.

### C.   The State's Efforts to Justify the ROFR as a Historical or Policy Matter Are Unfounded.

With no legal hook to save the ROFR law, Appellants resort to hyperbolic claims that eliminating the law would upend long-settled practice and endanger the reliability of Minnesota's electricity grid.  FERC rejected precisely those arguments when it eliminated the federal ROFR—and for good reason, as they are sorely misplaced.

Appellees first argue, without citation, that the practice of allowing local utilities to build their own transmission lines is so ingrained in the state's history that it cannot be subject to a Commerce Clause challenge.  But that ignores the fact that the ROFR law applies only to *federally* approved transmission lines that are part of the *interstate* grid.  Indeed, the fact that Minnesota's ROFR law replaces a now-

abandoned FERC rule makes it crystal clear that Minnesota is not operating in area

of "traditional local" regulatory authority. *Department of Revenue of Ky. v. Davis*,

553 U.S. 328, 356 (2008).

Appellees' attempts to shoehorn the ROFR law into the states' traditional

authority over "siting and permitting" of transmission lines fare no better.[4]  *See* Xcel

Br. 7-8.  The ROFR law has nothing to do with Minnesota's authority to determine

*where* or *how* a MISO-approved transmission line gets built.  These issues are

covered by Minnesota's Certificate of Need and Route Permit laws and

regulations—laws and regulations with which LSP would have to comply to build a

transmission line in Minnesota.  The ROFR law concerns who will *own* and *operate*

a regional transmission line, which is ultimately a question for MISO, not

Minnesota.  Indeed, the D.C. Circuit squarely rejected the argument that those are

purely local matters when it held that FERC had the power to order ISOs to remove

rights of first refusal from their tariffs.  *See S.C. Serv. Auth. v. F.E.R.C.*, 762 F.3d

41, 74 (D.C. Cir. 2014).

Notably, the only case Appellees (or the District Court) cite for their contrary

claim is this Court's decision in *North Dakota v. Heydinger*, 825 F.3d 912, 922 (8th

---

[4] Notably, even with respect to siting, FERC may override a state siting decision that impedes development of transmission that is located in a national interest electric transmission corridor.  16 U.S.C. § 824p(b).  Thus, even in the siting arena, states do not retain total control.

Cir. 2016), which dealt exclusively with *generation* facilities, a matter explicitly reserved to states by the FPA. *See* 16 U.S.C. § 824(b)(1). The very same provision of the FPA that carves out generation for the states grants *FERC* jurisdiction over "the transmission of electric energy in interstate commerce." *Id.* Thus, neither *Heydinger* nor the FPA provides any support for the notion that states have some longstanding regulatory power to decide who will build transmission lines that are part of an interstate grid. Appellees themselves recognize as much when they acknowledge that the federal government could preempt state ROFR laws. *See* State Br. 21, 31; Xcel Br. 33.

To the extent Appellees argue that FERC's decision not to preempt such laws shields Minnesota's law from Commerce Clause scrutiny, they are mistaken. A federal law or regulation empowers states to discriminate against interstate commerce only when that intention is "unmistakably clear." *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404, 414 (8th Cir. 1985). As the United States correctly explains, *see* U.S. Br. 15, a decision not to preempt laws is manifestly not enough to meet that demanding standard. *See Wyoming*, 502 U.S. at 458. As Commissioner Bay noted, FERC took no position on the constitutionality of state ROFR laws, leaving that matter for the courts to resolve. APP132. The United States emphatically reiterated that point in its amicus brief before this Court,

confirming that "the federal government did not approve Minnesota's ROFR law." U.S. Br. 15 (capitalization altered).

If anything, FERC's actions with respect to rights of first refusal only undermine Appellees' arguments that invalidating the ROFR law would spell the end of electricity distribution as we know it. After all, FERC eliminated the federal ROFR after considering and rejecting all the same reliability and regulatory compact arguments that Appellees press now. And FERC certainly did not condition that decision on any expectation that states would enact their own ROFR laws, or that such laws would survive constitutional scrutiny if they did. Indeed, it is notable that the best support Appellees can muster for their contrary position is the opinion of a *dissenting* FERC commissioner that is not even on point.[5] At a bare minimum, the fact that FERC did not share Minnesota's view that eliminating rights of first refusal would endanger the nation's electricity markets should foreclose the blanket-deference approach the District Court took.

