# UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT
_____

LSP TRANSMISSION HOLDINGS, LLC,

*Plaintiff-Appellant*,

v.

KATIE SIEBEN, Commissioner, Minnesota Public Utilities Commission,
DAN M. LIPSCHULTZ, Commissioner, Minnesota Public Utilities Commission,
MATTHEW SCHUERGER, Commissioner, Minnesota Public Utilities Commission,
JOHN TUMA, Commissioner, Minnesota Public Utilities Commission;
VALERIE MEANS, Commissioner, Minnesota Public Utilities Commission,
STEVE KELLEY, Commissioner, Minnesota Department of Commerce, each in
his or her official capacity,

*Defendant-Appellee*,

ITC MIDWEST LLC; NORTHERN STATES POWER COMPANY, doing business as
XCEL ENERGY,

*Intervenors Below-Appellee.*
_____

On Appeal from the United States District Court for the District of Minnesota,
No. 0:17-cv-04490 (DWF/HB)
_____

## PETITION FOR PANEL REHEARING OR REHEARING EN BANC
_____

CHARLES N. NAUEN
DAVID J. ZOLL
RACHEL A. KITZE COLLINS
LOCKRIDGE GRINDAL
  NAUEN P.L.L.P.
100 Washington Avenue, South
Suite 200
Minneapolis, MN 55401

PAUL D. CLEMENT
ERIN E. MURPHY
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
erin.murphy@kirkland.com

*Counsel for Plaintiff-Appellant*

May 8, 2020

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 4

REASONS FOR GRANTING REHEARING ........................................................ 7

I.      The Panel's Artificial Distinction Based On Where Companies With An In-State Presence Are Headquartered Is Foreclosed By Precedent ....................................................................................................... 8

II.     The Panel's Exception To The Commerce Clause For Laws Regulating Electric Transmission Is Foreclosed By Precedent .................... 10

III.    The Panel's Rejection Of LSP's Claims As Unsupported By A Record That LSP Never Got To Make Was Plainly Wrong ........................ 15

CONCLUSION ...................................................................................................... 17

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*,
115 F.3d 1372 (8th Cir. 1997) .......................................................................2, 9

*C&A Carbone, Inc. v. Town of Clarkston*,
511 U.S. 383 (1994) .......................................................................................2

*Camps Newfound/Owatonna, Inc. v. Town of Harrison*,
520 U.S. 564 (1997) .....................................................................................10

*Dean Milk Co. v. City of Madison*,
340 U.S. 349 (1951) ....................................................................................2, 9

*Fla. Transp. Servs. v. Miami-Dade Cty.*,
703 F.3d 1230 (11th Cir. 2012) .......................................................................9

*General Motors Corp. v. Tracy*,
519 U.S. 278 (1997) ....................................................................................3, 13

*Granholm v. Heald*,
544 U.S. 460 (2005) .................................................................................. 2, 8, 9

*Hunt v. Wash. State Apple Advert. Comm'n*,
432 U.S. 333 (1977) .......................................................................................11

*Lebanon Farms Disposal, Inc. v. Cty. of Lebanon*,
538 F.3d 241 (3d Cir. 2008) .........................................................................4, 16

*Lewis v. BT Inv. Managers, Inc.*,
447 U.S. 27 (1980) ..........................................................................................9

*Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*,
772 F.2d 404 (8th Cir. 1985) ........................................................................3, 12

*New England Power Co. v. New Hampshire*,
455 U.S. 331 (1982) ................................................................. 3, 5, 12, 13

*North Dakota v. Heydinger*,
825 F.3d 912 (8th Cir. 2016) ............................................................................3

*Pennsylvania v. West Virginia*,
  262 U.S. 553 (1923)............................................................ 3, 5, 12, 13

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970)....................................................................3

*Pioneer Military Lending, Inc. v. Manning*,
  2 F.3d 280 (8th Cir. 1993)..........................................................16

*S.D. Farm Bureau, Inc. v. Hazeltine*,
  340 F.3d 583 (8th Cir. 2003)......................................................15