In sum, neither *Tracy* nor any other principle of Commerce Clause jurisprudence shields the ROFR law from scrutiny. Because LSP has shown, or at

---

[5] Commissioner Moeller's dissent did not question FERC's decision to eliminate the ROFR for the transmission projects that LSP seeks to build—*i.e.*, projects deemed necessary to support the efficiency of the grid, which are paid for by multiple states. Rather, he was concerned with projects deemed necessary to support the reliability of the grid, which are a distinct type of project for which MISO currently does not allow competition. In any event, even as to reliability projects, four other FERC Commissioners disagreed with Commissioner Moeller's view.

the very least adequately pleaded, that the ROFR law discriminates against interstate commerce, the District Court's decision must be reversed.

## III.    THE STATUTE FAILS THE *PIKE* BALANCING TEST.

Appellees make no effort to rebut the significant burdens that the ROFR places on LSP individually and interstate commerce in general.  Instead, once again, they argue that this Court should blindly defer to the State's contention that the local benefits of its law outweigh those burdens.  Again, neither *Tracy* nor any other case obviates the need to conduct the balancing that *Pike* requires.  Intervenors cite this Court's decision in *Southern Union Co. v. Missouri Public Service Commission*, 289 F.3d 503 (8th Cir. 2002), but that case involved "*local* public utility rate regulation" and the "*distribution* of natural gas and electricity to *local retail customers.*"  *Id.* at 507, 509 (emphasis added).  By contrast, this case involves the transmission of electricity over federally approved and regulated lines.  Neither *Southern Union* nor any other case says that states are entitled to the same deference when it comes to the ownership and operation of interstate transmission lines.

To the contrary, both the Supreme Court and this Court have cautioned that "the production *and transmission of energy* is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests."  *Ark. Elec. Co-op Corp. v. Ark. Pub. Service Comm'n*, 461 U.S. 375, 377

(1983); *Middle S. Energy, Inc.*, 772 F.2d at 412. Moreover, this Court recently rejected a comparable plea for deference in *North Dakota v. Heydinger*. There too, the state argued that it was entitled to deference because it was "merely regulat[ing] in a traditional area of state authority." 825 F.3d at 922. And even though (unlike here) the state actually was regulating something reserved to the states (generation), this Court still invalidated the law on the ground that it impermissibly regulated economic activities outside of Minnesota. *Id.* *A fortiori*, the State cannot escape *Pike* balancing with a simple plea to deference in this distinctly interstate context. At a minimum, LSP is entitled to proceed with discovery on the relative burdens and benefits of the ROFR statute.

## **CONCLUSION**

LSP respectfully requests that this Court reverse the District Court's decision and either hold that the ROFR Law violates the Commerce Clause or remand for further factual development.

Dated:  February 11, 2019             LOCKRIDGE GRINDAL NAUEN P.L.L.P.

s/Charles N. Nauen
Charles N. Nauen, #121216
David J. Zoll, #0330681
Rachel A. Kitze Collins, #0396555
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Tel:   (612) 339-6900
Fax:   (612) 339-0981
cnnauen@locklaw.com
djzoll@locklaw.com
rakitzecollins@locklaw.com

KIRKLAND & ELLIS LLP
Paul D. Clement
Erin E. Murphy
655 Fifteenth Street, NW
Washington, D.C. 20005-5793
Tel:   (202) 879-5000
Fax:   (202) 879-5200
paul.clement@kirkland.com
erin.murphy@kirkland.com

**ATTORNEYS FOR PLAINTIFF-
APPELLANT LSP TRANSMISSION
HOLDINGS, LLC**

## CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32

The undersigned counsel of record hereby certifies, pursuant to Fed. R. App. P. 32(g), that:

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(ii) because this reply brief contains 6,494 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f); and

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 14.

Dated: February 11, 2019        s/Charles N. Nauen
                                    Charles N. Nauen (#121216)

## CERTIFICATE OF VIRUS FREE

Pursuant to Local Rule 28A(h)(2) of the Eighth Circuit Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief has been scanned for computer viruses and is virus free.

Dated: February 11, 2019        s/Charles N. Nauen
                                      Charles N. Nauen (#121216)

**CERTIFICATE OF SERVICE AND MAILING**

I hereby certify that on February 11, 2019, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

s/Charles N. Nauen
Charles N. Nauen (#121216)