*SDDS, Inc. v. South Dakota.*,
  47 F.3d 263 (8th Cir. 1995)........................................................10

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  139 S. Ct. 2449 (2019)........................................................1, 8, 11

*Town of Southold v. Town of East Hampton*,
  477 F.3d 38 (2d Cir. 2007).......................................................4, 16

*United Transp. Union v. Foster*,
  205 F.3d 851 (5th Cir. 2000).....................................................4, 16

*W. Lynn Creamery, Inc. v. Healy*,
  512 U.S. 186 (1994)...................................................................2, 9

*Walgreen Co. v. Rullan*,
  405 F.3d 50 (1st Cir. 2005) ...........................................................9

*Wyoming v. Oklahoma*,
  502 U.S. 437 (1992)......................................................... 3, 5, 12, 13

**Statutes**

16 U.S.C. §824.............................................................................5, 13

16 U.S.C. §824a...............................................................................12

Minn. Stat. §216B.246 .......................................................................6

N.D. Cent. Code §49-03-02 .................................................................6

Neb. Rev. Stat. §70-1028 ....................................................................6

S.D. Codified Laws §49-32-20 ....................................................................6

**Other Authorities**

*Promoting Wholesale Competition Through Open Access*
    *Nondiscriminatory Transmission Services by Public Utilities;*
    *Recovery of Stranded Costs by Public Utilities and Transmitting*
    *Utilities*, 75 FERC ¶61,080 (Apr. 24, 1996) ........................................................5

*Transmission Planning & Cost Allocation by Transmission Owning &*
    *Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶61,051
    (July 21, 2011) ........................................................................................5

**INTRODUCTION**

This case involves an exceptionally important constitutional question with nationwide implications and a panel decision that conflicts with precedent from this Court and the Supreme Court. The panel decision eliminates the Commerce Clause as a restraint on protectionism with respect to an entire sector of distinctly *inter*state commerce—a critical component of the nation's interstate energy markets, no less— even though the Supreme Court "reiterate[d]" just this past year that "the Commerce Clause by its own force restricts state protectionism." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2461 (2019). This Court should grant rehearing to ensure that the Supreme Court's reassurance and precedents apply with full force in this Circuit.

The Minnesota law at issue here grants electric transmission owners with an existing in-state presence a right of first refusal to construct, own, and maintain certain new transmission lines. Those lines are distinctly *inter*state: They connect to an interstate transmission grid, serve an interstate market regulated by the federal government, and are partially funded by out-of-state consumers. They also are classic instrumentalities of commerce: They are the lines through which electricity is transmitted across states. Yet Minnesota insists that they be built by a company with a pre-existing in-state presence. Such a patently discriminatory effort to benefit local interests to the detriment of out-of-state interests is virtually *per se* invalid

under the Commerce Clause.  *See C&A Carbone, Inc. v. Town of Clarkston*, 511 U.S. 383, 392 (1994); *Ben Oehrleins & Sons & Daughter, Inc. v. Hennepin Cty.*, 115 F.3d 1372, 1383 (8th Cir. 1997).

A panel of this Court nonetheless sustained Minnesota's law by embracing positions that are squarely at odds with controlling precedent.  The panel first opined that the law does not discriminate on its face because it distinguishes based on in-state presence rather than residency or in-state ownership.  But that claim conflicts with numerous Supreme Court cases that condemn protectionist preferences for companies with in-state presences without regard to whether the favored in-state entities were owned by out-of-state residents.  *See, e.g.*, *Granholm v. Heald*, 544 U.S. 460, 475 (2005); *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194 (1994); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 352-53 (1951).

The panel next erred in holding that Minnesota's law comports with the Commerce Clause because it is an exercise of the police power over the regulation of the siting, permitting, and constructing of transmission lines.  That is a *non sequitur*.  That a state is acting within its police powers simply means that its law is not *ultra vires*.  It does not mean that the state is free to discriminate in favor of in-state interests.  Indeed, the Supreme Court and this Court have long held that the Commerce Clause applies with full force to laws enacted pursuant to a state's police powers over the energy markets.  *See, e.g.*, *Wyoming v. Oklahoma*, 502 U.S. 437

(1992); *New England Power Co. v. New Hampshire*, 455 U.S. 331 (1982); *Pennsylvania v. West Virginia*, 262 U.S. 553 (1923); *North Dakota v. Heydinger*, 825 F.3d 912 (8th Cir. 2016); *Middle S. Energy, Inc. v. Ark. Pub. Serv. Comm'n*, 772 F.2d 404 (8th Cir. 1985). The only context in which the Supreme Court has concluded that the Federal Power Act ("FPA") alters that calculus is state regulation of captive retail markets. *See General Motors Corp. v. Tracy*, 519 U.S. 278 (1997). This case does not involve captive retail customers, and the panel wisely declined the state's invitation to extend *Tracy*'s holding to *interstate* transmission markets, which the FPA expressly reserves for *federal*, not state, regulation. But properly eschewing *Tracy* left the panel without any rationale for its holding—or at least without any rationale consistent with Supreme Court decisions striking down comparable efforts to discriminate in interstate energy markets.

Finally, the panel compounded these mistakes by faulting LSP for failing to produce a sufficient "record" to support a finding of discriminatory purpose or undue burdens under *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). That is a glaring mistake, as this case was resolved *against LSP on a motion to dismiss*. LSP's efforts to assemble the "record" that the panel found inadequate were pretermitted by the state's motion to dismiss. As numerous courts have held, the fact-intensive inquiries involved in the discriminatory purpose and *Pike* analyses should not be decided on the pleadings. *See, e.g.*, *United Transp. Union v. Foster*, 205 F.3d 851, 863 (5th Cir.

2000); *Lebanon Farms Disposal, Inc. v. Cty. of Lebanon*, 538 F.3d 241, 252 (3d Cir. 2008); *Town of Southold v. Town of East Hampton*, 477 F.3d 38, 52 (2d Cir. 2007). In all events, LSP cannot be faulted for the lack of a "record" when it was on the losing end of a motion to dismiss.

In short, the panel decision is wrong on all fronts and sanctions the exact kinds of burdens on interstate commerce that the Commerce Clause guards against. Indeed, as a direct consequence of Minnesota's law, a $150 million interstate transmission project that will be paid for primarily by consumers in Iowa was awarded to one of Minnesota's preferred in-state entities, completely bypassing a competitive selection process. Left standing, the decision below will allow such results to proliferate—particularly given that Minnesota's protectionist law has been copied by other states in this Circuit and precipitated the kind of race-to-the-bottom the Commerce Clause protects against. And that is to say nothing of the many other sectors in which states could deprive consumers of the benefits of competition under the panel's reasoning. This Court should grant rehearing or rehearing *en banc*.

## BACKGROUND

Congress enacted the FPA in 1935 to regulate the interstate market for electricity. The FPA gives the Federal Energy Regulatory Commission ("FERC") exclusive jurisdiction over the interstate transmission and wholesale sale of electricity, but leaves to states the regulation of retail sales and of certain facilities

used only in intrastate commerce.  16 U.S.C. §824(b)(1).  While states also may regulate the siting, permitting, and construction of transmission and generation facilities used in interstate commerce, the Supreme Court has repeatedly made clear that state energy regulations remain constrained by the Commerce Clause, striking down laws that discriminated against interstate commerce even when states argued that they were necessary to their local retail markets.  *See, e.g.*, *Wyoming*, 502 U.S. at 456-57; *New England Power*, 455 U.S. at 339; *cf. Pennsylvania*, 262 U.S. at 596-600.

Over the past 30 years, FERC has issued several orders to promote the development of competitive interstate markets.  *See, e.g.*, *Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 75 FERC ¶61,080 (Apr. 24, 1996).  Most relevant for present purposes is FERC Order No. 1000, which required FERC-jurisdictional entities to eliminate anticompetitive rights of first refusal for transmission lines that are part of an interstate grid and are paid for by consumers across multiple states in the region.  *See Transmission Planning & Cost Allocation by Transmission Owning & Operating Pub. Utils.*, Order No. 1000, 136 FERC ¶61,051, ¶¶260, 266, 342-44 (July 21, 2011).

Minnesota is part of the Midcontinent Independent System Operator ("MISO"), which eliminated rights of first refusal for these regional, cost-allocated

projects following Order No. 1000. Op.3. Minnesota (along with many other states in this Circuit) immediately responded by enacting the same rights of first refusal that FERC had just ordered eliminated. *See* Minn. Stat. §216B.246, subdiv. 1(c); S.D. Codified Laws §49-32-20; N.D. Cent. Code §49-03-02.2; Neb. Rev. Stat. §70-1028(1) (2013). Under Minnesota's right-of-first-refusal law, "[a]n incumbent electric transmission owner has the right to construct, own, and maintain an electric transmission line that has been approved for construction in a federally registered planning authority transmission plan and connects to facilities owned by that incumbent electric transmission owner." Minn. Stat. §216B.246, subdiv. 2. The law thus on its face grants entities that already have an in-state presence a special preference to construct new transmission lines that are part of the *federally* regulated interstate grid.

LSP challenged Minnesota's law under the Commerce Clause, arguing that it discriminates against out-of-state interests on its face and in its effects and purpose. The district court granted the state's motion to dismiss, and the panel affirmed (albeit on substantially different grounds). Op.10. The panel first opined that the law does not discriminate on its face because it favors incumbents, a few of which are owned by out-of-state companies. Op.10-14. The panel next embraced the novel proposition that the law is immune from Commerce Clause scrutiny because Minnesota has police powers over the siting, permitting, and construction of

transmission lines.  Op.15.  Finally, notwithstanding that LSP's complaint had been dismissed before discovery, the panel held that LSP's discriminatory purpose and *Pike* balancing claims failed on the "record" before it.  Op.15, 18.

## REASONS FOR GRANTING REHEARING

The panel's decision embraces sweeping positions that find no support in Supreme Court or Eighth Circuit precedent and effectively gives states free rein to blatantly discriminate against interstate commerce.  According to the panel, a law that expressly favors companies with an existing in-state presence does not discriminate against out-of-state interests so long as some of those in-state incumbents are incorporated or owned by shareholders out of state.  That decision conflicts with numerous decisions of this Court and the Supreme Court.  The panel's holding that interstate transmission projects paid for by customers across multiple states are immune from Commerce Clause scrutiny is even further afield— particularly given that the panel expressly eschewed reliance on a case that provides a far narrower immunity.  To forswear reliance on *Tracy* in favor of a theory that would immunize not only the law in *Tracy*, but countless other laws, does not work.  Finally, the panel faulted LSP for failing to produce a "record" supporting its discriminatory purpose and *Pike* claims when LSP was on the losing end of a motion to dismiss *on the pleadings*.  The Court should grant rehearing to correct that obvious error, to eliminate conflicts with Supreme Court and Eighth Circuit precedent, and

to prevent Minnesota from frustrating FERC's efforts to restore competition to the nation's interstate transmission markets.

## I. The Panel's Artificial Distinction Based On Where Companies With An In-State Presence Are Headquartered Is Foreclosed By Precedent.

By granting an express preference for entities with an existing presence to construct and operate new transmission lines that serve and are paid for by consumers across multiple states, Minnesota's law discriminates against interstate commerce on its face. Indeed, the law is not materially different from the Tennessee law that the Supreme Court just held "plainly favors Tennesseans over nonresidents" in violation of the Commerce Clause. *Tenn. Wine*, 139 S. Ct. at 2462. Just as Tennessee reserved the right to own or operate liquor stores to its own residents, Minnesota reserves initial rights to build and operate new transmission lines to entities with an in-state presence. If Tennessee had reserved new liquor licenses to "incumbents" who already owned liquor stores in Tennessee, the discrimination would have been just as patent, even if some of the "incumbent" stores were owned by out-of-state corporations. Minnesota's law is, if anything, even more pernicious, as it effectively forces out-of-state consumers to subsidize Minnesota's preference for in-state incumbents. In short, Minnesota's law is blatantly discriminatory and thus virtually *per se* invalid. *See, e.g.*, *Granholm*, 544 U.S. at 474 (finding unconstitutional state law that "grants in-state wineries access to the State's consumers on preferential terms").

The panel nonetheless deemed the law nondiscriminatory, observing that its incumbency preference "applies evenhandedly to all entities, regardless of whether they are Minnesota-based entities or based elsewhere." Op.13. But both Supreme Court and Eighth Circuit precedent foreclose any argument that facial discrimination against out-of-state competitors may be excused so long as some of the facially preferred in-state interests are incorporated, headquartered, or have shareholders in another state. In *Granholm*, for example, the Supreme Court invalidated a New York law that allowed wineries with an in-state presence to ship wine directly to consumers but prohibited out-of-state wineries from doing the same. The Court did not even ask whether the New York wineries were owned by New York citizens, by out-of-state corporations, or even by foreign nationals. *Granholm*, 544 U.S. at 475. Nor did the Supreme Court or this Court ask that question in any of the other cases that invalidated laws that discriminated in favor of entities with existing in-state presences. *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 194; *Dean Milk*, 340 U.S. at 352-53; *Ben Oehrleins*, 115 F.3d at 1386-87; *Fla. Transp. Servs. v. Miami-Dade Cty.*, 703 F.3d 1230, 1259 (11th Cir. 2012); *Walgreen Co. v. Rullan*, 405 F.3d 50, 52 (1st Cir. 2005). As these cases make clear, "discrimination based on the extent of local operations is itself enough to establish the kind of local protectionism" that is virtually *per se* invalid. *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 42 n.9 (1980).

In all events, even if it mattered where companies are headquartered when a state favors those with an in-state presence, Minnesota's law still could not stand, for the overwhelming majority of favored incumbents are Minnesota companies. Op.18 (citing LSP Compl.22). Indeed, of the 16 entities with an in-state presence, 11 are headquartered in Minnesota, and the four largest own a combined 79% of the transmission assets in the state. App.22-23 ¶67. Laws have the effect of discriminating against interstate commerce when the majority of the benefits inure to in-state entities. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564 (1997); *SDDS, Inc. v. South Dakota.*, 47 F.3d 263, 267 (8th Cir. 1995). Because Minnesota's law has that effect even ignoring companies headquartered outside the state, there is no escaping the conclusion that it is discriminatory.

## II. The Panel's Exception To The Commerce Clause For Laws Regulating Electric Transmission Is Foreclosed By Precedent.

The panel seemed to acknowledge that laws can be discriminatory even if they restrain some in-state entities, Op.13, and it disclaimed reliance on where incumbents are headquartered, Op.14 n.7. But that leaves its opinion resting on the untenable notion that a law that is discriminatory on its face and in its effects is nonetheless consistent with the Commerce Clause if it is enacted pursuant to a state's power to regulate "siting, permitting, and constructing transmission lines." Op.15; *see also, e.g.*, Op.12 n.6, 13, 16. That effort to carve an entire sector of interstate

commerce out for discriminatory treatment flouts decades of Supreme Court and Eighth Circuit precedent.

To the extent the panel meant to suggest that a state law survives Commerce Clause scrutiny so long as it is a valid exercise of the police power, that sweeping proposition is a non-starter. As the Supreme Court explained decades ago, if "a finding that state legislation furthers matters of legitimate local concern" sufficed to "end the inquiry," then that "would mean that the Commerce Clause of itself imposes no limitations on state action," *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350 (1977)—a proposition that the Court once again definitively rejected just this past year, s*ee Tenn. Wine*, 139 S. Ct. at 2461. While the Commerce Clause does not empower courts to inquire into the metes and bounds of state police powers, neither does it excuse discrimination against interstate commerce just because a law is not *ultra vires*.

To the extent the panel created a special immunity from Commerce Clause scrutiny for state laws involving "siting, permitting, and constructing transmission lines," Op.15, that conclusion fares no better. There is no exception to the Commerce Clause for state regulation of energy markets—let alone for aspects of those markets that the FPA expressly grants *to FERC*. As this Court has explained, while "[t]he regulation of utilities is one of the most important of the functions traditionally associated with the police power of the states," the "production and

transmission of energy is an activity particularly likely to affect more than one state"—especially when a state chooses, as Minnesota has, to meet its energy needs by connecting to the interstate grid. *Middle S. Energy*, 772 F.2d at 412. States thus have no more power to favor in-state interests in this context than in any other. *Id.*

If anything, states have less power to impose protectionist preferences on who may construct interstate transmission lines, for the FPA expressly reserves that market to FERC. *See* 16 U.S.C. §824a. While states may still have siting and other powers over transmission facilities, just as they still have siting and other powers over generation facilities, state regulations of transmission facilities that connect to the interstate grid are no more immune from Commerce Clause scrutiny than state regulations of generation facilities that sell electricity at wholesale. *See, e.g.*, *Wyoming*, 502 U.S. at 454-59 (invalidating Oklahoma law requiring coal-fired electric utilities to burn coal mixture containing at least 10% Oklahoma-mined coal); *New England Power*, 455 U.S. at 339 (invalidating New Hampshire law requiring hydroelectric generators to obtain state approval to transmit energy out of state); *cf. Pennsylvania*, 262 U.S. at 596-600 (invalidating West Virginia law requiring pipeline companies to serve in-state consumers first). In short, no one disputes that the state has the police power to impose permitting and other regulatory requirements on those who build or operate transmission lines in Minnesota. The

state just cannot use its police powers to impose requirements that discriminate against out-of-state interests.

The only case the state has offered in support of its contrary argument is *Tracy*, yet the panel expressly declined to embrace the district court's view that *Tracy* immunizes from Commerce Clause scrutiny all state laws that regulate some aspect of the energy market. And rightly so, as *Tracy* plainly did not establish such a remarkable proposition. If it had, the Court would have had to overrule nearly a century of Commerce Clause cases invalidating state efforts to justify discrimination in the energy or gas markets as necessary to the effective regulation of their retail markets. *See, e.g.*, *Wyoming*, 502 U.S. at 454-59; *New England Power*, 455 U.S. at 339; *Pennsylvania*, 262 U.S. at 596-600. Unsurprisingly, *Tracy* did not purport to do anything so radical.

*Tracy* instead just addressed one very narrow sphere of state regulation—namely, direct regulation of retail gas (and, by implication, electricity) sales to a captive local market, a subject that the FPA expressly reserves to the states. *See* 16 U.S.C. §824(b)(1). Because the nation's retail gas markets, like its retail electricity markets, were historically served by local monopolies, the Court concluded that by reserving authority over retail sales to the states, Congress preserved "the States' interest in protecting the captive market from the effects of competition." *Tracy*, 519 U.S. at 306. Ohio's sales tax exemption for gas purchased from a local

monopoly distributor thus did not run afoul of the Commerce Clause, for it was a direct effort to protect from competition the captive retail market over which local distributors had (with Congress's approval) been granted monopolies.

*Tracy* might aid the state if LSP were trying to eliminate (or extend) a preference in the *retail* electricity markets to all transmission companies simply because some Minnesota retail companies also own transmission. But that is not what is going on here, as Minnesota's law manifestly does not regulate the sale of electricity to local customers by local monopoly distributors. It regulates almost the opposite end of the local-to-interstate spectrum: who may construct and operate transmission lines that are part of an *interstate* grid. Indeed, the law expressly applies *only* to lines on the federally regulated interstate grid, not to purely local projects. And the state claims that it may extend its special powers over the *retail* market to this entirely different market simply because it may have some connection to retail. The better analogy thus is if, instead of declining to extend to bulk gas sellers the tax exemption for local monopoly sales, Ohio had created a tax exemption for wholesale gas sales by any Ohio-based entity. *Tracy* would in no way excuse such blatant protectionism in an interstate market.

That conclusion should have been readily apparent even before *Tennessee Wine*, but it is particularly straightforward after it. If a constitutional amendment that expressly reserves alcohol regulation to the states cannot immunize laws from

14

Commerce Clause scrutiny, then it is hard to see how a Supreme Court opinion that had nothing to do with transmission could empower states to discriminate in an interstate market that the FPA expressly reserves to FERC.  Simply put, Minnesota cannot decide to use the interstate grid to meet its energy needs and then force its sister states to subsidize its preference to reserve new transmission lines to companies with a Minnesota presence.

## III.  The Panel's Rejection Of LSP's Claims As Unsupported By A Record That LSP Never Got To Make Was Plainly Wrong.

Finally, the panel's holding that the "record" does not support a finding of discriminatory purpose or undue burden under *Pike* balancing is unsustainable.  LSP was on the losing end of a motion to dismiss, so LSP was denied the chance to develop a record.  Its only obligation at this stage was to plead allegations sufficient to support its discriminatory purpose and *Pike* claims, which it plainly did.

The panel's error in faulting a motion-to-dismiss loser for an insufficient record started with LSP's discriminatory purpose claim.  The panel acknowledged, as it must, that there is a factual dispute over the law's purpose.  Even the *absence* of evidence to support the legislature's professed purpose is indicative of discriminatory purpose, *see S.D. Farm Bureau, Inc. v. Hazeltine*, 340 F.3d 583, 594 (8th Cir. 2003), and here, there is ample evidence that the legislature's intent was in fact discriminatory, *see* App.34-37, 47.  That the panel could not resolve this

question in LSP's favor "[o]n this record," Op.15, thus provided no basis to affirm dismissal of LSP's claim before it could assemble a record.

The panel's holding on *Pike* balancing was even more glaring. There too, the panel affirmed dismissal on the ground that "this record does not establish that" the law fails *Pike* balancing. Op.18. But, again, LSP was never able to make its record because its claims were dismissed on the pleadings. Numerous courts of appeals have correctly held that *Pike* balancing should not be decided "on the basis of an empty record." *Foster*, 205 F.3d at 863; *see also Lebanon Farms*, 538 F.3d at 252; *Town of Southold*, 477 F.3d at 52. This case is no exception.

After all, Minnesota's law plainly burdens interstate commerce, as it wholly precludes companies like LSP from competing for interstate transmission lines that serve (and are paid for by) a multistate region if the lines are located in Minnesota. *See, e.g.*, *Pioneer Military Lending, Inc. v. Manning*, 2 F.3d 280, 283 (8th Cir. 1993). And that burden cannot be *categorically* outweighed by the state's interest in regulating utilities, for to hold otherwise would be to commit the same mistake just explained in Part II. The decision below thus impermissibly short-circuits not only the discrimination inquiry, but the *Pike* inquiry too. The Court should grant rehearing so that, at a minimum, LSP can fully develop a full record on whether Minnesota really can force its sister states to subsidize its preference to foreclose competition for interstate transmission lines.

## CONCLUSION

For the foregoing reasons, this Court should grant rehearing or rehearing *en banc*.

Respectfully submitted,

s/Erin E. Murphy

CHARLES N. NAUEN
DAVID J. ZOLL
RACHEL A. KITZE COLLINS
LOCKRIDGE GRINDAL
  NAUEN P.L.L.P.
100 Washington Avenue, South
Suite 200
Minneapolis, MN 55401

PAUL D. CLEMENT
ERIN E. MURPHY
KASDIN M. MITCHELL
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 389-5000
erin.murphy@kirkland.com

*Counsel for Plaintiff-Appellant*

May 8, 2020

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 35(b)(2)(A), I hereby certify that the textual portion of the foregoing brief (exclusive of the disclosure statement, tables of contents and authorities, certificates of service and compliance, but including footnotes) contains 3,888 words as determined by the word counting feature of Microsoft Word 2016.

Pursuant to Circuit Rule 28A(h), I also hereby certify that electronic files of this Brief and accompanying Addendum have been submitted to the Clerk via the Court's CM/ECF system. The files have been scanned for viruses and are virus-free.

s/Erin E. Murphy
Erin E. Murphy

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2020, I electronically filed the foregoing with

the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit

by using the CM/ECF system. I certify that all participants in this case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

s/Erin E. Murphy
Erin E. Murphy
